# EXHIBIT A

1          UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

3        HONORABLE JOHN F. WALTER, U.S. DISTRICT JUDGE

4

5   UNITED STATES OF AMERICA,          )
                                       )
6              Plaintiff,              )    Case No.
                                       )
7         vs.                          )    CR 15-131-JFW
                                       )
8   TEOFIL BRANK,                      )
                                       )
9              Defendant.              )
    _____)

10

11

12

13                  REPORTER'S TRANSCRIPT OF
                         TRIAL DAY 1
                    TUESDAY, JULY 7, 2015
14                       P.M. SESSION
                    LOS ANGELES, CALIFORNIA

15

16

17

18

19

20

21

22   _____

23           MIRANDA ALGORRI, CSR 12743, CRR
              FEDERAL OFFICIAL COURT REPORTER
24            312 NORTH SPRING STREET, ROOM 435
               LOS ANGELES, CALIFORNIA 90012
25                MIRANDAALGORRI@GMAIL.COM

                   UNITED STATES DISTRICT COURT

```
 1              APPEARANCES OF COUNSEL:

 2

 3    FOR THE PLAINTIFF:

 4         STEPHANIE YONEKURA
           United States Attorney
 5         BY:  KIMBERLY DENISE JAIMEZ
           BY:  EDDIE JAUREGUI
 6         BY:  RYAN WHITE
           Assistant United States Attorney
 7         United States Courthouse
           312 North Spring Street
 8         Los Angeles, California 90012

 9

10    FOR THE DEFENDANT:

11         HILARY L. POTASHNER
           Federal Public Defender
12         BY:  SEEMA AHMAD
           BY:  ASHFAQ G. CHOWDHURY
13         Deputy Federal Public Defender
           Central District of California
14         321 East Second Street
           Los Angeles, California 90012
15

16
      FOR THE VICTIM:
17
           SIDLEY AUSTIN, LLP
18         BY:  DOUGLAS A. AXEL
           BY:  ANAND SINGH
19         555 West Fifth Street
           Suite 4000
20         Los Angeles, California 90013

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

1                        M A S T E R   I N D E X

2

3                   TUESDAY, JULY 7, 2015, P.M. SESSION

4

5                   Chronological Index of Witnesses

6
    Government's                                                    Voir
7   Witnesses:            Direct   Cross   Redirect   Recross   Dire

8   Sterle, Sean            25      48

9   Saul, M. Scott          50      71       75

10  Burns, Donald           78

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                              EXHIBITS

 2

 3              TUESDAY, JULY 7, 2015, P.M. SESSION

 4
                               For        In       Withdrawn
 5    Exhibits          Identification  Evidence  or Rejected

 6    101  Text message from     10          10
           Defendant to D.B.
 7
      102  Letter from Bulholtz  10          10
 8         To D.B.

 9    103  Email from Ginger     10          10
           Gibas
10
      104  Colt Revolver Owner   10          10
11         Registration

12    108  FBI Extraction Report 10          10

13    109  Audi Title Transfer   10          10

14    110  Audi Florida Title    10          10

15    111  Text message from     10          10
           Yim to Defendant
16
      115  Tweet Screenshot      10          10
17
      116  Picture of Samsung    10          10
18         Phone 916-420-7906

19    119  D.B. E-mail to        10          10
           Defendant Referrals
20
      120  D.B. E-mail to        10          10
21         Defendant Test Results

22    127  Stroz Friedberg Phone 10          10
           Extractions
23
      128  Marine Investco Cert  10          10
24         Of Formation

25    130  Samsung Text Messages 10          10
           With D.B
```

**UNITED STATES DISTRICT COURT**

EXHIBITS CON'T

| Exhibits | | For Identification | In Evidence | Withdrawn or Rejected |
|---|---|---|---|---|
| 131 | Samsung Extraction Report | 10 | 10 | |
| 132 | Audi r8 Authorization | 10 | 10 | |
| 133 | Western Union E-mail | 10 | 10 | |
| 135 | Wells Fargo Screenshot | 10 | 10 | |
| 136 | Picture of Title "GIFT" | 10 | 10 | |
| 137 | Transfer of Title by By Seller | 10 | 10 | |
| 138 | Title Transfer Info | 10 | 10 | |
| 144 | Web History Re X-ray Proof Bag | 10 | 10 | |
| 150 | Photo of Deft inside r8 | 10 | 10 | |
| 153 | Photo of Deft at Starbucks | 10 | 10 | |
| 154 | Photo of Deft at Starbucks | 10 | 10 | |
| 155 | Photo of Deft at Starbucks | 10 | 10 | |
| 156 | Photo of Deft at Starbucks | 10 | 10 | |
| 157 | Photo of Deft in Audi r8 | 10 | 10 | |
| 158 | Property Receipt of Ammunition | 10 | 10 | |
| 166 | Photo of Protective Glasses | 10 | 10 | |

UNITED STATES DISTRICT COURT

EXHIBITS CON'T

| Exhibits | | For Identification | In Evidence | Withdrawn or Rejected |
|---|---|---|---|---|
| 167 | Photo of Protective Gear | 10 | 10 | |
| 168 | Photo of Ammunition Bag | 10 | 10 | |
| 174 | Jarec Wentworth Twitter Page Profile | 10 | 10 | |
| 175 | Cell Site Map | 10 | 10 | |
| 177 | Toll Records for 916-420-7906 | 10 | 10 | |
| 178 | Extraction Report for J. Griggs Phone | 10 | 10 | |
| 201 | Consensual Recording CD | 10 | 10 | |
| 201A | Transcript of Ex 201 | 10 | 10 | |
| 202 | UCE Video | 10 | 10 | |
| 202A | Transcript of Ex 202 | 10 | 10 | |
| 402 | BOP Approved Contact List | 10 | 10 | |
| 403 | E-mail Defendant to Buholtz | 10 | 10 | |
| 404 | E-mail Defendant to Garner | 10 | 10 | |
| 405 | E-mail Defendant to Hattig | 10 | 10 | |
| 406 | E-mail Defendant to Hattig | 10 | 10 | |
| 407 | E-mail Defendant to Garner | 10 | 10 | |

EXHIBITS CON'T

| Exhibits | | For Identification | In Evidence | Withdrawn or Rejected |
|---|---|---|---|---|
| 408 | E-mail Defendant to Buholtz | 10 | 10 | |
| 409 | E-mail Defendant to Buholtz | 10 | 10 | |
| 501 | Wire Transfer Stip | 10 | 10 | |
| 502 | Phone Usage Stip | 10 | 10 | |
| 601 | Gun Bag | 10 | 10 | |
| 604 | Defendant's Samsung Phone | 10 | 10 | |
| 701 | Diagram of Starbucks | 10 | 10 | |
| 105 | Goldman Sachs Records | 11 | 11 | |
| 106 | Reserved | 11 | 11 | |
| 107 | Goldman Sachs Custodian of Records | 11 | 11 | |
| 113 | Wells Fargo Statement | 11 | 11 | |
| 114 | Wells Fargo Custodian Of Records Declaration | 11 | 11 | |
| 121 | Wells Fargo Statement Savings | 11 | 11 | |
| 122 | Wells Fargo Custodian Of Records Declaration | 11 | 11 | |
| 123 | Wells Fargo Statement | 11 | 11 | |
| 124 | Wells Fargo Statement | 11 | 11 | |
| 125 | Wells Fargo Custodian Of Records Declaration | 11 | 11 | |
| 117 | T-Mobile Subscriber Information | 11 | 11 | |

UNITED STATES DISTRICT COURT

```
 1                        EXHIBITS CON'T

 2
                                      For        In      Withdrawn
 3     Exhibits               Identification  Evidence  or Rejected

 4     118  T-Mobile Custodian of    11           11
            Records Declaration
 5
       129  Twitter Custodian of     11           11
 6          Records Declaration

 7     170  Tweets 205-206           11           11

 8     172  Tweets Referencing       11           11
            Android Platform
 9
       173  Twitter Subscription     11           11
10          Information

11     134  MMS Message from Deft    63           63
            To Helena Luciano
12
       139  MMS Message of Audi      63           63
13          Photo

14     140  MMS Message of Audi      64           64
            Photo
15
       141  MMS Message of Audi      64           64
16          Photo

17     143  MMS Message of Audi      64           64
            Photo
18
       142  MMS Message of Audi      65           65
19          Photo

20     145  Unidentified             65           65

21     146  Audi Photograph          65           65

22     147  Audi Photograph          65           65

23     148  Audi Photograph          66           66

24     149  Audi Photograph          66           66

25
```

**UNITED STATES DISTRICT COURT**

EXHIBITS CON'T

| Exhibits | For Identification | In Evidence | Withdrawn or Rejected |
|---|---|---|---|
| 151  Audi Pics of Deft With Yim | 66 | 66 | |
| 501  Stipulation | 108 | | |

**UNITED STATES DISTRICT COURT**

```
 1              LOS ANGELES, CALIFORNIA; TUESDAY, JULY 7, 2015
                              1:27 P.M.
 2                               ---

 3         (The following proceedings were held in

 4         open court out of the presence of the jury:)

 5              THE COURT:  All right.  We're on the record.  The

 6    jury is not present, and apparently the defendant is not

 7    present.  There's a matter that I want to discuss, and it's

 8    about exhibits.  So I don't think the defendant's presence is

 9    necessary unless you feel uncomfortable proceeding without the

10    defendant.

11              MS. AHMAD:  We can proceed, Your Honor.

12              THE COURT:  All right.  I wanted to make a record,

13    based upon the filings, with respect to the exhibits that have

14    been preadmitted.  I'm going to use document no. 238 which was

15    filed on July 1st, 2015.  The following exhibits will be

16    preadmitted:

17         101 to 104, 108 to 111, 115-116, 119 to 120, 127 to 128,

18    130 to 133, 135 to 138, 144, 150, 153 to 154, 155 to 158, 166

19    to 168, 174 to 175, 177 to 178, Exhibit 201, 201-A, 202, 202-A,

20    402 to 409, 501 to 502, 601, 604, and 701.

21         (Marked for identification and received

22          into evidence Exhibit Nos. 101 to 104, 108

23          to 111, 115-116, 119 to 120, 127 to 128,

24          130 to 133, 135 to 138, 144, 150, 153 to

25          154, 155 to 158, 166 to 168, 174 to 175,
```

UNITED STATES DISTRICT COURT

```
1          177 to 178, 201, 201-A, 202, 202-A,

2          402 to 409, 501 to 502, 601, 604, and 701.)

3             THE COURT:  I didn't quite understand the document

4    that you provided me this morning which is the second category

5    which is headed "business records" to which the defendants have

6    not objected.  I went through the pretrial exhibit stipulation,

7    and there were no objections to those exhibits.  So I intend to

8    admit those exhibits which will be exhibits 105 and 107,

9    exhibits 113 to 114, exhibits 121 to 125, exhibits 117 to 118,

10   and exhibits 129, 170 to 173.  So I think I've covered that.

11          (Marked for identification and received

12          into evidence Exhibit Nos. 105 and 107, 113

13          to 114, 121-125, 117 to 118, 129, 170, 172,

14          173.)

15             MR. CHOWDHURY:  Your Honor, I'm not sure I got

16   everything on that list.

17             THE COURT:  It's basically on the list that --

18             MR. CHOWDHURY:  Okay.  I'll just check it.

19             THE COURT:  I just restated it for the record

20   because it's important that we have it in the record because

21   it's not a filing.

22             MR. CHOWDHURY:  Got it.  Thank you.

23             THE COURT:  Do you need a copy?

24             MR. CHOWDHURY:  I've got it.

25             MS. AHMAD:  We do, Your Honor.
```

12

1              THE COURT:  I don't know if I advised counsel or

2    not, but that lectern does not turn.  So if you're up there

3    trying to turn it, it's going to be an impossible feat.

4              MR. JAUREGUI:  Your Honor, I may have made one error

5    on that exhibit list.  May I confer with counsel about one

6    exhibit?

7              THE COURT:  Sure.

8         (Counsel confer.)

9              MR. JAUREGUI:  Okay, Your Honor.  I did make a

10   mistake.

11             THE COURT:  You did or did not?

12             MR. JAUREGUI:  I did.  In the 170 to 173 series of

13   exhibits, defense counsel did object to no. 171, and they

14   maintain their objection to that exhibit.

15             THE COURT:  Okay.

16             MR. JAUREGUI:  Thank you, Your Honor.

17             THE COURT:  All right.  The defendant is present.

18   Let's bring in the jury and hear the opening statements of

19   counsel.

20        (The following proceedings were held in

21         open court in the presence of the jury:)

22             THE COURT:  All right.  Welcome back, ladies and

23   gentlemen.  We're now going to hear the opening statements of

24   counsel.  We'll begin with the Government counsel.

25        You may proceed.

1         MR. JAUREGUI:  Thank you, Your Honor.

2      "I can bring your house down, Don."  "I have a Twitter and

3  your photos and lies can be made, or maybe it's the truth."

4  "What people will read and see of you, wow, I guess I hold the

5  cards right now."  "I want a new car, a motorcycle, and both

6  hands full of cash.  Then I will erase it and you."

7         That is how the defendant in this case, Teofil Brank, also

8  known as Jarec Wentworth, initiated his plot to extort

9  Donald Burns of $1.5 million and a car worth $180,000.  At the

10  time the defendant was a pornographic actor and on the side an

11  escort.  He got paid to have sex with men and eventually to

12  introduce other young men to the prostitution business.  The

13  defendant's victim, Donald Burns, was and is a wealthy

14  businessman, a CEO, a board chairman, a donor to political and

15  social causes.

16         Burns is openly gay, but as you will hear, he had lots of

17  skeletons in his closet.  You see, Burns had a taste for young,

18  good looking men, and his money bought him access to them.  In

19  2013, when his 18-year relationship ended, Burns began having

20  sex with prostitutes regularly, many of whom were associated

21  with a popular gay porn website.  Burns asked one of those

22  prostitute porn stars to seek out the defendant who at the time

23  was making films for that website under the stage name

24  "Jarec Wentworth."

25         Burns wanted to know whether the defendant would be

1   interested in a pay-for-sex arrangement.  He was told that the

2   defendant was interested, and so began their relationship.  The

3   defendant started meeting Burns for sex.  He accepted roughly

4   $2,000 for each sexual encounter he had with Burns.  The two

5   met in La Jolla and in Palm Beach, and each time the defendant

6   was paid $2,000 give or take.

7        But then Donald Burns got another idea.  He knew the

8   defendant was plugged into the gay porn world, and he asked the

9   defendant to find him other men with whom to have sex.  He told

10  the defendant that he would pay him a referral fee of 2,000 to

11  $2,500 for every referral he made.  And if the defendant joined

12  in, he would pay him both for the sex and the referral.  That

13  was the basis of the relationship between Burns and the

14  defendant.

15       Over the course of 2013 and 2014, the defendant and Burns

16  engaged in group sex, and the defendant helped Burns gather

17  young men for sex parties.  The defendant knew Burns' taste.

18  He knew what kind of guys he liked, and he knew how to get

19  them.  He boasted to Burns that he had the pick of the guys

20  and, quote, "knew how to convince."  But he also knew that

21  Burns was a rich and well-connected man who did not want this

22  information, the fact that he was regularly paying gay porn

23  stars and prostitutes to have sex with him, known.  He wanted

24  this a secret.

25       In late 2014, something went awry.  One of the defendant's

1   referrals backed out on a deal that the defendant had brokered

2   for Burns.  Burns had already paid the defendant approximately

3   $2,000 for referring that escort to him, but when the escort

4   reneged, the defendant did not give Burns his money back.

5       You will hear from Donald Burns at this trial, and he will

6   tell you that he didn't care that much about that money but

7   that he felt he could not trust the defendant after that.  He

8   started to pull away from the defendant.  Then on February 16,

9   2015, the relationship took another turn.  When Burns told the

10  defendant he no longer felt comfortable working with him

11  meaning he would no longer pay him money, the defendant

12  responded via text, "Be wise.  Don't get me mad.  I can bring

13  your house down, Don.  I have a Twitter."

14      And then the defendant did this.  The defendant asked his

15  thousands of Twitter followers "How many porn stars know a

16  guy" –– "a man named Don?  Yes, Don."  You will hear from Burns

17  that, as the defendant was texting him and as he learned about

18  this tweet, he was overcome with dread.  He became panicked,

19  and he asked the defendant to take down the tweet.  "Can you

20  please be good to me, man?  What do you want, Teo?  Please take

21  down the post about me," he wrote.

22      And what did Teo want?  Well, as you heard, first it was a

23  new car, motorcycle, and both hands full of cash.  You will see

24  the text from the defendant to Burns saying that.  Then three

25  minutes later the defendant said he wanted Burns' Audi r8 and

1   $250,000.  You will see that text as well.  And ten minutes

2   after that, defendant upped the ante one more time asking Burns

3   for yet another $250,000.  Half a million dollars in total plus

4   the car, that's what Teo wanted.

5       So what did Donald Burns do?  He paid.  He wanted the

6   Twitter posts down and the whole thing to go away.  And once he

7   agreed to it, the defendant said to him via text message, which

8   you will see, "How do I know you won't report me for

9   extortion?"  Donald Burns did not report the defendant for

10  extortion then.  He actually wired the defendant $500,000 from

11  his bank account in New York, and he gave him his car.  He

12  hoped the defendant would take down the tweet and it would all

13  go away.  He was scared.

14      Now, the tweet did go away after Burns agreed to the

15  defendant's requests.  It was deleted from defendant's

16  Jarec Wentworth account at Twitter, but that is not the end of

17  the story.  On March 3rd, 2015, only two weeks after getting

18  the Audi and the $500,000, the defendant texted Burns again,

19  and you will see this.  "New deal.  New deal.  Account will be

20  deleted if a new deal is reached."  This time the defendant

21  wanted $1 million and title to the Audi r8 that he had been

22  driving around for two weeks.

23      But it so happened that, as the defendant's text messages

24  were coming in on March 3rd and March 4th, Donald Burns was

25  with the FBI.  He was worried that this very thing would

happen, that the defendant would not stop his demands.  So he reached out to law enforcement.  Federal agents watched as the defendant's texts came through on Burns' phone.  "New deal, new deal.  One mill cash.  Get it all.  Put it in a case."

Now, ladies and gentlemen, you will hear in this trial that at this point the FBI took over.  They monitored the texts, they listened in on phone calls, and they walked Burns through how to respond to the defendant's requests.

Burns told the defendant that he would give him the million dollars but that he was afraid to give him the money himself.  He told the defendant that he would send a representative to meet him at a Starbucks in El Segundo on March 4, that his representative would give him the million dollars and the title to the Audi r8.  But as you will hear, the representative was, in fact, an undercover FBI agent.

On the night of March 4, 2015, the defendant showed up at the El Segundo Starbucks.  He was driven there by a friend named Etienne Yim.  Mr. Yim will also testify at this trial he is a cooperator and he has pleaded guilty.  And he will tell you that the defendant told him he was picking up $1 million that night from a man named Don whom the defendant had blackmailed.  And he will also tell you that on that night they had a gun, that the defendant thought they might be set up at the Starbucks.

The defendant, as you will hear, asked Yim to "have my

1    back."  He told Yim that, if anyone at the Starbucks should

2    start shooting at the defendant, that Yim should shoot back.

3         Yim watched as his friend got out of the car to meet

4    Burns' representative.  He stayed in the car with the gun.  The

5    defendant went inside the Starbucks looking for a man in black

6    jeans and a sports coat.  He walked up to that man and said

7    something to the effect of "What do you got for me?"  Defendant

8    took the title to the r8 from the undercover agent, the man in

9    the black jeans and the sports coat, and said, "And?"  The

10   undercover agent posing as Burns' representative told the

11   defendant that he had the million dollars outside in the trunk

12   of his car and that he should meet him outside.

13        Standing outside in the darkness, the agent popped open

14   the trunk to his car and told the defendant that the money was

15   right there in the backpack.  But before the defendant could

16   reach in for the money, the FBI intervened and arrested him.

17        That, ladies and gentlemen, is what happened, and that's

18   what brings us here.  The United States has charged the

19   defendant Teofil Brank with multiple counts of extortion and

20   attempted extortion of Donald Burns for $1 million.  I will

21   recite the counts briefly to you.

22        Count 1, transmitting threatening communications with

23   intent to extort.  That relates to the threats made on or about

24   February 16, 2015, by the defendant to Burns via text message.

25        Count 2, extortion affecting interstate commerce.  This

1  relates to the defendant having obtained $500,000 from

2  Donald Burns by wrongful use of fear, namely, by threatening to

3  distribute Burns' personal, sexual, and embarrassing

4  information to the public via Twitter.

5       Counts 3 and 4, receiving proceeds of extortion.  This

6  relates to the defendant having obtained the Audi r8 and the

7  $500,000 from Donald Burns.

8       Count 5, attempted extortion affecting interstate

9  commerce.  This goes to the million dollars defendant tried but

10  ultimately failed to get from Donald Burns.

11       And, finally, Count 6, use of an interstate facility to

12  facilitate an unlawful activity for using his cell phone to

13  promote, manage, establish, or carry on an extortion.

14       Ladies and gentlemen, the Government submits that, once

15  you see and hear all the evidence, the text messages, recorded

16  phone calls, surveillance video at the Starbucks, photographs,

17  and the testimony, you will return the only verdict that is

18  consistent with the facts of this case, and that is guilty as

19  charged to all counts.

20       Thank you.

21            THE COURT:  All right.  Thank you very much.  Now

22  I'll hear from the defense.

23            MS. AHMAD:  Ladies and gentlemen, Mr. Teofil Brank

24  did not threaten, did not harm, did not extort Donald Burns.

25  He is not guilty.  And the only reason that we are sitting here

 1   today is Donald Burns did not want to make good on the promises

 2   he had made to my client, Teofil Brank.

 3          So what really happened in this case, ladies and

 4   gentlemen?  And I just want to take a step back and sort of

 5   recognize that this case involves a lot of interesting detail

 6   and a world that we may not be familiar with.

 7          So just to orient you a little bit, the prosecutor

 8   mentioned a gay pornography company that Mr. Brank worked for.

 9   That company is called "Sean Cody."  It's based out of

10   San Diego.  And the thing about Sean Cody is Sean Cody really

11   represents the elite of the elite when it comes to their

12   industry.  So Sean Cody actors are the most desirable, the most

13   good looking, the most handsome.

14          And, in addition, Sean Cody actually occupies a subculture

15   within gay pornography where straight men will actually do gay

16   pornography because they can earn three or four times the

17   amount of money that they would earn doing straight

18   pornography.  So that's a little bit about Sean Cody.  And I

19   know it seems improbable, but it's actually a phenomenon that's

20   called "gay for pay."

21          So what happened in this case, and how did Donald Burns

22   and Teofil Brank first cross paths?  In 2013 Donald Burns used

23   an online prostitute service literally called "Rentboy.com."

24   And that's what he did.  He rented a young man for purposes of

25   prostitution.  This young man named Myles worked at Sean Cody

and had a pay-for-sex relationship with Donald Burns.  He also
introduced Teofil Brank to Donald Burns, and in 2013, as you
heard the prosecutor say, Donald Burns, Teofil Brank, and a
third individual had group sex at a hotel in La Jolla that
Donald Burns paid for.

     Now, over the course of 2013 and 2014, Teofil Brank and
Donald Burns continued their pay-for-sex arrangement.  But in
addition, Teofil Brank was the gateway for Donald Burns to this
world of Sean Cody actors.  And Teofil Brank started referring
some of these other individuals to Donald Burns for purposes of
sex.  So how did that work?

     You're going to hear testimony from Donald Burns and
you're going to see an e-mail, ladies and gentlemen, that
Donald Burns wrote to my client in September of 2014.  The
e-mail lists 11 Sean Cody actors that Donald Burns wanted to
have sex with that he had researched, that he had looked up,
that he had targeted to have sex with.  Donald Burns provided
this list to my client and offered him, quote, "Recruiting
$22,000 of potential lol."  And what he meant by that was he
was willing to pay Teofil Brank $2,000 for each of the
individuals -- each of the 11 individuals that he could arrange
to have sex with Donald Burns.

     In addition, ladies and gentlemen, you'll see that at the
beginning of the e-mail Donald Burns says in his own words,
"Teo, these are the guys that nobody has ever cracked," meaning

1    these were the young men that Donald Burns had not been able to

2    secure previously to engage in prostitution for him.  So let's

3    look at the e-mail briefly.  There was a young man listed

4    no. 4, Kyle Mills.  Donald Burns e-mailed him, but Kyle

5    responded back with a very cool "Thanks but not interested."

6        Jacob Burton, no. 6, Donald Burns chatted with him, but

7    Jacob Burton rightly knew that prostitution was illegal and

8    said no.  But these individuals made it on Donald Burns' list

9    anyway.  So the question is why?

10       Donald Burns is going to take that stand, ladies and

11   gentlemen, and he's going to tell you that he is a

12   telecommunications mogul.  He started a company and he later

13   sold it for $1.1 billion.  He's going to take that stand, and

14   he's going to tell you that today he is worth $138 million.

15   This is a man who moves in exclusive circles and has his whole

16   life, and he wanted what was most exclusive and what was most

17   elusive to him.

18       So how did he get it?  In addition to these pay-for-sex

19   arrangements that he was setting up, he also groomed some of

20   the Sean Cody actors that he had a relationship with.  And

21   you're going to hear from two of these young men.  One is named

22   Mackinzie Amadon and the other Justin Griggs.  And what

23   Donald Burns did with these young men is he gave them the

24   impression that he was going to provide them with a life

25   outside of pornography.  He encouraged them to get out of

1   pornography.  He mentored them.  He counseled them.  He took

2   them on trips around the world, jet-setting at high society

3   events.  And in the case of Mr. Amadon, he spent over $200,000

4   over the course of their relationship.

5        And just like he groomed these two young men, he groomed

6   Teofil Brank.  He mentored him.  He counseled him.  He

7   developed a friendship with him, and he seized upon his dreams

8   to get out of the pornography industry.  He encouraged him to

9   get into modeling, to get head shots taken, and he used his

10  personal contacts to connect Mr. Brank to Abercrombie & Fitch.

11       The difference between Mr. Amadon and Mr. Brank is that

12  Donald Burns never made good on those promises, those promises

13  that he had made to Teofil Brank for two years.  And so what

14  happened earlier this year?  Teofil Brank never threatened to

15  expose Donald Burns for his prostitution arrangements or his

16  referral fee arrangements.  He did what many of us do when

17  we're in a relationship for two years and you find out that the

18  person that you've been with is manipulating you.  He wanted to

19  tell his friends what had happened to him.  And when he went to

20  part ways with Donald Burns, he asked for what was owed to him.

21  He asked for the Audi, and he asked for the $500,000.

22       Donald Burns didn't go hire an attorney at that moment.

23  Donald Burns didn't go running to the FBI.  He gave that car

24  and he gave that money to my client like that.  And he did it

25  because he knew he owed it to him.  He knew that he had been

1    making promises over the course of their relationship.

2         The only reason we are here now, ladies and gentlemen, is

3    that Donald Burns and Teofil Brank had a disagreement about the

4    price and about the promises that had been made between them

5    for two years.  That's the only reason we're here today.

6         But Donald Burns doesn't get to decide that, once

7    Mr. Brank asks for a million dollars, that all of a sudden now

8    it's extortion.  And I understand that it sounds like a lot to

9    us.  A million dollars is pennies to Donald Burns.

10        The other thing I want to mention to you all is that

11   Donald Burns did not pay this money to Mr. Brank because he was

12   worried about his reputation.  This is a man who cultivated

13   relationships with porn stars, who took them around the world,

14   who took them to meet politicians and dignitaries, who had sex

15   parties at his house and invited the Sean Cody gay porn

16   production company to his house, and a man who was seeking to

17   have sex with 11 different young men at the same time.  He was

18   not worried about his reputation.

19        The last thing I want to mention very briefly, ladies and

20   gentlemen, is about the gun.  That gun was not procured by

21   Mr. Brank.  He's not the one who got the gun.  It was unloaded.

22   It was never on Mr. Brank's person.  And he's not charged with

23   a gun crime right now.

24        As I said at the beginning, there's a lot of information

25   in this case, and I'd ask you to remember two things.

1    Donald Burns' reputation was never threatened.  And, number

2    two, Teofil Brank only asked for the money that had been

3    promised to him and that he deserved.  Mr. Brank is not guilty.

4           THE COURT:  All right.  Thank you very much.

5        Call your first witness.

6           MS. JAIMEZ:  Thank you, Your Honor.  The Government

7    calls Special Agent Sean Sterle.

8           THE COURT:  If anybody wants to leave, leave now

9    before the witness gets on the stand, please.

10           **SEAN STERLE, GOVERNMENT'S WITNESS, SWORN:**

11           THE CLERK:  Please be seated.  Please state and

12    spell your full name for the record.

13           THE WITNESS:  Sean Sterle, S-e-a-n S-t-e-r-l-e.

14           THE COURT:  You may proceed.

15                        DIRECT EXAMINATION

16    BY MS. JAIMEZ:

17    Q    Good afternoon.

18    A    Good afternoon.

19    Q    Agent Sterle, how are you currently employed?

20    A    I am employed as a special agent with the Federal Bureau

21    of Investigation.

22    Q    When did you start with the Federal Bureau of

23    Investigation?

24    A    My entrance-on-duty date was July 19, 1998.

25    Q    What is your formal title?

```
 1   A      Special agent.
 2   Q      What's your current assignment, Agent Sterle?
 3   A      I'm currently assigned to Squad C-1 of the Los Angeles
 4   Field Office.
 5   Q      What type of cases does Squad C-1 handle?
 6   A      Squad C-1 handles primarily violent crimes which would
 7   consist of extortions, kidnappings, murder for hires,
 8   fugitives, bank robberies, and interference with interstate
 9   commerce through threats of violence or violence.
10   Q      And have you ever acted in a supervisory capacity?
11   A      Yes, I have.
12   Q      Can you explain that a little?
13   A      From February of 2012 to June of 2013, I was a supervisory
14   special agent in Washington, D.C., at the Hoover building at
15   the FBI headquarters.  I was a supervisor in the USOU, the
16   Undercover and Sensitive Operations Unit, and my job was to
17   oversee all of the undercover operations occurring in the
18   western United States.
19   Q      And have you ever personally served as an undercover?
20   A      Yes, I have.
21   Q      How many times?
22   A      Conservatively, I would say 30 times.
23   Q      And do you ever conduct undercover training?
24   A      Yes, I do.
25   Q      Have you ever received any awards or commendations?
```

1    A    Yes, I have.

2    Q    Where were you on March 3rd, 2015?

3    A    On March 3rd, 2015, I was at the Los Angeles Field Office

4    which is at 11000 Wilshire Boulevard in the Westwood area of

5    Los Angeles.

6    Q    What, if anything, of note happened that day?

7    A    Well, late in the -- late in the afternoon, early evening

8    I was approached by my supervisor, Joe Brine, who reported to

9    me that there was an extortion that was occurring, and

10   supervisory Special Agent Brine took me into a conference room

11   where I was introduced to the victim who was there with his

12   attorney and a private investigator.

13   Q    And did you ever see any evidence related to this alleged

14   extortion?

15   A    Yes, I did.  They showed me the evidence that they had

16   brought in.

17   Q    And generally what evidence was it?

18   A    I saw a list of text messages that were downloaded off of

19   the victim's phone which was correspondence between the victim

20   and Mr. Brank.  I also saw a Goldman Sachs wire transfer of

21   $500,000 from the victim to a Wells Fargo account in the name

22   of Teofil Brank.

23   Q    And after seeing these items, did you become involved with

24   the investigation at all?

25   A    Yes, I did.

**UNITED STATES DISTRICT COURT**

```
1    Q     How did you become involved?
2    A     Well, besides, you know, round-tabling different
3    strategies on the case, I became directly involved as the
4    undercover agent in this case.
5    Q     Now, why was an undercover agent brought in?
6    A     In any kind of extortion or murder for hire or any case
7    where you can extract the victim from dealing with the suspect,
8    you're always going to try to do that.  I mean, our primary
9    goal, I guess you could say, would be to keep the victim out of
10   harm's way, hence, if we can take him out and put in somebody
11   who has been trained to, you know, deal with the suspects and
12   has gone through it before, that will definitely -- you know, I
13   try to get an undercover agent in.
14   Q     What was the purpose of the undercover operation in this
15   case?
16   A     An undercover operation in this case would be to pay the
17   demands of Mr. Brank being a million dollars cash and the title
18   to a $180,000 automobile.
19   Q     And what was your assigned identity as an undercover?
20   A     My assigned identity was as a guy named Sean, just like my
21   regular name, but I was a -- going to be introduced as a
22   business associate of the victim, kind of somebody that handles
23   his nontraditional business activities.
24   Q     And did you discuss your role with the victim at all?
25   A     Yes, I did.
```

**UNITED STATES DISTRICT COURT**

```
1    Q     And, to your knowledge, was Teofil Brank ever alerted to
2    the fact that another individual would be delivering the
3    $1 million?
4    A     Yes, he was.
5    Q     Now, when was the undercover operation scheduled to occur?
6    A     It was scheduled to occur the following day which was
7    March 4, 2015.
8    Q     And where was it scheduled to occur?
9    A     It was scheduled to occur at a Starbucks restaurant which
10   I believe is 530 North Sepulveda Boulevard in the city of
11   El Segundo, California.
12   Q     Why a Starbucks?
13   A     Well, Starbucks for two reasons or any public place for a
14   couple reasons.  The other reason being this particular
15   Starbucks going back to 2004, we did a successful undercover
16   operation in dealing with a murder-for-hire suspect, and so I
17   knew the area pretty well and knew how that operation occurred.
18   And so it was kind of a blueprint for this operation.
19   Q     And why did you think this particular operation was going
20   to increase the potential for success?
21   A     Why did I think this operation --
22   Q     Or this particular location would increase the potential
23   for success?
24   A     Okay.  One, any time as an undercover that you're dealing
25   with, you know, a suspect and there's a lot of money on the
```

line, you know, unlike the movies where they tend to have it in

the back of an alley or warehouse or something like that, you

know, you really want to try to stay away from that just so --

because that brings a lot of stress into the whole thing.

Obviously, you know, a million dollars and expensive car, I

mean, people have been killed for less.

So the main thing is have everybody try to feel as

comfortable as possible, have that in a public place, Starbucks

being a really obvious public place that, you know, both we

believe the suspect and myself for that matter would feel

comfortable in.

Q     Now, turning your attention to what's been previously

admitted as Exhibit 701 -- and if we could publish it for the

jury -- what is this item, Agent Sterle?

A     That is a schematic of the Starbucks located at

530 North Sepulveda in El Segundo and the parking lot, the

shopping center with Ralphs market.  Just to orient you guys,

the Ralphs market would just be to the south of the parking

lot, and the Starbucks and Jersey Mike's would be to the north

of the parking lot.

Q     And where did you initially arrive on March 4 for the

undercover operation?

A     When I first got to the area, I parked the car, if you can

see -- I don't know if -- when I touch this will it --

Q     Right here?

```
1    A    Yes.  There you go.  So that's where I parked the car
2    originally.  The reason why that we, you know -- our plan was,
3    you know, to have the million dollars in the car.  And as you
4    can see, I mean, a Ralphs, a Starbucks, a Jersey Mike's, it's
5    going to be a well traversed area, a lot of people.
6         So with the experience of working in this parking lot
7    before, we knew that there was a back corner of the parking lot
8    where we could try to set up the takedown where the arrest
9    would happen after the money had changed places and in case
10   anything had, you know -- anything happened where the suspect
11   had brought a firearm and there was, you know, any gunfire or
12   anything like that, it was the most out of the way to ensure
13   that no innocent bystanders would be injured.
14   Q    And what kind of car were you driving at the time?
15   A    I was driving a 2014 black Tesla sports car.
16   Q    Why a Tesla?
17   A    Because the victim is a successful businessman and I was
18   an associate of his.  It made sense for our legend, if you
19   will, or our backstory that we worked together to have a higher
20   end car like the one he drove, like the one he was going to
21   give to Mr. Brank.
22   Q    Now, did you do anything to prepare for the meeting?
23   A    I did.
24   Q    What did you do?
25   A    Besides, you know, obviously discussing with the victim
```

1    our -- what's called our legend, our story, how we knew each

2    other, how long we knew each other, et cetera; but for the

3    technical aspect, I was fitted with an audio/video recorder, an

4    audio recorder and a transmitter.

5    Q    And when you say you discussed the story or the backstory

6    with the victim, who are you referring to specifically?

7    A    Mr. Burns, Donald Burns.

8    Q    Now, turning your attention to what's been previously

9    admitted as Exhibit 202 -- please take a moment to turn there

10   in the binder before you.  Do you recognize this exhibit?  I'll

11   give you a moment to turn there.

12   A    202?

13   Q    202.

14   A    Got it.  Yes, I do.

15   Q    What is it?

16   A    These are -- it's like a xerox copy of the copies of the

17   audio/video recording of my meet with Mr. Brank on March 4.

18   Q    And is it a fair and accurate copy of that recording?

19   A    Yes, it is.

20          MS. JAIMEZ:  At this time, Your Honor, the

21   Government seeks permission to publish the first part of

22   Exhibit 202.

23          THE COURT:  You may.

24          MS. JAIMEZ:  Thank you, Your Honor.

25   ///

**UNITED STATES DISTRICT COURT**

1        (The video, Exhibit No. 202, commenced

2        playing before the jury.)

3   Q    BY MS. JAIMEZ:  Now, where were you when you filmed the

4   first portion of Exhibit 202?

5   A    When I turned on the audio/video recorder there, I was in

6   a Rubio's fish taco restaurant probably a quarter to a half

7   mile south on Sepulveda from the Starbucks located at

8   530 North Sepulveda.

9   Q    And what happened after you filmed this portion of the

10  recording?

11  A    You know, after starting the recording and the

12  transmitter, you know, I -- from that point there I waited for

13  the -- I guess you could call them my cover team or takedown

14  team which would be the guys that would be making sure nothing

15  happened to me, and then also that would be, if everything went

16  as planned and Mr. Brank showed up and accepted the money and

17  the car, we'd execute the arrest.  We coordinated together.

18  From that point there I drove over to the Starbucks, Ralphs,

19  Jersey Mike's parking lot and parked in that back corner we

20  showed you in the diagram before.

21  Q    So pulling up Exhibit 701 again, what time did you arrive

22  at the parking lot approximately?

23  A    At the parking lot, I probably got there 6:15, 6:20.

24  Q    Where did you go from the parking lot?

25  A    Parked the car.  We were rushing to get there.  I was

**UNITED STATES DISTRICT COURT**

1    starving.  I grabbed a sandwich at Jersey Mike's and then went

2    into the Starbucks.

3    Q    And was Teofil Brank there when you got there?

4    A    No, he was not.

5    Q    What did you do when you were in the Starbucks?

6    A    I got there in -- I would say I got there at approximately

7    6:30 to the Starbucks.  I went in and just, you know, ordered a

8    drink, a coffee, and then sat down at the bar area of the

9    Starbucks.  I guess it would be the bar along the window on the

10   Sepulveda side.  So if you're looking at -- I don't think I can

11   get it but -- there you go.  Does that work?  Does that come

12   up?  Okay.

13        So on the west side there, you know, large window looking

14   out on Sepulveda Boulevard, and then there was a wooden bar

15   approximately, you know, like this table or the -- the stand

16   that I'm at right now and bar stools.  And there was one spot

17   open at the time I got there in the whole coffee shop.  So I

18   got that seat.  That was the only one I could find.

19   Q    Did you wait there long, Agent Sterle?

20   A    Yes, I did.

21   Q    How long approximately?

22   A    I mean, Mr. Brank arrived at approximately 8:30.  So two

23   hours.

24   Q    And is the person that arrived at the Starbucks the person

25   that you knew as Teofil Brank in the courtroom today?

```
1   A     Yes, he is.

2   Q     Can you point to him and describe for the record what he's

3   wearing?

4   A     Mr. Brank is the man sitting at the table there.  So I

5   guess, for the court reporter, would be to the left of

6   Your Honor.  He's wearing a white shirt, brown hair combed to

7   the left.

8              THE COURT:  The record will indicate the witness

9   identified the defendant.

10  Q     BY MS. JAIMEZ:  To clarify, what time approximately did

11  the defendant arrive?

12  A     Arrived at approximately 8:30 p.m. on the 4th of March.

13  Q     Was that meeting recorded?

14  A     Yes, it was.

15             MS. JAIMEZ:  Your Honor, permission to publish the

16  remainder of 202.

17             THE COURT:  Yes, you may.

18             MS. JAIMEZ:  Thank you.

19        (The video, Exhibit No. 202, commenced

20        playing before the jury.)

21  Q     BY MS. JAIMEZ:  Now, Agent Sterle, why were some portions

22  of this recording so difficult to hear?

23  A     Well, especially in the beginning, the earliest part of

24  the recording or when Mr. Brank and I met, you know, it

25  occurred inside the Starbucks.  So you've got your background
```

1    noise of people.

2         At that point it was 8:30.  Still it was surprisingly

3    crowded.  A lot of background conversation.  There was music

4    going on over the -- being piped in or whatever through the

5    speakers and also, especially when we first initiated the

6    conversation, he was speaking in a very low tone of voice.

7    Q     Now, were you able to hear the defendant?

8    A     Yes, I was.

9    Q     Now, looking again at Exhibit 701, where were you sitting

10   when the defendant approached you?

11   A     I was sitting approximately about there.

12   Q     And how did the defendant approach you?

13   A     So, you know, just playing the part that I was playing

14   and, you know, not wanting to be looking around, you know --

15   and as things were going on here -- and it's about 8:30 at this

16   point.  I was in contact with Agent Jaime Aguirre who was back

17   in Westwood with the victim and would, you know, relay --

18   periodically relay info to me through a phone call of what was

19   going on.  In that he said that, you know, Mr. Brank was very

20   cautious and had mentioned that, you know, I don't want to show

21   up and have there be a fed there or something like that.  So

22   that being said, I knew he was on a heightened alert, if you

23   will, trying to figure out if I could be a law enforcement

24   agent.

25        So as I'm sitting there reading the paper facing westbound

```
 1   toward Sepulveda Boulevard on the stool, I heard a voice, you
 2   know, say something like, "So what do you got for me?"  And at
 3   that point I turned, and Mr. Brank was sitting on the stool
 4   next to me which obviously was then open and was facing
 5   180 degrees eastbound.
 6   Q    So why don't we see the defendant's face on the recording,
 7   the first part of the recording -- excuse me -- inside the
 8   store?
 9   A    The first part of the recording, obviously, you know, when
10   he comes in and sits there, in my opinion, trying to be covert
11   as far as, you know, making contact with me, so he didn't come
12   up, "hey."  The victim had described, you know, I was wearing a
13   black jacket and jeans and everything, but he didn't come up to
14   me and say, "Hey, you must be Sean."  He sat facing the other
15   way and kind of -- you know, in a low tone I heard something
16   like, "So what do you got for me?"  Then when I turned and saw
17   that it was him, that's when I said, "Oh, hey, Teo.  I'm Sean."
18   I introduced myself.
19        At that point there, he's facing this way.  I'm facing --
20   he's facing more eastbound.  I'm facing more westbound.  I know
21   he's alerted to possibly, you know, being a law enforcement
22   trap.  I knew the audio would pick it up, but the video is
23   shooting straight out like this.  So if I would have turned all
24   the way around to be like, "Hey, Teo," it would have been your
25   typical speak into the lapel.  It would have been obvious that
```

**UNITED STATES DISTRICT COURT**

```
1    I was trying to record a conversation with him, in my opinion.

2    So hence, I kept kind of more of a natural tone going with him

3    and kept facing forward.

4    Q    And was defendant's comment "What do you have for me," was

5    that captured by the recording?

6    A    No, it wasn't.

7    Q    What was your response to that comment?

8    A    My response was -- when I turned and looked and saw it was

9    Mr. Brank and I said, "Hey, Teo."

10   Q    And that was captured by the recording?

11   A    Yes, it was.

12   Q    Now, during the recording we heard you say or you asked

13   the defendant whether or not he wanted to talk inside or

14   outside.  Why did you ask that?

15   A    Well, I mean, going back to an earlier statement that I

16   made here today, more than anything else we wanted to make sure

17   everybody is comfortable, he's comfortable so nothing

18   irrational happens during the meet.  So whatever was -- you

19   know, whatever I thought would make him the most comfortable,

20   give him the choice.  Hence, he was speaking kind of low inside

21   a Starbucks, you know, climate controlled.

22        It wasn't cold in there, but he was wearing a hoodie with

23   the hood up over his head like that.  And so, I mean, I

24   didn't -- to me it seemed like, you know, he was keeping his

25   identity a little bit concealed.  I'm like, "Do you want to
```

1   talk in here, or do you want to go outside?" because there's

2   other people in there, they could hear the conversation,

3   et cetera.  So whatever I could make him most comfortable with

4   I wanted to go with.

5   Q    And what did you discuss during that conversation?

6   A    During that conversation -- okay.  So anyway, when I asked

7   him that, he kind of just said, "Here."  So we stay in there,

8   and then I took out the title to the 2004 Audi r8 automobile

9   that he wanted the title from Mr. Burns.

10  Q    Okay.  Now, turning to what's been previously admitted as

11  exhibits 109 and 110 -- and actually, let's pull those up on

12  the screen.  And 110.

13       Now, what are exhibits 109 and 110, Agent Sterle?

14  A    109 and 110 -- there you go -- are the Florida certificate

15  of title for the 2004 Audi r8.

16  Q    2004 --

17  A    I'm sorry.  2014.  Sorry.

18  Q    Belonging to who?

19  A    Donald Burns.

20  Q    And why had you brought Exhibit 109 and 110 to the

21  Starbucks?

22  A    You know, Mr. Brank wanted the title to the car.  That was

23  part of his first demands.  He had already picked up the

24  automobile, according to the victim, from his place in

25  San Diego.  So he had the car.  He just did not have the

UNITED STATES DISTRICT COURT

1    certificate of ownership.  Hence, he wanted that.  That and the

2    million dollars is what I was supposed to bring to the meeting

3    that night.

4    Q    So what were you explaining during the first part of the

5    recording inside the Starbucks?

6    A    I was explaining to him that in -- it's not up there right

7    now but in --

8    Q    Page 2 of 109.

9    A    So page 2 of 109, and I said in there like, okay, there is

10   the title, which is actually the certificate of title.  Primary

11   part of it is going to be 110.  So I was, you know -- I tore

12   that off, gave that to him, showed that Donald Burns had signed

13   that as relinquishing -- as the seller and giving it to

14   purchaser Mr. Brank.

15   Q    Agent Sterle, looking at Exhibit 109, whose writing is on

16   Exhibit 109?

17   A    That is Mr. Burns.

18   Q    Okay.  And what does it say to the right-hand side on

19   Exhibit 109?

20   A    "Gift."

21   Q    Okay.  To your knowledge, was this a gift?

22   A    No, it was not.

23   Q    Okay.  And if we could pull out a -- no.  We can leave it.

24        Now, looking at Exhibit 109, is any portion of this not

25   filled out?

```
 1   A      Yes.  The address part.

 2   Q      Okay.  Did you discuss this with the defendant?

 3   A      I did.  When I -- I tore the top part off.  I said, we've

 4   got to return the top part of this to the state of Florida DMV

 5   so they know that the victim, Mr. Burns, has sold the -- or

 6   given the car to Mr. Brank.  That being said, I mean, the

 7   Florida DMV would need to have an address to send the new

 8   certificate of title of the car to Mr. Brank so he would have a

 9   certificate with his name on it.

10   Q      Okay.  And did the defendant provide you with an address?

11   A      No, he did not.

12   Q      And what did you think about that at the time?

13   A      I mean, to me --

14              MR. CHOWDHURY:  Objection.  Relevance, Your Honor.

15              THE COURT:  Sustained.

16   Q      BY MS. JAIMEZ:  Now, what happened after the title

17   hand-over?

18   A      After the title -- you know, I gave him the -- the major

19   part of the title.  I kept the top part of the lien and said,

20   "Okay, we're all set."

21   Q      All right.  Did the defendant take any portion with him?

22   A      Yes, he did.

23   Q      What did he take?

24   A      He took -- it would be Exhibit No. 110.

25   Q      Bringing up 110.
```

```
1        And what happened after he took Exhibit 110?

2   A    Then he said, "And?"

3   Q    And what did you think he was referring to?

4            MR. CHOWDHURY:  Objection.  Calls for speculation.

5            THE COURT:  Sustained.

6   Q    BY MS. JAIMEZ:  What did you do after he said, "And?"

7   A    And then I just -- I just said, "It's your lucky day.  You

8   ready to get paid?"  And he nodded affirmatively.

9   Q    Now, did you have the $1 million with you in the

10  Starbucks?

11  A    No, I did not.

12  Q    Why didn't you have it with you?

13  A    I mean, obviously -- well, a couple things.  One, we

14  didn't have a true million dollars.  It was a couple of books

15  in a book bag.  But I wouldn't bring a million dollars into a

16  Starbucks for a meeting, you know -- a meeting with somebody

17  who was extorting somebody.  It's not safe.  It goes against

18  undercover procedures 101, if you will.

19  Q    Okay.  So what did you do next after he asked you -- after

20  he said, "And?"

21  A    Well, after he said, "And?" I said, "Are you ready to get

22  paid?"  Which he said, yes, or nodded affirmatively.  And I

23  said, "Okay.  It's out in the car.  You know, let's go get it."

24  Q    Right.

25  A    Can't say if I quoted myself exactly on that, but I said,
```

1    "Let's go get it."  And then he did not want to go out to the

2    car.

3    Q    But ultimately did you decide to go out to the car

4    together?

5    A    Well, he said -- he said, "No, you know what, I don't want

6    to go to the car."  I'm just summarizing.  "I don't want to go

7    to the car.  You know, bring it to me on the patio."

8    Q    Now, turning to what's been previously admitted as

9    exhibits 155 through 156, take a moment to pull those up.

10   They're also available on the screen, Agent Sterle.  155 and

11   156.

12   A    Okay.  Got it.

13   Q    What are exhibits 155 through 156?

14   A    Those are images or still photos captured of Mr. Brank

15   from the audio/visual device that I was wearing.

16   Q    So what were you and the defendant doing when these photos

17   were taken?

18   A    We were walking toward the door right after he said, you

19   know, "Come bring the" -- "Come bring it to me out on the

20   patio."

21   Q    Okay.  And where did you go from here?

22   A    So I followed him out -- followed him out the door, and as

23   I'm, you know, walking out, I said, okay.  I'm going to drive

24   the car up.  You know, just one of those things.  Best laid

25   plans, you know, never survive first contact.  So as a -- as

1    our whole plan of, you know, having him come out to the car and

2    the arrest team being there, everything has got to change at

3    this point.

4    Q    So pulling up Exhibit 701.

5         So what did you do?

6    A    So Mr. Brank is going to be right there.  So here -- I

7    start walking this way.

8    Q    And describe what you're doing for the record, please,

9    Agent Sterle.

10   A    I'm walking eastbound through the parking lot, and our two

11   arrest takedown vehicles are in this vicinity here so it would

12   be easy to effect an arrest over at the undercover vehicle.

13   Thank you.  So I continued down here, and I get in the car.

14        Now, once I get in the car, because I'm wearing a

15   transmitter, I start, you know, talking, you know, out to my

16   cover team saying, Mr. Brank is not coming to the car.  We're

17   going to have to go to plan B.

18        Luckily there was a space like right -- the first or

19   second space where the car is here I noticed as I was coming

20   out.  So hustled over, got in the car.  As I'm driving back,

21   I'm talking, telling these guys, hey, we're going to have to

22   change, you know, be ready.  I'm going to try to get him to the

23   back of the car just like we said -- our signal when the trunk

24   went up to effect the arrest.

25   Q    Now, during this time you say you're not going to pull it

1    out, what did you mean?

2    A    I wasn't going to take the money out of the trunk.  I was

3    going to keep the money in the trunk, and our signal would

4    still be when the trunk got popped open.

5    Q    Okay.  And what happened after you moved the car?

6    A    When I moved the car, parked there, exited the car, and

7    then Mr. Brank -- I kind of motioned to him, and he approached

8    me.

9    Q    Okay.  Now, turning to what's been previously admitted as

10   exhibits 153 through 154 -- and 154, what are these items?

11   A    Those again are photo stills of the audio video recording

12   of myself -- that was taken of myself and Mr. Brank.

13   Q    Now, where were you and the defendant when these photos

14   were taken?

15   A    I had just exited the automobile.  So I'm on the driver's

16   side, and he's walking up to me from the patio.

17   Q    And what was the defendant's demeanor like at this point?

18   A    Well, as compared to when we first sat down, he was much

19   more relaxed and was -- wasn't talking quietly.  One, we were

20   outside; so maybe that had something to do with it.  But he was

21   much more, you know, engaging with me.

22   Q    And based on your training and experience, how did you

23   interpret this change in demeanor?

24            MR. CHOWDHURY:  Objection.  Calls for speculation.

25            THE COURT:  Sustained.

1   Q    BY MS. JAIMEZ:  Now, looking at Exhibit 154, what is

2   defendant holding here?

3   A    Oh, the one that's up on the screen, if that's 154 right

4   now, that was the envelope containing the title -- the Florida

5   state title to the r8, Audi r8.

6   Q    What happened right after these photos were taken then?

7   A    Right after these photos were taken, you know, we had a

8   short conversation in which, you know, I told -- I told

9   Mr. Brank that he had really scared the victim which he said he

10  didn't understand why he was scared.  You know, he didn't --

11  and then he made a statement on the video that the only reason

12  this is happening is because somebody's ego got a little too

13  big.

14  Q    And did you give the signal?

15  A    Not at that point right there.

16  Q    So what did you do next?

17  A    So I asked him -- you know, I just said, "Hey, do you want

18  to count it out right here?" which is one of the reasons I was

19  having it back in that back corner.  It wouldn't be so

20  conspicuous if we did have an actual million dollars to be

21  sitting in front of -- there were still people close there

22  going in and out of Starbucks -- to be counting out a million

23  dollars.  But I asked him, "Hey, do you want to count it out

24  here?" to which he said, "No.  Just open it."

25  Q    Did you ever open the bag?

```
 1   A    At that point I opened the trunk.

 2   Q    Then what happened?

 3   A    Then the bag was in the trunk.  So at that point to give

 4   my arrest team a little more time, I -- you know, it was a

 5   padlock.  I had a key to it.  So I dug around in my pocket,

 6   came out with a key, offered him to do it, to open the bag.

 7   And he said, "No.  You do it."  And as I bent down to undo the

 8   bag, that's when the arrest was executed by the takedown team.

 9   Q    Now, did the defendant say anything during the arrest?

10   A    Yeah.  Well, he was asked -- yeah.  As they were taking

11   him down, yeah.  He was asked questions, and he did make a few

12   statements.

13   Q    Did he give a name initially?

14   A    Yes.  I believe it was Special Agent Franco Marrow asked

15   him what his name was to which he replied "Josh."

16   Q    And did the defendant --

17   A    Then he changed it.

18   Q    Did the defendant make any other statements, Agent Sterle?

19   A    He was asked by, I believe, Special Agent Morrow again or

20   by Frank again did he have any weapons or any guns on him, and

21   Special Agent Jeff Bennett asked him if he had come with

22   anybody else, was there anybody with him.

23   Q    What did the defendant say in response to the question was

24   anyone with him?

25   A    I believe he said, "No."
```

**UNITED STATES DISTRICT COURT**

```
 1   Q    Now, to your knowledge, was anyone with the defendant that
 2   evening?
 3   A    Yes.  Somebody was.
 4   Q    Now, looking at Exhibit 701, where was this other person?
 5   A    The other person was in a car parked right there.  So one
 6   thing is the undercover, as soon as the arrest was executed
 7   and, you know, he was cuffed up and everything was safe as far
 8   as -- safe and secure, as the undercover, we're trained to,
 9   like, remove yourself from the situation.  And from that point
10   I went into the Starbucks and shut off the audio video and
11   audio recorder and -- recorders and the transmitter.
12   Q    Agent Sterle, to your knowledge, what happened to the
13   associate?
14   A    Well, when I was walking out, he was being put into an FBI
15   Government car, and he apologized to me which -- he said, "Hey,
16   sorry about that."  And I was like --
17            MS. JAIMEZ:  Okay.  No further questions,
18   Agent Sterle.  Thank you.
19            THE COURT:  All right.  Cross-examination.
20            MR. CHOWDHURY:  Thank you, Your Honor.
21                      CROSS-EXAMINATION
22   BY MR. CHOWDHURY:
23   Q    Good afternoon, Agent Sterle.
24   A    Good afternoon.
25   Q    So on March 4, 2015, when Mr. Brank was arrested, there
```

```
 1   was no gun found on his person?

 2   A      No, there was not.

 3              MR. CHOWDHURY:  No further questions.

 4              THE COURT:  All right.  May this witness be excused?

 5   Hearing no objection, this witness will be excused.

 6        You may step down.

 7              MS. JAIMEZ:  Yes, Your Honor.  Thank you.

 8              THE COURT:  All right.  Call your next witness.

 9              MS. JAIMEZ:  Your Honor, the Government calls

10   M. Scott Saul.

11          M. SCOTT SAUL, GOVERNMENT'S WITNESS, SWORN:

12              THE CLERK:  Please be seated.  Please state and

13   spell your full name for the record.

14              THE WITNESS:  M. Scott Saul, M. S-c-o-t-t, Saul,

15   S-a-u-l.

16              MS. JAIMEZ:  Your Honor, at this time the Government

17   will read Mr. Saul's qualifications if it pleases the Court.

18              THE COURT:  All right.

19              MS. JAIMEZ:  (Reading.)

20        M. Scott Saul is a certified computer forensic examiner

21   with a specialty in cell phone devices assigned to the FBI

22   computer analysis response team.  His duties include conducting

23   forensic examinations on computer evidence, performing

24   comprehensive technical analyses of digital evidence, preparing

25   evidence for examination from crime scenes, developing and
```

1    providing evidence collection and examination methods to field

2    offices and outside law enforcement agencies, performing search

3    and seizure operations, and retrieving information stored on

4    digital devices to provide information in a form useful to

5    investigators while providing instruction and training to

6    agents and others involved in investigations.

7         Mr. Saul has been a forensic examiner for six years.  He

8    has examined over 900 pieces of digital evidence in connection

9    with approximately 120 investigations.  Over his career he has

10   taken approximately over 30 courses in forensic examinations.

11   Mr. Saul is one of only three FBI certified cell phone forensic

12   examiners currently working in the FBI's Los Angeles office.

13        He has received several certifications including, one, the

14   cell phone Technology and Forensic Data Recovery Certification

15   by the Public Agency Training Council; and, two, the GIAC

16   Security Essentials Certification to name a few.  He holds a

17   Bachelor's of Science in human services with a specialization

18   in criminal justice.

19                        DIRECT EXAMINATION

20   BY MS. JAIMEZ:

21   Q    Mr. Saul, does this description accurately reflect your

22   qualifications?

23   A    Yes, ma'am.

24        MS. JAIMEZ:  Your Honor, at this point the

25   United States would ask the Court to find that Mr. Saul is an

```
 1   expert in the field of forensic examinations and allow the

 2   United States to elicit testimony in the form of expert

 3   opinion.

 4              THE COURT:  All right.  I will so find.

 5        And I want to give the ladies and gentlemen of the Jury an

 6   instruction.  Although I've qualified the witness as an expert,

 7   you should understand that, simply because I have qualified

 8   this witness and allowed this witness to give his opinions,

 9   that does not mean that I endorse or approve any of the

10   opinions he may give you.

11        Opinion testimony should be judged just like any other

12   testimony.  You may accept it or reject it and give it as much

13   weight as you think it deserves considering the witness'

14   education and experience, the reasons given for the opinion,

15   and all the other evidence in the case.  It is for you to

16   decide whether or not the opinions given by this witness assist

17   you in your important function of resolving the factual

18   disputes in this case.

19        You may proceed.

20              MS. JAIMEZ:  Thank you, Your Honor.

21   Q    Mr. Saul, what is the process used by the FBI for

22   conducting a forensic examination of a cell phone?

23   A    The basic process begins with determining that, as an

24   examiner, you have legal authority to examine the phone,

25   generally a search warrant or consent to search.  Once that's
```

1    established, I would go to -- as examiner, I would go to our

2    evidence unit, take physical possession of the cell phone,

3    ensure it's the same cell phone I have legal authority to

4    examine.

5        Once that's done, the tool of choice that we use at the

6    FBI, basically our go-to tool for cell phone forensics, is the

7    Cellebrite Universal Forensic Extraction.  I would then connect

8    the phone to that device after making sure that the device was

9    free of connecting to networks, isolate it so it can't connect

10   to networks where it can't be wiped down or altered.  Once I

11   connect it to that device, then I see what functions are

12   supported.  I use that to extract the data.

13       We use a term in forensics called "imaging."  It's

14   basically taking -- it's called imaging because it's a mirror

15   image, referred oftentimes a mirror image, duplicate copy of

16   the data that's on the phone.  So I create a file that takes

17   all that data, puts it into a single file or set of files, and

18   then take those files, and I use Cellebrite's physical analyzer

19   software on a forensic workstation, and I use that to process

20   the file that I've created.  And it takes out, basically parses

21   and extracts all the data from that file, everything from the

22   contents of the cell phone into a useable format that I can see

23   such as all the text message history, e-mail, and such.

24       Once I do that, I verify the authenticity of the image

25   file I created.  We do that using a hashing algorithm which is

a mathematical algorithm.  We use software.  We -- basically it takes a known set of data, you run it through the software, and it provides you with sort of a digital fingerprint which in cell phones is -- using Cellebrite is a 64-character numbers and letters signature.

So once I do that, it creates that signature.  Once I do the processing, I run it through that again.  I verify the hash value hasn't changed which verifies the authenticity of that file and the contents of the phone.  Once I do that, I then create the report, burn it onto -- usually onto optical media, CD or DVD or Blu-ray disc, and I provide that to the case agent for them to review all the data.

Q    What is the principal technology used in this extraction you just described?

A    The principal tool that I use is a Cellebrite Universal Forensic Extraction device.

Q    And why is the Cellebrite technology used?

A    It's been around for a while.  It basically supports almost any phone we can throw at it.  It supports more phones than most software.  It's also been tested, validated by a third party, and also the FBI headquarters laboratory will also verify each of the software updates before they push them out for us to use.

Q    Now, does making a copy of the phone alter the data at all?

```
 1  A     Making the copy does not alter the phone although in a
 2  cell phone just powering on the cell phone is going to change
 3  some of the settings.  It's going to log that you've powered on
 4  the device if you try to connect to any networks.  So it's
 5  going to change; however, there's several partitions on a cell
 6  phone, there's different layers basically, and it doesn't alter
 7  the user partition or the user data.
 8  Q     And what do you mean when you say "user data"?
 9  A     That's where the -- it stores all the text message
10  communications, e-mail, web browsing, whatever the user of the
11  cell phone has done.
12  Q     Now, you mentioned the hash value.  What is the
13  significance briefly of the hash value?
14  A     Again, it's for authenticity.  It authenticates that the
15  file hasn't changed.  So it creates this file at the beginning.
16  Then after I process the evidence item, it -- I can use the
17  algorithm again, and it's going to give me the same exact
18  fingerprint.  If I was to change a period, add a space,
19  anything to any of the data on the phone, it would drastically
20  alter that number.
21  Q     Did you do anything else to verify the copy you make is an
22  exact image?
23  A     Once I'm done, I take the phone and spot-check it.  So
24  I'll look at some of the items that have been extracted that
25  are on the report, and I'll look for those items on the phone
```

**UNITED STATES DISTRICT COURT**

```
 1    itself to make sure it's the data that's on the phone.
 2    Q     When you extract data or create a mirror image, are you
 3    ever able to recover deleted items or items deleted by the
 4    user?
 5    A     Yes.  In most cases.
 6    Q     Can you explain how that's done briefly?
 7    A     Briefly, when you delete a file on a computer or digital
 8    device, it doesn't actually delete it.  It's not efficient for
 9    the operating system to use the processor to overwrite the file
10    at that point.  So it just marks it in a table that it's been
11    deleted.  So the data is still there until that space is
12    needed, and then the operating system has marked that space as
13    deleted so it's available for use.  If the operating system
14    needs to store new data, then it will use that space and
15    overwrite whatever is there marked for deletion.
16    Q     And how often are you able to recover deleted data on a
17    device?
18    A     In most cases we're able to.
19    Q     And what are some of the variables that affect your
20    ability to recover deleted items?
21    A     The size of a device, if there's very little free storage,
22    whatever has been deleted is pretty much going to immediately
23    be written over with new data.  So oftentimes, if it's a device
24    with a small amount of storage, we're not going to recover
25    deleted items.  Or if it is a heavy user, if somebody uses a
```

**UNITED STATES DISTRICT COURT**

```
1   cell phone and is constantly deleting and putting new data onto
2   the phone, it's going to overwrite that data.
3   Q    Now, who is authorized to conduct these extractions at the
4   FBI office?
5   A    Well, there's -- as you said, there's three of us.  I'm
6   the only full-time cell phone data examiner.  So we encourage
7   the agents to use kiosks that have this equipment set up for
8   them, and if they have any questions or problems, they can
9   submit it to me or ask me questions.  But any of the agents
10  investigating a crime where they seized a cell phone can do
11  this process themselves.
12  Q    Now, were you assigned to perform any tasks in this case?
13  A    Yes, I was.
14  Q    What were you assigned to do?
15  A    I was assigned to perform an extraction examination of a
16  cell phone.
17  Q    And when was that?
18  A    I believe it was March 13 of 2015.
19  Q    Okay.  Now, showing you what's been previously admitted
20  now as Exhibit 116 as well as Exhibit 604 --
21           MS. JAIMEZ:  May I approach the witness, Your Honor,
22  to provide.
23           THE COURT:  Yes.
24  Q    BY MS. JAIMEZ:  Now, Mr. Saul, do you recognize
25  Exhibit 116 on the screen and Exhibit 604 in your hand?
```

**UNITED STATES DISTRICT COURT**

```
 1   A      The exhibit on the screen is a photograph that I took on a
 2   device that I performed the examination on.
 3   Q      Okay.  And what is Exhibit 604 in your hand and
 4   Exhibit 116 on the screen?
 5   A      It is a cell phone Samsung Note 3.
 6   Q      Okay.  And how do you recognize it?
 7   A      It appears to be the same phone that I examined.
 8   Q      And why did you examine it?
 9   A      Why did I examine it?  I received a request in a search
10   warrant authorizing me to examine it.
11   Q      In connection with this case?
12   A      Correct.
13   Q      Now, you conducted a forensic examination of this phone?
14   A      Yes, ma'am.
15   Q      Okay.  And what steps did you take to preserve the
16   evidence on the phone?
17   A      I basically followed the steps that I described earlier,
18   isolated from the networks and then extracted the data and
19   created the reports.
20   Q      And after you extracted the data, did you do anything to
21   verify it was an exact image?
22   A      I did verify the hash value that it was the same.  It did
23   not alter.  And I spot-checked it and looked for files on here
24   as well as the report.
25   Q      Okay.  Now, directing your attention to exhibits 130
```

1    through -- 130, 132 through 151 in the binder before you, 130

2    and then skipping 131, 132 through 151, please, if you would

3    take a moment to flip through those.  132 through 151.

4    A    I'm sorry.  What was the last number?

5    Q    151.  So 132 through 151.

6    A    Okay.

7    Q    Do you recognize these exhibits, Mr. Saul?

8    A    So far, yes, I do.

9    Q    And how do you recognize them?

10   A    They're Cellebrite extraction reports, information taken

11   from those reports.

12   Q    Extraction reports taken from where?

13   A    From cell phones examined in this case.

14   Q    Can you be slightly more specific, Mr. Saul?  Cell phones

15   or which cell phone?

16   A    For example, item 131, Exhibit 131 is a cell phone report

17   that I created.  It has my name, the case number associated

18   with this case, and describes the Samsung.  It is the report

19   that I created.

20   Q    Okay.  Exhibit 131.  And then looking at Exhibit 130, 132

21   through 151.

22   A    Exhibit 130 is a text message exchange between

23   Teofil Brank and Donald Burns.

24   Q    And generally looking at 132 through 151, are you able to

25   recognize these items, 132 through 151?

1   A    These are also extracted contents from cell phones

2   examined in this case.

3   Q    Okay.  And how do you recognize these items?

4   A    I recognize the cell phone report.

5   Q    So looking at 132 through 151, do you recognize these as

6   items taken from the phone before you, Mr. Saul?

7          MR. CHOWDHURY:  Your Honor, I would just note -- I

8   would object.  I think the witness is still looking, flipping

9   through.  I don't think he's seen all the exhibits yet to

10  answer the question.

11         THE COURT:  Yes.  Let's let him finish looking

12  through the exhibits, and you can tell us when you're done.

13      Are you using your report, which is 131, to assist you in

14  identifying the exhibits 132 through 151?

15         THE WITNESS:  No, sir.  Actually, 131 is the one

16  that appears to be the report.  It is the report that I created

17  when I examined the phone, and the other exhibits appear to be

18  from a cell phone that was examined in this case.

19         THE COURT:  Right.  How do you know that 132 through

20  151 are the items that you extracted from the phone?

21         THE WITNESS:  These aren't the items that I

22  extracted from the phone.

23         THE COURT:  Okay.  Go ahead.

24  Q    BY MS. JAIMEZ:  Taking a moment, Mr. Saul, looking at

25  Exhibit 132 through 151, looking at the information, the

1    headers above, please take a moment to examine them.

2           THE COURT:  Maybe it's easier if you do a couple of

3    them at a time so we're not having a group of 132 to 151.

4           MS. JAIMEZ:  Yes, Your Honor.

5    Q    Mr. Saul, turning your attention specifically to

6    Exhibit 131, are you able to recognize this item?

7    A    Yes, ma'am.

8    Q    What is this?

9    A    This is the extraction report, the first few pages that I

10   created when I examined the phone which is the

11   Samsung Galaxy Note 3.

12   Q    And which phone are you referring to specifically?

13   A    The Samsung Galaxy Note 3 which is this phone, Exhibit

14   604.

15   Q    Now, turning your attention to Exhibit 130 before you,

16   please take a moment to examine 130 and the top of 130.  Do you

17   recognize this item?  Is this item related to the phone that

18   you examined?

19           MR. CHOWDHURY:  Compound question, Your Honor.

20           THE COURT:  Wait a minute.  The objection is

21   sustained.

22   Q    BY MS. JAIMEZ:  Are you able to now recognize Exhibit 130?

23   A    Exhibit 130 is a text history from the Samsung phone I

24   extracted.

25   Q    So you're able to recognize Exhibit 130?

```
1              MR. CHOWDHURY:  Objection.  Asked and answered.

2              THE COURT:  Overruled.

3              THE WITNESS:  Yes.

4    Q    BY MS. JAIMEZ:  Where did it come from, to be clear?

5    A    From the Samsung Galaxy Note 3 that I examined.

6    Q    Are you referring to Exhibit 604?

7    A    604, yes.

8    Q    Now, turning to Exhibit 132, take a moment to look at that

9    exhibit at the very top.

10   A    Okay.

11   Q    Now, where have you seen this exhibit before?  Where have

12   you seen this image before, if anywhere?

13             MR. CHOWDHURY:  Objection.  Compound, Your Honor.

14             THE COURT:  Overruled.

15             THE WITNESS:  This appears to be an e-mail from that

16   phone, from the report that I created.

17   Q    BY MS. JAIMEZ:  Yes.  Now, please take a moment to turn to

18   Exhibit 133 and please conduct the same analysis.

19   A    Yes.  This also appears to be an e-mail from the phone

20   that I examined.

21   Q    Now, turning to Exhibit 134 --

22             THE COURT:  That doesn't answer the question.  How

23   do you know it's an e-mail that you extracted from the phone?

24   Just by looking at this document?

25             THE WITNESS:  Your Honor, I have seen the entire
```

1    report which I scrolled through in pretrial hearings.

2            THE COURT:  Okay.  So then does that also apply to

3    132 to 151?  You've seen each of those documents before, and

4    those are the documents you extracted from the phone?

5            THE WITNESS:  Your Honor, I'd have to look real

6    quickly at them if I could.

7            THE COURT:  That's what we're trying to get at.  If

8    you could look at them quickly and make that determination,

9    then we do not have to go through them individually.

10       That's what you're trying to accomplish, is it not?

11           MS. JAIMEZ:  Yes, Your Honor.

12           THE WITNESS:  (Witness reviewed exhibits.)

13       Yes.  They do appear to all come from that phone.

14   Q    BY MS. JAIMEZ:  How do you know that, to clarify?

15   A    They're consistent with the report, plus I saw the entire

16   report in a pretrial hearing.

17           MS. JAIMEZ:  Your Honor, the Government at this time

18   would seek to move exhibits 130, 132 through 151 into evidence

19   to the extent they have not been previously admitted.

20           THE COURT:  Well, you tell me which ones haven't

21   been admitted.

22           MS. JAIMEZ:  Yes, Your Honor.  Exhibit 134,

23   Exhibit 139 --

24           THE COURT:  Wait a minute.  You're offering 134.

25   There's an objection?

```
 1              MR. CHOWDHURY:  No, Your Honor.

 2              THE COURT:  All right.  134 will be received into

 3    evidence without objection.

 4          (Marked for identification and received

 5           into evidence Exhibit No. 134.)

 6              THE COURT:  Next exhibit?

 7              MS. JAIMEZ:  Exhibit 139 through 143.

 8              THE COURT:  No.  139.

 9          Any objection to 139?

10              MR. CHOWDHURY:  One moment, Your Honor.

11              THE COURT:  Do them individually.

12              MS. JAIMEZ:  140, Your Honor.

13              THE COURT:  No.  We're still on 139.

14              MR. CHOWDHURY:  Relevance, Your Honor.

15              THE COURT:  That objection is overruled.  It will be

16    received into evidence.

17          (Marked for identification and received

18           into evidence Exhibit No. 139.)

19              THE COURT:  The next exhibit?

20              MS. JAIMEZ:  140, Your Honor.

21              THE COURT:  Any objection?

22              MR. CHOWDHURY:  One moment, Your Honor.  No

23    objection, Your Honor.

24              THE COURT:  140 is received into evidence without

25    objection.
```

64

```
 1            (Marked for identification and received
 2         into evidence Exhibit No. 140.)
 3                THE COURT:  Next?
 4                MS. JAIMEZ:  141, Your Honor.
 5                THE COURT:  Any objection to 141?
 6                MR. CHOWDHURY:  No, Your Honor.
 7                THE COURT:  It will be received into evidence
 8  without objection.
 9            (Marked for identification and received
10         into evidence Exhibit No. 141.)
11                MS. JAIMEZ:  143, Your Honor.
12                THE COURT:  143, any objection?
13                MR. CHOWDHURY:  No, Your Honor.
14                THE COURT:  143 will be received into evidence.
15            (Marked for identification and received
16         into evidence Exhibit No. 143.)
17                MS. JAIMEZ:  If I missed it, 142, Your Honor.
18                THE COURT:  Yes, you did.
19         Any objection to 142?
20                MR. CHOWDHURY:  One moment, Your Honor.  No,
21  Your Honor.
22                THE COURT:  All right.  142 will be received into
23  evidence without objection.
24            (Marked for identification and received
25         into evidence Exhibit No. 142.)
```

```
 1              THE COURT:  Next.

 2              MS. JAIMEZ:  145.

 3              THE COURT:  Any objection?

 4              MS. CHOWDHURY:  No, Your Honor.

 5              THE COURT:  Received into evidence.

 6         (Marked for identification and received

 7         into evidence Exhibit No. 145.)

 8              THE COURT:  Next?

 9              MS. JAIMEZ:  146.

10              THE COURT:  Any objection to 146?

11              MR. CHOWDHURY:  One moment, Your Honor.  No,

12    Your Honor.

13              THE COURT:  All right.  146 will be received into

14    evidence.

15         (Marked for identification and received

16         into evidence Exhibit No. 146.)

17              THE COURT:  Next?

18              MS. JAIMEZ:  147, Your Honor.

19              THE COURT:  Any objection to 147?

20              MR. CHOWDHURY:  No, Your Honor.

21              THE COURT:  It will be received into evidence.

22         (Marked for identification and received

23         into evidence Exhibit No. 147.)

24              THE COURT:  Next one?

25              MS. JAIMEZ:  148, Your Honor.
```

```
 1              THE COURT:  Any objection to 148?

 2              MR. CHOWDHURY:  No, Your Honor.

 3         (Marked for identification and received

 4         into evidence Exhibit No. 148.)

 5              MS. JAIMEZ:  149.

 6              THE COURT:  Any objection to 149?

 7              MR. CHOWDHURY:  No, Your Honor.

 8         (Marked for identification and received

 9         into evidence Exhibit No. 149.)

10              MS. JAIMEZ:  And 151, Your Honor.

11              THE COURT:  Any objection to 151?

12              MR. CHOWDHURY:  No, Your Honor.

13              THE COURT:  151 will be received into evidence

14    without objection.

15         (Marked for identification and received

16         into evidence Exhibit No. 151.)

17              MS. JAIMEZ:  All right.  Thank you, Your Honor.

18    Q    Now, Mr. Saul, take a moment to look at Exhibit 131 before

19    you, and let's bring it up on the screen, please, previously

20    admitted into evidence.  Please turn to the last page of this

21    exhibit.

22    A    Okay.

23    Q    What does the last page of this exhibit show, Mr. Saul?

24    A    It shows contents from the Samsung Galaxy Note 3 that I

25    examined.  It shows the SMS which is short message service
```

1  which is text messages.  It shows the number that were

2  recovered during the exam which was 10,183.  It shows that

3  2,464 of those were deleted and recovered.  It shows -- do you

4  want me to go through each line?

5  Q    No.  What does it show specifically with respect to

6  identifying information of the user looking near the bottom of

7  the exhibit?

8  A    For e-mail it shows the e-mail address

9  jarecwentworth@gmail.com and has 161 e-mail messages that were

10 recovered.

11 Q    How did this e-mail address come to be associated with

12 this phone, Exhibit 604?

13            MR. CHOWDHURY:  Objection.  Calls for speculation.

14            THE COURT:  Overruled.

15            THE WITNESS:  The user of the phone would have

16 entered this e-mail address and account into the phone to

17 receive and send e-mail.

18 Q    BY MS. JAIMEZ:  And generally, what does this report

19 indicate with respect to deleted text items going back --

20 A    It will show -- sorry.  Was there an objection?  Sorry.

21 It will show the number of deleted files that were recovered,

22 text messages that were recovered.

23 Q    Does it show anything with respect to the number of items

24 that were not recoverable?

25 A    If they've been overwritten, the software will not know

1    that they've been deleted.  They're not there; so it will not

2    know that.  So it won't show what can't be recovered.

3    Q    So, to be clear, what does this show with respect to

4    deleted information concerning SMS messages?

5    A    It shows that there were 2,464 deleted text messages that

6    it was able to find and recover.

7    Q    And were any text messages deleted on this phone, 604?

8    A    Yes.  There were well over 2,000 that were deleted.

9    Q    Were you able to recover those text messages?

10   A    Those were the ones that I did recover, yes.

11   Q    Now, would there be any other way to verify text messages

12   that were not recoverable based on your expert opinion?

13   A    If it's a text message, you could find the other phone,

14   the message that it was sent to.  You could recover from that

15   phone or telephone logs from the service provider.

16   Q    Now, turning to what's been previously admitted -- now

17   changing topics, let's turn to Exhibit 115 and 178.

18        Do you recognize these exhibits?

19   A    Exhibit 115?

20   Q    And 178.

21   A    Yes, I do.

22   Q    Now, looking at Exhibit 115, do you recognize this item?

23   A    Exhibit 115 is a screenshot of a Twitter post that someone

24   captured on the cell phone, and 178 is a report of a cell

25   phone -- another cell phone that I examined in this case which

69

1    was a Samsung Galaxy Alpha, and I located this screenshot on

2    that cell phone.

3    Q    And when did you conduct this other extraction in 178?

4    A    It was on June 26, 2015.

5    Q    Now, looking at Exhibit 115 up on the screen, are you able

6    to tell when this screenshot was created?  Turning to the

7    second page.

8    A    Yes, I am.

9    Q    When was that?

10   A    It was created at 1:47 p.m. on February 16.

11   Q    And how are you able to know that that was the date it was

12   created?

13   A    This was the metadata associated with that screenshot that

14   I extracted.

15   Q    And looking at Exhibit 178 -- take a moment to bring it up

16   on the screen, 178, are you able to tell the type of phone that

17   was examined here?

18   A    Yes, I am.

19   Q    And what type of phone is it?

20   A    It was a Samsung Galaxy Alpha phone.

21   Q    Now, turning your attention to what's been previously

22   admitted as Exhibit 108, take a moment to turn there.  If we

23   could bring it up on the screen as well.

24        What is this exhibit, Mr. Saul?

25   A    This is a Cellebrite extraction report created in this

1    case from an iPhone -- Apple iPhone 6.  It was extracted by

2    Special Agent Jonathan Bouman.

3    Q    How do you know that?

4    A    Based on the report itself and information displayed.

5    Q    So do you know what process was used to create this report

6    based on your expert opinion?

7    A    Yes.

8    Q    What process?

9    A    It would have been similar to the process I described

10   earlier using the Cellebrite machine.

11   Q    And when the Cellebrite process is used to extract text

12   messages, what time zone is used for the text messages?

13   A    In this case, it's the Universal Coordinated Time.

14   Q    Is this typical for Cellebrite extraction, Mr. Saul?

15   A    Yes.  That's a Universal timestamp that doesn't change.

16   Q    And why is the Universal time standard used?

17   A    Because --

18   Q    As opposed to local time.

19   A    You can figure out what time it is anywhere in the world

20   based on what time it is in UTC time.

21   Q    How reliable is a Cellebrite report?

22   A    From my training and experience, it's reliable.  It's

23   information extracted from the device that it's doing the

24   extraction from.

25   Q    In your expert opinion, would a Cellebrite report

```
 1   accurately represent any text messages on the cell phone it's

 2   extracting from?

 3   A    Yes, it would.

 4            MS. JAIMEZ:  No further questions at this time.

 5            THE COURT:  All right.  Cross-examination.

 6            MR. CHOWDHURY:  Thank you, Your Honor.

 7                      CROSS-EXAMINATION

 8   BY MR. CHOWDHURY:

 9   Q    Good afternoon, Mr. Saul.

10   A    Good afternoon.

11   Q    Just to be clear, in your testimony just now you spoke

12   about three different cell phones; is that right?

13   A    Correct.

14   Q    There was the Apple cell phone; is that right?

15   A    Yes.

16   Q    Belonging to Mr. Burns; right?

17   A    That's what I believe, yes.

18   Q    Why do you believe that?

19   A    It's basically from the information I received from the

20   case agents, and there was Special Agent Bouman's extraction of

21   the victim's phone, what I believed to be the victim's phone.

22   Q    You were told it was Don Burns' phone?

23   A    Correct.

24   Q    You also examined what you believe to be Mr. Brank's

25   phone.
```

```
1   A    Correct.

2   Q    And the other phone you examined was what you believe to

3   be Mr. Griggs' phone.

4   A    That's my understanding, yes.

5   Q    Okay.  So turning to the screenshot, Exhibit 115 from the

6   Twitter, to be clear, this screenshot was found on

7   Mr. Justin Griggs' Samsung phone; is that right?

8   A    Yes, sir.

9   Q    Now, you talked about the legal authority you have to

10  conduct these searches.  The legal authority you have to

11  conduct a search of Mr. Brank's phone was pursuant to a search

12  warrant; is that right?

13  A    Correct.

14  Q    You did not have a search warrant to search Mr. Burns'

15  phone; is that right?

16  A    I did not do the search of Mr. Burns' phone.

17  Q    Do you know if a search warrant -- if there was a search

18  warrant that authorized the search of Mr. Burns' phone?

19  A    In this case I don't know.

20  Q    That search was a consent search, wasn't it?

21  A    That's my understanding, but I don't know.

22  Q    What is a consent search?

23  A    When a person authorizes you to examine their phone.

24  Q    And Mr. Burns only consented to a search between

25  February, 2014, and March, 2014 -- isn't that right? -- of the
```

1    phone?

2    A     I don't know.

3    Q     That was the time frame that was examined; is that right?

4           MS. JAIMEZ:  Objection.  Lacks foundation,

5    Your Honor.

6           THE COURT:  We'll see.  Objection is overruled.

7         You can answer the question if you know.

8           THE WITNESS:  I don't know what Mr. -- what he

9    authorized.

10   BY MR. CHOWDHURY:

11   Q     Can you turn to Exhibit 108.

12   A     Yes.

13   Q     And take your time and look through it.  But in looking

14   through it, would you agree with me that the date range here

15   only goes between February, 2015, and March, 2015?  Take your

16   time.

17   A     (Witness reviewed exhibits.)

18         Okay.  It appears to go between February 16 and March 5.

19   Q     February 16, 2015, and March 5, 2015?

20   A     Yes, sir.

21   Q     We have nothing else in this report beyond February, '15,

22   and March, 2015; is that right?

23   A     That appears accurate, yes.

24   Q     That's because that's the only range that Mr. Burns would

25   consent to; is that right?

```
 1   A     I don't know.  I wasn't there for that.
 2             MS. JAIMEZ:  Objection.  Lack of foundation.
 3             THE COURT:  The objection is overruled.  The witness
 4   said he didn't know.
 5   Q     BY MR. CHOWDHURY:  Now, you spoke about taking a physical
 6   image of the phone; is that right?
 7   A     Correct.
 8   Q     Okay.  And there's a difference between a physical image
 9   and a logical image; is that right?
10   A     Correct.
11   Q     What is a "logical image"?
12   A     A logical image works with the operating system to
13   basically provide whatever you're asking for.  You can select
14   whatever data you want whether it be text messaging history or
15   call logs or contact history.
16   Q     And you can select a range of time?
17   A     I don't think you can select a range.  I think you select
18   all text messages.
19   Q     Okay.  A physical image is an exact image of everything on
20   the phone; is that right?
21   A     Correct.
22   Q     Now, in Cellebrite forensic software -- that was used to
23   search Mr. Burns' phone; is that right?
24   A     Cellebrite software was used, yes.
25   Q     That allows the examiner to select a date to include in
```