```
 1  the physical -- in the logical image; is that right?
 2  A    With the reporting you can go through and select a range,
 3  but when you extract it, no.  You select all text messages.
 4  Q    All right.  But what we have here, what we looked at at
 5  Exhibit 108 is a report; right?
 6  A    Correct.
 7  Q    And that report under the Cellebrite software, you can
 8  select a range of time; right?
 9  A    Correct.
10  Q    Okay.  You didn't search Mr. Burns' computer; is that
11  right?
12  A    No, I did not.
13          MR. CHOWDHURY:  May I have one moment, Your Honor?
14          THE COURT:  Yes.
15          MR. CHOWDHURY:  No further questions, Your Honor.
16          THE COURT:  All right.  Any additional questions of
17  this witness?
18          MS. JAIMEZ:  Yes, Your Honor.
19                  REDIRECT EXAMINATION
20  BY MS. JAIMEZ:
21  Q    Looking at Exhibit 108, Mr. Saul, pulling Exhibit 108 up,
22  please, you testified that there was a limited date range for
23  the text messages here; correct?
24  A    That's in this exhibit, yes.
25  Q    What is the date range?
```

```
 1   A      February 16, 2015, through March 5th, 2015.

 2   Q      And when was the extraction done?  When was this report

 3   created?

 4   A      On March 6, 2015.

 5   Q      So does it -- would it surprise you that messages only go

 6   up to March 5th?

 7              MR. CHOWDHURY:  Objection.  Relevance, Your Honor.

 8              THE COURT:  Overruled.

 9              THE WITNESS:  No, it does not.

10   Q      BY MS. JAIMEZ:  And what -- when do you typically have

11   authority to search phones or cell phones?  What are the

12   different types of authority that you can obtain?

13   A      There's a search warrant which is a Court authorizing us

14   to search it.  There's consent which is the owner of the phone

15   providing consent.

16   Q      And in this case, how many phones did you search

17   altogether?

18   A      I personally examined two phones.

19   Q      Two phones.  Okay.

20          And the defendant's phone, how was it searched?  Based on

21   what authority?

22   A      With a search warrant.

23   Q      And the victim Donald Burns' phone, under what authority

24   was it searched?

25   A      My understanding -- again, I wasn't there, but my
```

1    understanding, it was a consent search.

2         MS. JAIMEZ:  Thank you, Mr. Saul.

3         THE COURT:  May this witness be excused?

4         MR. CHOWDHURY:  Yes, Your Honor.

5         THE COURT:  All right.  We're going to take our

6    afternoon recess.  We'll be in recess for ten minutes.

7         (A recess was taken at 3:26 p.m.)

8         (The following proceedings were held in

9         open court out of the presence of the jury:)

10        THE COURT:  All right.  All counsel are present.

11   The defendant is present.  Let's bring in the jury.  Call your

12   next witness.

13        MS. JAIMEZ:  Your Honor, the Government calls

14   Donald Burns.

15        (The following proceedings were held in

16        open court in the presence of the jury:)

17        THE COURT:  All right.  You may call your next

18   witness.

19        MS. JAIMEZ:  Your Honor, the Government calls

20   Donald Burns.

21        **DONALD BURNS, GOVERNMENT'S WITNESS, SWORN:**

22        THE CLERK:  You may be seated.

23     Please state and spell your full name for the record.

24        THE WITNESS:  Donald, middle initial A., Burns,

25   B-u-r-n-s.

```
 1              THE COURT:  All right.  You may proceed.
 2                      DIRECT EXAMINATION
 3   BY MS. JAIMEZ:
 4   Q     Good afternoon, Mr. Burns.
 5   A     Good afternoon.
 6   Q     Where do you currently reside?
 7   A     In Palm Beach, Florida.
 8   Q     Do you live there year-round?
 9   A     I do not.
10   Q     Where else do you reside?
11   A     I also live in Nantucket, Massachusetts, and I spend a
12   small amount of time in La Jolla, California.
13   Q     How would you describe the towns that you reside in?
14   A     Both as to Palm Beach and to Nantucket, I consider them to
15   be very small towns with populations ranging from about 8,000
16   people to 60,000 people.
17   Q     Now, do you reside alone or with anyone else?
18   A     I reside alone.  I ended a long-term relationship a little
19   bit more than two years ago.
20   Q     What do you do for a living, Mr. Burns?
21   A     I'm the founder and president of the Donald A. Burns
22   Foundation, and in addition to that, I'm chairman of the board
23   of a small public company called magicJack VocalTec, Limited,
24   and I also manage my own personal development portfolio.
25   Q     Now, what did you do before working for magicJack?
```

**UNITED STATES DISTRICT COURT**

```
 1    A    I was cofounder and vice chairman of a public company
 2    called Telco Communications Group.
 3    Q    Now, Mr. Burns, do you know anyone by the name of
 4    Teofil Brank?
 5    A    I do.
 6    Q    How do you know him?
 7    A    I recall that I met him through a gentleman named Myles in
 8    an arrangement that involved paying he and Myles for sex.
 9    Q    Do you know Mr. Brank by any other name?
10    A    I originally knew him also by what I would describe as his
11    stage name which was Jarec, and then I later came to know him
12    by what I would also describe as his stage name of
13    Jarec Wentworth.
14    Q    Now, is the person that you know as Teofil Brank or Jarec
15    or Jarec Wentworth in the courtroom today?
16    A    He is.
17    Q    Can you point to him and describe for the record what he's
18    wearing?
19    A    Yes.  He's at the table on the left in a striped shirt
20    with a -- the collar buttoned.
21              THE COURT:  The record will reflect the witness has
22    identified the defendant.
23    Q    BY MS. JAIMEZ:  Now, Mr. Burns, how many times did you pay
24    the defendant for sex approximately?
25    A    Approximately four or five.
```

1    Q     And approximately how much each time?

2    A     I recall it was between $1,500 and $2,500.

3    Q     Besides paying for sex with the defendant, did you have

4    any other arrangements with the defendant?

5    A     Yes.  From time to time I paid him to refer other adult

6    industry or pornographic industry models to me for the purposes

7    of paying them for sex.

8    Q     Now, why did you turn to the defendant for such referrals?

9    A     At some point in late 2014, I recall that he promoted to

10   me that he had wide range in contacts in the adult industry and

11   that he had excellent skills of persuasion and that he would be

12   very well qualified to recruit other people from the adult

13   industry for these pay-for-sex meetings.

14   Q     Now, Mr. Burns, why were you engaged in this pay-for-sex

15   activity?

16   A     It was partly a coping mechanism from the loss of my

17   long-term relationship, but frankly, it was also a way of

18   engaging in sexual contact without commitment.

19   Q     Now, did the referral fee arrangement that you had with

20   the defendant work out as you planned?

21   A     I remember a time -- it didn't ultimately.  I remember a

22   time in January of 2015 where he had arranged a referral for a

23   gentleman with the first name of Marcin, and I advanced the

24   defendant approximately $2,000 to pay him for that referral

25   arrangement.  And the meeting was canceled at the last minute,

1    and I remember a text message exchange where the defendant

2    announced to me, if you will, that he was not going to return

3    the $2,000.

4    Q    What was your reaction to the defendant's refusal to

5    return the $2,000?

6    A    I thought it wasn't the right thing to do, but I don't

7    recall making a big deal about it, and I certainly didn't take

8    any steps to recover it.

9    Q    And when did all of this happen?

10   A    I recall that this was in the January, 2015, time frame.

11   Q    Now, did you hear from the defendant again after

12   January, 2015?

13   A    I heard from the defendant again in the middle of

14   February, 2015.

15   Q    And how did the defendant reach out to you?

16   A    By text message.

17   Q    Now, were those text messages preserved on your phone?

18   A    They were preserved on my phone, yes.

19   Q    And how was that done?

20   A    It was done in two different ways actually.  I ultimately

21   turned my telephone over to an agent at the FBI who's in the

22   courtroom today and consented to the FBI extracting all of the

23   text messages on my phone.

24   Q    Now, did you turn over the entirety of that phone for

25   extraction?

```
1    A      I did not.

2    Q      Why not?

3    A      The phone is filled with my personal financial

4    information, pictures of my friends and family, tax

5    information, and it is literally full of attorney/client

6    communications in matters not relating to this.

7    Q      Now, let's take a moment to turn to what's been previously

8    admitted as Exhibit 108, and let's pull it up on the screen.

9           Do you recognize Exhibit 108, Mr. Burns?

10                THE COURT:  It's in the binder if it's easier to

11   read in paper copy.

12                THE WITNESS:  Thank you, Your Honor.

13          Yes, I do recognize this document.

14   Q      BY MS. JAIMEZ:  And what is it?

15   A      If you'll allow me just to look at the rest of the pages,

16   please.

17   Q      Take your time.

18   A      (Witness reviewed exhibit.)

19          This report is what I understand to be the results of the

20   extraction of the text messages that the FBI agent did from my

21   phone.

22   Q      Text messages from what period?

23   A      I believe they cover a period -- forgive me just a

24   second -- from the middle of February -- February 16, 2015,

25   through March 5, 2015.
```

**UNITED STATES DISTRICT COURT**

1    Q     And is it a fair and accurate representation of the text

2    message exchanges that you had with the defendant in that time

3    period?

4    A     I reviewed this document on more than one occasion now,

5    and to the best of my ability to determine, it is a fair and

6    accurate representation.

7    Q     And how are the text messages represented in Exhibit 108

8    based on your review?

9    A     They're a little unusual.  They go from -- if I could

10   describe it this way, backwards to forwards.  In other words,

11   the oldest text message is the first, and then it goes

12   backwards to the newest text message.  And they're also in a

13   time format called UTC which I've come to understand is about

14   eight hours later than the time here on the West Coast.

15   Q     Thank you.

16         Now, looking to page 27 of Exhibit 108 and specifically

17   item 382, can you please read this text.

18   A     This is a text message on February 16 at 6:49 UTC time

19   p.m. which I understand to be about 10:49 a.m. here on the

20   West Coast.  And it is a text message from the defendant to me,

21   and it reads, "So another month has passed, and you broke your

22   word again.  Tisk tisk."

23   Q     Now, how long had it been since you had last spoken to the

24   defendant when you received this text message?

25   A     It was about a month.

```
 1   Q    And what did you think about this message when you
 2   received it?
 3   A    His first text message, I had no idea what the defendant
 4   was talking about.
 5   Q    Where were you when you received this first text message?
 6   A    I was in Vancouver, Washington at an out-of-business
 7   shipyard.
 8   Q    Did you respond to the defendant?
 9   A    I did.
10   Q    Looking at Exhibit 381, can you note how you responded?
11   A    I just sent him back a question mark.
12   Q    Did the defendant clarify what he meant after you sent
13   your question mark?
14   A    He did somewhat.  He wrote back to me very shortly after
15   and said, "The car."
16   Q    And can you read on through item 379, please?
17   A    Yes, I can.  And the defendant continued, "How can we work
18   if trust is broken?"
19   Q    And did you respond to this?
20   A    I responded in text message 377, "I think we don't have
21   any working relationship anymore.  The $2,000 advance is an
22   outstanding issue.  You're right that I'm not making a big deal
23   out of it, but I'm not comfortable working together after
24   that."
25   Q    Now, what did you mean when you said, "The $2,000 advance
```

**UNITED STATES DISTRICT COURT**

1   is an outstanding issue"?

2   A    I thought it wasn't the right thing to do for the

3   defendant to keep the $2,000 referral fee related to Marcin.

4   Q    And what did you mean when you said you didn't think you

5   had a working relationship anymore?

6   A    Meaning with regard to the defendant looking for other

7   adult industry models for pay-for-sex arrangements.

8   Q    Now, overall, what were you trying to say in this text

9   message, Mr. Burns?

10   A    I was trying to communicate that I didn't think it was

11   particularly a big deal but that I wasn't anxious in continuing

12   any kind of arrangement with the defendant to recruit adult

13   industry models for pay-for-sex arrangements.

14   Q    Now, can you read the defendant's response to you in items

15   376 through 373?

16   A    The defendant writes me after that and says, "Be wise on

17   how you reply.  I can bring your house down, Don.  This was a

18   simple conversation, and you throw this shit out at me.  Don't

19   get me mad."

20        And he continues, "I do have a Twitter and your photos.

21   Lies can be made, or maybe it's the truth.  Just saying."  He

22   finishes with, "Have a good day."

23   Q    Now, how did you interpret this set of text messages?

24   A    They were threatening, but I didn't know where the threat

25   was going at this point.  I knew that Twitter was a social

1   media outlet, and I didn't know particularly at the time what

2   photos he was talking about.  But it frightened me because -- I

3   guess the best way I could describe it is it was chilling.  I

4   didn't have any idea where it was going from here.

5   Q    The defendant writes, "I can bring your house down."  How

6   can the defendant bring your house down, or how did you

7   interpret this?

8   A    The defendant had previously referred in the other text

9   message to either communicate in truth or lies.  The truth that

10  he knew about me that was so embarrassing and shameful was that

11  I had been paying for sex.

12  Q    And what was it that you were afraid of?  What were you

13  afraid would happen?

14  A    I was afraid that he would post that truthful information

15  to his Twitter account and that that information, with the way

16  the internet works today, would spread like wildfire.

17  Q    Now, why would a posting on the defendant's Twitter

18  account matter?

19  A    We live in a world today where social media outlets like

20  Twitter are so interconnected with the internet and other

21  social media outlets that, once a piece of information is

22  posted on social media, it literally spreads and is almost

23  impossible to recover.  In other words, if something, either a

24  lie about me were published on social media or an embarrassing

25  truth, then, even if that was posted for a matter of hours,

1   people could, for example, retweet it.  They could blog about

2   it.  They could do any number of things almost instantly, and

3   you'd never really be able to get that negative information,

4   whether it was the truth or lie, back.

5   Q    Do you think that's true of every Twitter posting?

6   A    I think Twitter is one of the social media outlets that is

7   very viral in nature.  In other words, if something is

8   retweeted, it can spread very rapidly.  And also the

9   defendant's Twitter account was specifically directed to the

10  adult industry, and that is an industry that I had made

11  connections in and was paying for sex in.

12  Q    Now, did you text the defendant back after receiving this

13  last set of texts?

14  A    I did.  I texted in text message no. 372, "Don't

15  understand why you're always pissed at me.  I didn't think you

16  wanted to ever hear from me again when we last talked."  And I

17  wrote in 371, "I've always been a big supporter of you, but

18  you're mad at me all the freaking time."

19  Q    And now reading through item 370.

20  A    And in 370 the defendant responds to me and says, "I guess

21  you're the emotional one.  Do you not read what you say?"

22  Q    Now, Mr. Burns, what did you mean when you said you were

23  always a big supporter of the defendant?

24  A    From time to time -- over the period that I knew the

25  defendant, from time to time he would text me and ask me

```
 1    advice.  I remember specifically that he asked me some advice
 2    quite some time ago about legitimate modeling opportunities
 3    outside of the adult industry, and most recently he and I had a
 4    fairly long text conversation when he was struggling with a
 5    landlord tenant and roommate problem in Washington, D.C., and I
 6    directed him to go to the landlord/tenant office and, you know,
 7    did that sort of thing.  So if he would ever text me with any
 8    kind of normal life problem, I was generally happy to sort of
 9    give him advice.
10    Q    Had you ever provided the defendant with financial
11    support?
12    A    I have not provided the defendant with financial support
13    outside of the referral fees and the pay-for-sex fees that
14    we've discussed so far.
15    Q    Did you ever promise to provide the defendant with
16    financial support?
17    A    I did not.
18    Q    Why did you write that the defendant was, quote, mad at
19    you all the time?
20    A    Well, the last time we spoke, even though he was the
21    one -- excuse me.  I remember.  Even though he was the one that
22    was keeping the $2,000 referral compensation, he almost seemed
23    angry at me for canceling the meeting.  And so it just seemed
24    like he was annoyed with me leaving that conversation.
25    Q    And did you continue texting with the defendant?
```

1    A      Yes, I did.

2    Q      Can you please read items 369 through 368?

3    A      In 369 I wrote to the defendant and said, "Happy for you

4    to have the dough, but don't want people pissed off at me all

5    the time.  That's why I haven't bothered you since we last

6    chatted."

7    Q      What "dough" are you talking about here?

8    A      The $2,000 referral fee in the January time frame of 2015.

9    Q      And why hadn't you, quote, "bothered" with the defendant?

10   A      Because I just didn't want to make a big deal out of it

11   with him.  It wasn't something that I thought was worth a fight

12   over.

13   Q      And how did the defendant respond to you in items 367

14   through 365?

15   A      He writes back to me -- the defendant writes back to me in

16   text message 367 and says, "You're not nice.  You are a rude,

17   self-centered narcissist.  I was only trying to be a friend and

18   throw you boys, but you argue with me over little things and

19   expect me to take it?  You of all people know I bite when

20   someone corners me."  Then he continues, "You didn't hold your

21   word twice on the car, and that gets me upset.  Trust is what

22   works, and you break them.  Maybe you need a taste of it."

23   Q      Now, how did you interpret these text messages?

24   A      Working backwards from 366 about the car, I still at this

25   point had no idea what promises he was talking about related to

1  any car.  In the text message below, where he says, "You of all

2  people know I bite when someone corners me," I assumed it

3  referred back to the landlord/tenant/roommate challenge that he

4  had in Washington.

5  Q    Did you have any idea what car he's referring to here?

6  A    I still did not know what car or what promise about a car

7  he was referring to in this text message.

8  Q    And what is defendant referencing or how did you

9  understand his reference to, quote, "throwing you boys"?

10 A    He was talking about referring adult industry models for

11 pay-for-sex arrangements.

12 Q    And when you say "adult industry models," who are you

13 referring to?

14 A    Pornographic models, men that perform in the pornographic

15 industry targeted to gay audiences.

16 Q    Now, looking again at the text message, how did you

17 interpret defendant's statement "Maybe you need a taste of it"?

18 A    Again, this is sort of a layering on of a threat, but I

19 don't know where the threat is going.  My anxiety level is

20 rising, and my fear level is rising, but I still really can't

21 imagine where this text message series is going.

22 Q    And what was your response in items 364 through 363?

23 A    I write to the defendant in a text message, "Don't want

24 you cornered.  Want you happy.  The Boston person didn't do the

25 right thing.  I'm the only one that's worse off.  It's okay to

1  talk to each other about differences and challenges without

2  either of us being cornered."  And I continue, "If you're

3  pissed at me, I have no problem with" -- excuse me.  "If you're

4  not pissed at me, I have no problem hanging out.  Just thought

5  you weren't interested in being around me."

6  Q    Now, to clarify, who is this Boston person you're

7  referring to?

8  A    This is the adult industry model I referred to with the

9  first name of Marcin.

10 Q    And what were you trying to communicate in these text

11 messages?

12 A    I was trying to communicate, if this text message series

13 had started out in a normal way between friends or

14 acquaintances, that I would have done the same thing.  In other

15 words, I didn't know that any animosity existed or had been

16 created.

17 Q    What did the defendant write back to you in items 362

18 through 361?

19 A    In 361 he writes "IDC," which I understood to mean I don't

20 care, "about the Boston kid.  You and I have issues to work

21 out.  I have the plug of the guys, and I know how to convince.

22 You know if I don't want to talk to you.  We had a longer

23 period of that already.  I enjoy your company and will milk the

24 fun out of you, LOL," which I took to mean laugh out loud.

25 "Only Cuzco, you know, the good life."

1       "I only want to learn from you," in the next text message.

2   "You have brains and experience.  I'm a man who seeks

3   knowledge."

4   Q    What did you think about the tone of these text messages?

5   A    They were strange because he seems to be saying, oh, well,

6   the Boston kid thing wasn't important to me either.  I just

7   sort of wanted to hang out with you.  Then in the next text

8   messages he's talking to me like a mentor.

9   Q    The defendant also says "you and I have issues to work

10  out" near the beginning of the exchange.  What did you think

11  about that reference?

12  A    I really don't know.  Other than the $2,000 related to

13  Marcin's referral, I didn't know what other issues, if any, we

14  had to work out.

15  Q    What was your response in item 360?

16  A    I wrote in 360 back to the defendant, "Yeah, I agree, but

17  I don't want to walk on eggshells with you.  We should be able

18  to have a disagreement and be cool with each other."

19  Q    What happened in items 359 through 355?

20  A    In 359 -- text message 359, the defendant writes me, and

21  he says, "It's been that way.  Then I hear your excuse."  In

22  quotes, "'I don't think you wanted to talk to me,'" end quote.

23  "Wow, really.  And I'm the one here bugging you."

24       In 358 he says, "You promised me you would let me drive

25  the r8.  Cars are my life.  You know that."

And he continues in the next text message, "Show I'm nothing to you. Promises broken." And then he writes, "I'm feeling evil right now. And disappointed."

Q Now, how did you understand the defendant's reference to, quote, "the r8"?

A Well, I finally understood that he was talking about an Audi automobile that I own in La Jolla, California.

Q What do you mean he was talking about an Audi automobile?

A He was talking about the car I own in La Jolla, California, but I still wasn't clear on what promise that he thought I made with regard to that car.

Q And how did you interpret the set of text messages generally?

A They were odd actually. Again, because this -- there's been some very threatening talk thus far, and these again were a little bit more like, oh, I just wanted to hang out with you.

Q Now, defendant uses the language "I'm feeling evil right now." Had he ever used that language with you before?

A I hadn't heard him say that before.

Q What did you think of this reference?

A At this point my anxiety level is rising almost with every text because, again, I can't -- I can't picture where this text conversation is going. It sort of went from an anxiety about him posting true or false -- excuse me -- true or false embarrassing information on Twitter about me to me feeling,

```
 1    even from a personal level, frightened and unsafe.
 2    Q     Now, did you respond?
 3    A     I did.
 4    Q     Can you read items 351 through 350 now?
 5    A     I wrote to the defendant, "Dude, you're so pissed.  You're
 6    talking about blowing me up in Twitter.  Remember, I tracked
 7    you down because I liked your energy and we have had fun
 8    hanging out.  If we annoy each other, then we should call each
 9    other assholes and put it behind us.  Not all this bad energy.
10    Right?"  And, I'm sorry.  They're duplicates.  These two are
11    duplicates in 352 and 355.
12    Q     Read on to the next, 350.
13    A     In 350 I text to the defendant, "I didn't even know you
14    were talking about the r8.  Next time I'm in town for a few
15    days, it's a deal.  I just haven't been back."
16    Q     Now, how did the defendant respond to your, quote, "Put it
17    behind us" text message looking at items 349 through 347 now?
18    A     The defendant texted me at about -- continuing on 2/16, he
19    writes to me by text message, "Check my Twitter.  The
20    conversation will grown, and questions will be asked.  You lied
21    to me, and now you're treating me like shit.  I asked again,
22    and you put it behind you.  Now it's biting your ass.  I think
23    it's time -- I think by the time I'm out of the gym, you will
24    have a sweet treat for me that will make me erase my tweet."
25    Q     Can you go back and reread item 349?
```

UNITED STATES DISTRICT COURT

```
 1  A     Okay.  The defendant texted me at 349, "Check my Twitter.
 2  The conversation will grown, and questions will be asked.  You
 3  lied to me and treated me like shit.  I asked again, and you
 4  put it behind you.  Now it's biting your ass."
 5  Q     What did you think about this message?
 6  A     I could only draw the conclusion that he posted something
 7  embarrassing or intended to embarrass me or frighten me on his
 8  Twitter feed.
 9  Q     Now, in the following text message the defendant
10  references a sweet treat that would make him erase his tweet.
11  What did you think he was referring to here?
12  A     I assumed he was going to ask me for something in exchange
13  for removing the tweet, but I can't testify that I knew exactly
14  what he was going to ask me for here.
15  Q     So did you check your Twitter or did you check the
16  defendant's Twitter page as he directs you to here?
17  A     I was in an out-of-business shipyard that had very poor
18  cell service, and I wasn't able to be on Wi-Fi; so I actually
19  couldn't look at Twitter.  I need to clarify I'm not a Twitter
20  user either.  So I called a mutual associate of the defendant
21  and mine by the name of Justin Griggs, and I asked Justin to
22  check the defendant's Twitter feed to see if he had posted
23  something about me.
24  Q     And did Mr. Griggs check the Twitter account?
25  A     He did.
```

1    Q     Did he find anything?

2    A     He did.  There was apparently a text message -- excuse me.

3    A text message -- a tweet posted by Jarec Wentworth's Twitter

4    account, and I recall, without specifically looking at it, it

5    said "Do any porn stars know a guy named Don?" with a follow on

6    that said, to the best of my recollection, "Yes, Don."

7    Q     Now, did you ever receive a copy of this tweet?

8    A     When I first spoke to law enforcement officials, I

9    couldn't remember whether or not I had actually seen the tweet

10   or Mr. Justin had simply told me the tweet existed and

11   described it to me.  I subsequently recalled that I did see the

12   tweet and that Justin did send me the tweet.

13   Q     How did you see the tweet?

14   A     I saw the tweet on my iPhone.

15   Q     How is it possible that you could have forgotten a tweet

16   that created so much anxiety for you?

17   A     Precisely because, when I first saw it, I deleted it

18   within literally moments of seeing it because it made me a

19   little bit sick to my stomach, and at this point my hands were

20   shaking even communicating with the defendant by text message.

21   Q     Now, looking at what has been previously admitted as

22   Exhibit 115, which will appear before you on the monitor as

23   well, do you recognize this item?

24   A     Yes, I do.

25   Q     What is it?

```
1    A    This is the tweet that I recall that Justin sent me.
2    Q    And how do you know that?
3    A    Because it's fairly burned in my mind at this point.
4    Q    What was going through your mind when you saw this tweet
5    on your phone?
6    A    I took this as the defendant proving to me that he fully
7    intended to do something more than this if I didn't have
8    whatever he decided -- whatever the sweet treat was by the time
9    he got out of the gym.
10   Q    Why would an innocuous post saying "How many porn stars
11   know a man named Don?" be threatening?
12   A    Because I was paying adult male porn stars for sex.
13   Q    So what were you afraid of specifically with respect to
14   this Twitter account?
15   A    I think the defendant put it best.  He said something to
16   the effect of "The questions will be asked, and the
17   conversation will grow."
18   Q    Now, by the time you saw this tweet, what did you think
19   was happening?
20   A    I was clear at this point, in my mind at least, that the
21   defendant was threatening me with ruining my reputation.
22   Q    And at this time did you know how many Twitter followers
23   Jarec Wentworth or the defendant had?
24   A    I'm not sure that I recall how many he had.  I may have
25   heard him refer to that in the past, but I don't know that I
```

UNITED STATES DISTRICT COURT

1  knew at this particular moment how many followers he had.

2  Q     Did you have an opinion about the number?  Did you think

3  there were many?  Few?

4  A     I had an opinion --

5           MS. AHMAD:  Objection, Your Honor.  Calls for

6  speculation.

7           THE COURT:  The objection is overruled.  You may

8  answer the question.

9           THE WITNESS:  I believed that he was a very popular

10  adult industry star and that he had many fans.

11  Q     BY MS. JAIMEZ:  Did the defendant text you anything else

12  after posting this tweet?

13  A     He did.

14  Q     Can you please read items 345 through 344?

15  A     I'm turning to page 25 in the exhibit.

16           THE COURT:  What's the exhibit number again we're

17  dealing with?

18           MS. JAIMEZ:  Exhibit 108.

19           THE COURT:  All right.

20           THE WITNESS:  At text message 345, the defendant

21  writes me and says, "I can't get a friendship anymore because

22  who will want to be friends with blackmail?  I only wanted to

23  drive the cars and enjoy your company.  I guess finding you

24  boys is out of the picture; so it leaves me with nothing to

25  want out of this.  So I'm just going to bite hard.  You got

1    money, but I don't want that.  Money won't wash away what

2    people will read and see of you.  Wow, I guess I hold all the

3    cards now."

4         And he says in text message 344, "And trust me, the other

5    guys will stand with me."

6    Q    And to clarify, how did you interpret "throwing you boys"?

7    A    Again, that was the referral arrangement whereby, if he

8    referred someone to me for a pay-for-sex arrangement that was

9    an adult male model, then, in fact, I would pay him

10   compensation for it.

11   Q    And what were you thinking when you read the word

12   "blackmail" in his text message?

13   A    Well, I mean, I don't know whether that exact word had run

14   through my head.  I might have thought of extortion.  I'm not

15   entirely sure of the difference between the two.  But, again,

16   now things are becoming crystal clear at this point that he

17   absolutely intends to follow through with posting truthful

18   embarrassing shameful information about me or lying about me

19   using his Twitter feed.

20             THE COURT:  And what dates are we referring to now?

21             THE WITNESS:  We are still, Your Honor, at

22   February 16.

23             THE COURT:  All right.

24   Q    BY MS. JAIMEZ:  So taking what you've just said then, how

25   do you interpret his reference in the text message, quote, "I

1   don't want money"?

2   A    I thought it was bizarre.  Remember, I'm thinking now that

3   the sweet treat request was coming, but now I'm actually

4   confused because it seems completely at odds with wanting

5   something to take his tweet down, maybe he meant property as

6   opposed to money.  But again, I'm sort of back in the dark at

7   this point.

8   Q    And who are the other guys that will, quote, stand with

9   the defendant?

10  A    I'm assuming that he's referring to other male models that

11  he was aware that I had paid for sex.

12  Q    Did you continue to communicate with the defendant after

13  receiving this message?

14  A    Yes, I did, Ms. Jaimez.

15  Q    Can you read what happened in items 342 through 341?

16  A    In 342, I explained by texting to the defendant, "Teo, I

17  can't call right now, but please let me know what you want to

18  do -- what you want me to do.  Please take down posts about

19  me."

20       And he responds immediately with, "What are you offering?"

21  Q    So what did you think when defendant says, quote, "What

22  are you offering?"

23  A    We're back out of the murky area now, and now he's

24  essentially got his hand out and wanting to know what I will

25  give him to take that tweet down.

**UNITED STATES DISTRICT COURT**

1   Q    Did you think about making an offer at that point?

2   A    I didn't.

3   Q    What happened in the next few items, specifically 340

4   through 337?

5   A    I texted the defendant at item no. 340, "Look, man, just

6   tell me.  I want this behind us."

7        The next text is at 339, "We've known each other too

8   long."

9        And then he texts, "Oh, boy, Str8upgayporn is on it.  He

10  favored it."

11  Q    Now, how did you interpret this last part, quote,

12  "Str8upgayporn is on it"?

13  A    I had presumed that the item had been retweeted by the

14  editor of Str8upgayporn or someone associated with that blog

15  which covers the adult or pornographic industry.

16  Q    And how did you feel about this possible retweet at this

17  point?

18  A    It's precisely as I described earlier in my testimony.

19  The internet is something that, once information is posted to

20  it, spreads exponentially and very quickly, and it was actual

21  concrete demonstration that, within moments of the defendant

22  posting something referencing me, that it was already beginning

23  to travel across the internet.

24  Q    Now, you say in your text message, "Look, man, just tell

25  me.  I want this behind us."

1        What are you trying to say here?

2    A    I'm trying to say, if you want a sweet treat, you have to

3    tell me what the sweet treat is because I have no idea what you

4    want from me.

5    Q    And why are you willing to comply so quickly at this

6    point?

7    A    Precisely for the reason that the defendant is pointing

8    out to me that, moments after he has posted a reference to me

9    on Twitter, that other people are taking note of it and

10   repeating the information or reposting the information.  And I

11   feel as if -- again, this is all something not unique to me.

12   This is what I feel about the internet broadly and social media

13   that, once someone posts information, truthful or lie, that it

14   spreads like wildfire on the internet.

15        So I wanted to note what he needed from me, what he was

16   demanding from me in order to take down his tweet.

17   Q    Now, as you're receiving all of these messages, did you

18   ever consider just calling the defendant?

19   A    I did consider calling the defendant.

20   Q    And did you do so?

21   A    I ultimately called him around lunchtime I believe.

22   Lunchtime here on the West Coast.

23   Q    Okay.  And were you able to immediately get through to

24   him?

25   A    Excuse me.  The first time I tried to call him I believe I

1    was in the shipyard and was not able to get through to him

2    then.  I ultimately did reach him around lunchtime when I

3    realized it was a bank holiday that day.

4    Q    Now, going back before the phone call, can you look at

5    item 334 on page 25.

6    A    At item no. 334, I asked the defendant, "Do you want me to

7    call or not?  I have fucked up cell service."

8    Q    And then what happened in items 333 through 322?

9    A    The defendant writes me, "I want a new car, motorcycle,

10   and both hands full of cash."

11        And then in 332 he makes it clear, if he gets those

12   things, then he will erase it and you.

13   Q    And reading on through 322.

14   A    At item 321 I say -- I say, "So how do you want it?

15   Agreed.  I can't do that this second."  I said to the

16   defendant, "Give me your dollar sign."  I meant in that text

17   message give me your bank information.  And then in 329 I asked

18   the defendant if -- "Do you want me to call you or not?  I have

19   fucked up cell service."

20        He responds back, "Then I'll erase it."  In 327 he says,

21   "The r8 and $250,000."

22   Q    And can you read your response?

23   A    He continues actually on that point in a text message,

24   "Have the money in the care with the title.  Simple."  I

25   presumed "care" to mean "car."  He tells me to make my calls.

1      And in 324 I asked the defendant, "Send me your ABA and
2   account number, and I'll send the money by wire.  Go pick up
3   the car today before 6:00.  You know I have to do what you
4   want."
5   Q    Now, what did you mean when you say, "You know I have to
6   do what you want"?
7   A    I have no bargaining position here.  I have no bargaining
8   power.  We're not sort of having a normal negotiation between
9   two people.  He can write whatever he wants whenever he wants
10  without limitation on Twitter or for that matter any other
11  social media platform, and I don't have any way to stop him at
12  this point.
13  Q    And can you read the following two text messages on top of
14  the screen here?
15  A    I write to the defendant, "Mary will be there until 6:00
16  to give you the car.  You'll have the fed funds confirm number
17  within a short time of me getting your info.  Happy for you to
18  change your mind, but I'll do it."
19  Q    Now, how did you interpret the defendant's reference to,
20  quote, "the r8 and 250,000"?
21  A    I believed he meant that he wanted my r8 Audi automobile,
22  which I only own at La Jolla, California, and $250,000 cash.
23  Q    And what was the Audi r8 worth at this time?
24  A    Approximately $180,000.
25  Q    Now, you reference a person by the name of "Mary."  Who is

**UNITED STATES DISTRICT COURT**

1    she?

2    A    Mary works for me at my La Jolla, California house.

3    Q    Now, as you're communicating with the defendant in these

4    text messages, what's going through your mind?

5    A    I'm panicked.  It's difficult for me to type on my iPhone.

6    Text message service is even a little spotty from time to time.

7    And I'm -- there's no other way to describe it.  I'm scared to

8    the core of what he's going to write about me on Twitter.

9    Q    And what time approximately was it when you sent these

10   text messages?

11   A    I believe at this point we are approaching noon West Coast

12   time.

13   Q    Did anything of note happen after you had these text

14   message exchanges?

15   A    I reached the defendant by telephone call.

16   Q    And what happened during the telephone call?

17   A    I realized I had to call him because I had promised him

18   a -- and I was at a lunch place at this point called Beaches in

19   Vancouver, Washington.  So I had regular cell service at this

20   point.  And I called him, and I told him that I had realized it

21   was a bank holiday and that there was no way I could send him

22   money on that day in any way.

23   Q    What was his reaction?

24   A    His reaction was on the telephone, "If you don't get me

25   the cash today, then you need to give me $500,000 tomorrow."

1    Q    So were you ever able to find out a way to get the cash to

2    the defendant?

3    A    I was never able to get him cash.  I think perhaps he

4    thought I had cash laying around my home, but I always

5    explained that I needed his bank information to send a wire

6    transfer.

7    Q    And did the defendant provide you with his bank

8    information?

9    A    He did.

10   Q    Can you look at item 310 and read it for the jury, please?

11   A    The defendant texted me a text message that reads as

12   follows: "Routing no. 121000248 and accredited number," which I

13   took to mean account number, "8110313197."  Then I believe I

14   texted him, "Hold on."

15   Q    And did the defendant ever tell you whose name was

16   associated with that account information he sent you?

17   A    He did.

18   Q    Looking at items 308 through 307.

19   A    Forgive me for getting ahead.

20        I texted him at item number 308 a question stated,

21   "Teofil Brank account name?"

22        And he responded almost immediately at line 307 with

23   "Yes."

24   Q    Mr. Burns, did you wire the $500,000 demanded?

25   A    I did.  It was wire transferred with the first morning's

1    business the next business day.

2    Q    When was that?

3    A    That would have been February 17.

4    Q    And why were you willing to wire so much money?

5    A    Because we've talked about it about three times in

6    testimony so far.  Every minute that that text message

7    stayed -- excuse me -- text message.  Each minute that that

8    tweet stayed in the public domain, it was going to be literally

9    by the minute harder to retract it.

10   Q    Now, from what account did you wire the money?

11   A    My primary brokerage account at Goldman Sachs & Company.

12   Q    Let's take a moment to look at Exhibit 105 which has been

13   previously admitted into evidence.

14        Looking at the last page, do you recognize Exhibit 105?

15   A    Ms. Jaimez, let me just look at the exhibits so I make

16   sure that I recognize it.

17        (Witness reviewed exhibit.)

18        This is Goldman Sachs brokerage statement from the period

19   ending February 28, 2015, and I do recognize it.

20   Q    And what is happening on the last page of this exhibit?

21   A    On the last page there's a lot of blackout, but there's a

22   single line that demonstrates or records rather a wire transfer

23   in the amount of $500,000 to Teofil Brank, and it also gives

24   some bank information Wells Fargo.

25            MS. JAIMEZ:  At this time, Your Honor, the

**UNITED STATES DISTRICT COURT**

```
 1  Government will read the parties' stipulation at Exhibit 501.
 2            THE COURT:  All right.
 3       (Marked for identification Exhibit No. 501.)
 4            MS. JAIMEZ:  Plaintiff United States of America and
 5  Defendant Teofil Brank, defendant, individually and by and
 6  through counsel hereby stipulate to the following fact:
 7       On February 17, 2015, Donald Burns wired defendant
 8  $500,000 from Mr. Burns' Goldman Sachs account located in
 9  New York to defendant's Wells Fargo account located in
10  California, and thus the $500,000 traveled in interstate
11  commerce."
12            THE COURT:  Is that the stipulation of the
13  defendant?
14            MS. AHMAD:  I'm sorry, Your Honor?
15            THE COURT:  You entered into that stipulation?
16            MS. AHMAD:  Yes, Your Honor.
17            THE COURT:  All right.  I will instruct the jury
18  that the parties have agreed to certain facts that have just
19  been read to you, and you should therefore treat these facts as
20  having been proved.
21            THE WITNESS:  Your Honor, forgive me for asking you,
22  but is it possible to get a glass of water?
23            THE COURT:  Of course.
24            THE WITNESS:  Thank you.
25  Q    BY MS. JAIMEZ:  Now, Mr. Burns, if you hadn't wired the
```

```
 1    $500,000, where would you have used that money?
 2    A     The most likely use of that --
 3              MS. AHMAD:  Objection, Your Honor.  Relevance.
 4              THE COURT:  Overruled.
 5              THE WITNESS:  The most likely destination for that
 6    cash would have been the business project that I have going
 7    on -- thank you very much -- the business project I have going
 8    on in Vancouver, Washington which is building a ship for
 9    profit.
10    Q     BY MS. JAIMEZ:  Now, turning to what's been previously
11    admitted as Exhibit 128, take a moment to examine that exhibit.
12    A     (Witness reviewed exhibit.)
13    Q     And if we could blow it up.
14          What is Exhibit 128, Mr. Burns?
15    A     Exhibit 128 is a collection of documents that I recognize
16    as being issued by the state of Delaware which memorialized the
17    formation of my company -- the company that I control called
18    Marine Investco, Limited Liability Company.
19    Q     Is this the company you just mentioned previously?
20    A     Yes.  This company is developing a ship in Vancouver,
21    Washington for profit.
22    Q     Now, did the defendant ever recover or obtain the Audi r8
23    mentioned in the text messages, to your knowledge?
24    A     To my knowledge he did.
25    Q     Now, taking a moment to turn now to -- in your binder to
```

```
 1   Exhibit 146 and 148, please take a moment to turn there.

 2   A    Ms. Jaimez, I'm at 146.

 3   Q    And 148 as well.

 4   A    (Witness reviewed exhibit.)

 5        I've reviewed 147, and I'm now looking at 148.

 6   Q    Okay.  Considering just exhibits 146 and 148, what are

 7   these exhibits?

 8   A    Exhibit 146 is a picture of an Audi r8 that looks very

 9   similar to mine.

10   Q    And Exhibit 148, what is it?

11   A    In 148 I'm confident in saying that this Audi r8 is my car

12   because I recognize the Florida license plate on the rear.

13             MS. JAIMEZ:  Government moves exhibits 146 and 148

14   into evidence.

15             THE COURT:  They're already in.

16             MS. JAIMEZ:  Permission to publish, Your Honor.

17             THE COURT:  Yes.

18   Q    BY MS. JAIMEZ:  Now, blowing up Exhibit 146, when did the

19   defendant pick up your Audi r8?

20   A    I recall that it was in the afternoon of February 16.

21   Q    And where did he pick it up from, to your knowledge?

22   A    To my knowledge, he picked it up at my home in La Jolla,

23   California.

24   Q    What did you think that your $500,000 wire and turning

25   over this car would accomplish?
```

**UNITED STATES DISTRICT COURT**

```
 1              MS. AHMAD:  Objection, Your Honor.  Asked and
 2   answered.
 3              THE COURT:  Overruled.
 4              THE WITNESS:  I believed that the defendant had
 5   promised, when he had the $500,000 and when he had possession
 6   of the car and the title, that -- excuse me.  Not the title
 7   specifically -- and the car, that he would take the tweet that
 8   he had posted that referenced me down.
 9   Q    BY MS. JAIMEZ:  And did it work initially?
10   A    Yes.  Initially it did work.
11   Q    How do you know?
12   A    It's a very difficult thing for me to recall, and I'm
13   actually not able to determine with certainty that I checked at
14   that moment.  I just ultimately came to learn that he took the
15   tweet down.
16   Q    So turning back to Exhibit 108, the text messages and
17   looking at items 244 through 240, can you please read those
18   items?
19              THE COURT:  Let's get a date for these items.  I
20   think it's helpful to put it in chronology.
21              THE WITNESS:  And, Ms. Jaimez, one more time, an
22   item number, please.
23   Q    BY MS. JAIMEZ:  244 through 240, please.
24        And if you could provide the date of these texts.
25   A    On February 17 -- excuse me.  Forgive me.  You wanted me
```

```
 1    to start at which item, Ms. Jaimez?
 2                 THE COURT:  244.
 3                 THE WITNESS:  Thank you, Your Honor.
 4        I texted defendant, "Can you please take post down?  You
 5    have car and title tomorrow."
 6        And the defendant responded, "Yes."
 7        I responded with, "Thank you."
 8        And he responded at text message 241, "Like we promised."
 9    And at 240, "Done."
10    Q    BY MS. JAIMEZ:  And the date of these again?
11    A    This is February 17, and it's approximately 8:30 in the
12    morning West Coast time.
13    Q    Now, after having these text communications, did you
14    continue to communicate with the defendant?
15    A    Yes, I did.
16    Q    About what?
17    A    The defendant immediately at -- after promising to take
18    the tweet down for $500,000 and the Audi r8 automobile, he
19    immediately texted me at line 239 and says, "I want insurance
20    for one year on the r8."
21    Q    How did you respond in item 236?
22    A    I want to continue if you don't mind, Ms. Jaimez.  He
23    clarifies in a text message, "Full," which I assumed was full
24    coverage insurance.  "And then we part" in his final text
25    message in that series.
```

1    I pushed back on this request by writing the defendant and

2  saying, "Teo, you have a half a million dollars.  You can have

3  any insurance you want.  Why are you doing this to me after

4  I've lived up to everything you wanted?"

5    And he responded after that in a text message, "I have to

6  pay taxes, Don."

7  Q    How did you feel about the defendant's request for

8  insurance?

9  A    I thought it was crazy considering that he had just

10  threatened me, that he had made a series of promises that, if I

11  did what he asked, that he would take that tweet down.  And

12  almost instantly he had his hand out again with an implied

13  threat that now I need this extra.  Then we're done.

14  Q    At this point did you have any interest in providing

15  insurance?

16  A    I did not.

17  Q    Besides discussing insurance in the text messages, did you

18  discuss anything else?

19  A    He -- excuse me.  The defendant at line 235 tells me, "I

20  have to pay taxes, Don."  And then 234, "Unless you'd like to

21  make it up in cash."

22    And I said to him, "No, you don't.  I have to pay gift

23  taxes.  Your money is freaking tax free."

24  Q    And what else is discussed specifically in items 226

25  through 217 on page 22 of 108?

A     In 226 I am starting a conversation to hand over the title
to the Audi r8 to the defendant, and I write him that "Florida
says no power of attorney because owner needs to sign for
odometer miles.  I'm just hanging out for delivery now.  If
package doesn't show up last delivery, we can regroup and
figure out the plan.  "I'll show up" -- excuse me.  "I'll need
odometer miles when I get the title in my hands, but don't give
it to me yet because Florida and California will be freaks
about accuracy.  Like I said, I have delivery notification set
up; so you can track also.  We're doing a final check with
California DMV to see if we can get any better answer."

      I follow up to the defendant a text message 225 reporting
to him, "Got it.  Odometer reading, address, and driver's
license information."  And he starts asking me in the next text
message, "Why do you need the info?  Just sign and mail."

Q     And how do you respond?

A     I respond by texting the defendant, "I'll send you a pic.
Top gets buyer info to be filed with issuer Florida so they
release to new issue.  Address is really where you want to have
it sent" -- excuse me.  "Address is really where you want it
sent."  In parentheses, "but is required on same tear off.
Odometer reading on front part.  Want a pic?"

      The defendant texts back, "Yes."

      And then I texted the defendant, "Hold on a minute."  And
then I sent the defendant a series of text photographs to prove

1    to him that the title requires this information.

2    Q    Now, what prompted this conversation, Mr. Burns?

3    A    He was reluctant to -- well, he refused to give me the

4    information to fill out on the car title that the seller needed

5    to tear off and give to the state of Florida as it was a

6    Florida car title so the actual change in ownership of the car

7    could happen.

8    Q    Now, why are you so concerned about a clean title

9    transfer?

10   A    He's had my car for several days right now, and while it

11   didn't occur to me at first, on a human level and on a

12   financial level both, I started to become concerned about him

13   hurting himself or killing himself or hurting or killing a

14   bystander with my car.  That would have taken a human toll on

15   me in addition to making me absolutely financially liable for

16   anything he did in my car.

17   Q    And what did you send the defendant in these last few

18   texts, one of three, two of three?

19   A    I sent him several pictures of the Florida title to

20   demonstrate to him that I wasn't fishing for information, that,

21   if he wanted the car retitled, that he would need to provide

22   this information and let me have it so I could file it in

23   Florida.

24   Q    Now turning to what's been previously admitted as

25   exhibits 136 through 138, take a moment to turn there,

1    Mr. Burns.

2    A    Ms. Jaimez, would you like me to look at all three at one

3    time?

4    Q    Yes, please.

5    A    (Witness reviewed exhibits.)

6         Okay.  I'm familiar with them.

7    Q    What are these items?

8    A    These are the photographs that I sent the defendant of the

9    actual Florida title and the section of the title that I was

10   asking for his assistance in completing.

11   Q    Looking specifically at 136, what do you say in this

12   message?

13   A    The body of the message takes three of three, "Price will

14   say 'gift,'" in capital letters.

15   Q    Who wrote this?

16   A    I did.

17   Q    Why did you write "gift"?

18   A    Because it's the only way that we were aware of that one

19   could transfer the title of a car when no money had exchanged

20   hands.

21   Q    Was this a gift?

22   A    It was absolutely not a gift.

23   Q    Now, did you ever give the defendant authorization to

24   drive the Audi?

25   A    Yes.  In the telephone call that we had on the Monday that

1    was the bank holiday which I believe was February 16, he

2    demanded from me a signed letter that would give him

3    authorization to operate the automobile, and I explained to him

4    that at this out-of-business shipyard I didn't have any

5    resources to create a letter, sign it, and fax it or pdf it.

6    So I told him the best I could do is send him an e-mail

7    authorization to authorize him to operate the motor vehicle.

8    Q    So turning to what's been previously admitted as

9    Exhibit 132, what is this item?

10   A    I'm familiar with this item, and it is the e-mail that I

11   sent to the defendant at approximately -- excuse me.  It's at

12   approximately 12:43 p.m. West Coast time on February 16.  It

13   says, "To whom it may concern, Teofil Brank is authorized to

14   drive the Audi r8 Florida tag number AHF185.  Yours truly,

15   Don Burns."

16   Q    Why did you send this e-mail?

17   A    It was a demand from him as part of the e-mail.

18   Q    Mr. Burns, looking back, what details specifically were

19   you so concerned the defendant would make public?

20   A    Absolutely that I had been paying for sex with adult male

21   models.

22   Q    Can you describe the details of that pay-for-sex

23   arrangement that you had?

24   A    From every three to six weeks, I would fly adult male

25   models from the pornographic industry to my home, and we would

have sexual contact with each other, and generally they would

spend the night, and they would be paid for their services, and

they would fly home typically the next late morning or early

afternoon.

Q     And when did this practice start approximately?

A     I first recall it starting in the early 2013 time frame,

perhaps March or April.

Q     And how many people would come to these meetings?

A     I recall the first time was two, but there could be

anywhere from one additional persons to four additional people.

Q     And how much would you pay these individuals?

A     I estimate between 1,500 and $2,500 per person.

Q     And how would you pay them?

A     Typically in cash.

Q     How would you recruit people for these meetings?

A     If I met a male model that worked in the industry, they

would typically have the opportunity to refer a friend or

associate in the adult industry, and in many cases I offered to

pay them a referral fee.

Q     So what could one earn in total for attending your meeting

and bringing a friend?

A     1,500 to $2,500 for sexual contact and then another $1,500

to $2,500 for a referral fee.

Q     Why would you recruit people for these meetings in this

referral fee manner?

A     Because I felt as if it was a very discrete way to engage

in this activity.

Q     And what type of people typically came to these sexual

liaisons?

A     They were typically people that were current performers in

the adult or pornographic industry.

Q     So was the defendant the first person that ever recruited

for you?

A     I do not think he was.

Q     Would other people recruit for you on a regular basis?

A     Yes.  I don't know that I would characterize it as a

regular basis, but there certainly were other people that were

paid referral fees.

Q     Now, was your referral fee arrangement with the defendant

exactly like every other arrangement, or was it slightly

different?

A     It was slightly different.

Q     How was it different?

A     We may have talked about it earlier.  Come late 2014, I

remember the defendant promoting to me his connections in the

industry and his persuasive powers.  I ultimately provided him

an e-mail list of people in the industry that I would be

interested in meeting with.

Q     Now, turning to what's been previously admitted as

Exhibit 119, take a moment to turn there if you'd like.

1    A    I'm there, Ms. Jaimez, and I recognize the document.

2    Q    What is Exhibit 119?

3    A    It's an e-mail that I sent the defendant on

4    September 27, 2014.

5    Q    How did this e-mail come to be?

6    A    This was in response to the defendant promoting to me his

7    industry contacts and as well his persuasive powers.  And I

8    simply went on a popular adult website called Seancody.com and

9    sent him Facebook information, and to the extent that it was

10   available on the internet or through some other form, contact

11   information for them, and I listed a referral fee opportunity

12   for any particular referral.

13   Q    How many referrals are noted here on Exhibit 119?

14   A    There are 11.

15   Q    And what specifically are you asking defendant to do here?

16   A    To recruit any one of these models for a pay-for-sex

17   arrangement.

18   Q    And who would receive payment if all of these referrals

19   took place?

20   A    The individual adult models would receive payment if they

21   were involved in a pay-for-sex arrangement, and the defendant

22   would receive a referral fee.

23   Q    What would the total cost or exposure be if every single

24   one of these referrals took place?

25   A    I think I've looked at it, and it's about $50,000.

**UNITED STATES DISTRICT COURT**

1   Q    Why were you willing to commit so many resources to this

2   endeavor?

3   A    I really never looked at it as a $50,000 exposure because

4   I thought it was highly unlikely that the defendant or,

5   frankly, anybody would be able to recruit more than, you know,

6   two or three of these people for a pay-for-sex arrangement.

7   Q    Now, looking at Exhibit 119, what is the most amount of

8   money the defendant could have earned if every single one of

9   these referrals came to be?

10  A    I characterized it -- I would characterize it as an

11  estimate.  It's in the subject line which is $22,000.  But I

12  can't testify that I have added up all the numbers, but I

13  believe that's 11 times $2,000.

14  Q    Now, did any of these meetings actually occur?

15  A    None of these meetings occurred.

16  Q    Did any of these meetings get scheduled?

17  A    Yes.  A meeting with the adult model with the first name

18  of Marcin was scheduled.

19  Q    Now, how many times -- or going back, who is Marcin?

20  A    Marcin is an adult male model, and I don't remember his

21  last name.

22  Q    Have you testified about Marcin previously today?

23  A    Yes.  He had been referred to as, I believe, the Boston

24  kid.

25  Q    And so did that referral actually turn into a sexual

**UNITED STATES DISTRICT COURT**

1  liaison?

2  A    It did not.

3  Q    How many times in total has the defendant referred people

4  to you since you met him?

5  A    I recall approximately four.

6  Q    And how much did you pay the defendant approximately for

7  his referrals?

8  A    I recall that it was 1,500 to $2,500.  I'm estimating

9  1,500 to $2,500 per referral.

10  Q    And how much did you pay defendant for his own sexual

11  contact with you on a transactional basis?

12  A    I recall a similar price range.  I'm estimating a similar

13  price range.

14  Q    And how many times did you pay the defendant for his own

15  sexual contact with you?

16  A    I recall approximately four.

17  Q    Was there ever any incident where you had sex without

18  paying him?

19  A    Not that I recall.  No.  I apologize.  There was one

20  meeting at the Bel-Air Hotel where he was a guest of mine at

21  the hotel and he was not compensated for sexual contact at that

22  particular trip.

23  Q    Did you promise to pay him at that time?

24  A    I actually said just the opposite, that I was not able to

25  compensate him for sexual contact on that trip.

**UNITED STATES DISTRICT COURT**

```
 1   Q      Now, did you typically pay the defendant on a timely basis
 2   for his referrals or his contact with you?
 3   A      To the best of my knowledge, always.
 4   Q      Did you ever owe the defendant money?
 5   A      Not that I know of.
 6   Q      Now, looking at the header of Exhibit 119, who was this
 7   e-mail sent to?
 8   A      It was sent to jarecwentworth@gmail.com.
 9   Q      And who did you understand that to be?
10   A      I understood that to be the defendant.
11   Q      And who was the e-mail from?
12   A      The e-mail was from me.  It's characterized here by my
13   first and middle name, and then the e-mail address is
14   argomediallc@gmail.com.
15   Q      What is Argo Media, LLC?
16   A      Argo Media was a project name I gave to a business idea of
17   going into the adult entertainment industry in the mid 2013
18   time frame.
19   Q      And did that company ever come to be?
20   A      No.  The company never existed.
21   Q      So why are you using that name to communicate with the
22   defendant?
23   A      It was just to create a discrete e-mail address.  So
24   this -- these kind of communications were segregated from my
25   work and personal e-mail account.
```

1    Q    And what do you mean when you say "these kind of

2    communications"?

3    A    These communications that involve pay-for-sex

4    arrangements.

5    Q    Did other people in the pornography community know about

6    Argo Media?

7    A    A few of the models that I knew generally that I

8    considered in 2013 getting into the adult industry, but I don't

9    think they knew anything about sort of the specific business

10   concept or that Argo Media ever existed.

11   Q    Mr. Burns, did you ever promise pornography actors work in

12   exchange for having sex with you?

13   A    Do you mean --

14   Q    Work at Argo Media in exchange for having sex with you?

15   A    Absolutely not.

16   Q    Now, what is Rentboy.com?

17   A    Rentboy.com is an internet site that allows potential

18   clients to connect with paid escorts.

19   Q    Have you had any familiarity or any use of the Rentboy.com

20   website?

21   A    Yes.

22   Q    Can you describe that briefly?

23   A    I believe that the person that referred me to the

24   defendant, first name Myles -- to this day I'm not able to

25   remember his last name.  I contacted him through Rentboy -- my

1    recollection is that I contacted him through Rentboy.com.

2    Q    And what type of people are listed on Rentboy.com?

3    A    They are men that make themselves available for paid

4    sexual encounters.

5    Q    Now, Mr. Burns, how would you treat the pornography actors

6    or the --

7              THE COURT:  Counsel, before we launch into a new

8    subject, I think it's an appropriate time to take our evening

9    break since I feel that the air conditioning has gone off.

10         Ladies and gentlemen, we're going to take our first

11   evening recess, and I want to remind you of the instruction

12   that I gave you earlier.  You're not to discuss this case with

13   anyone including your fellow jurors, members of your family,

14   people involved in the trial, or anyone else, nor are you

15   allowed to permit others to discuss the case with you.

16         Also, it's very important in this case in particular that

17   you do not read any news stories or articles or listen or --

18   listen to or watch any radio or TV reports about the case.  I

19   don't know if there are going to be any, but certainly I'm

20   instructing you and ordering you not to look at any of those

21   media reports.

22         And, more importantly, you're not to get on the internet

23   or Google or otherwise research or look up any information

24   about this case or anyone who has anything to do with the case

25   on the internet through the various iPhones, iPads,

 1   BlackBerries, Twitter.  You can only judge this case by the

 2   evidence that's presented in this courtroom.

 3        If you violate the Court's order, what that would mean is

 4   that I would have to declare a mistrial.  And as I indicated to

 5   you this morning, a mistrial means that we have to start the

 6   case over again.  So please keep that instruction in mind

 7   throughout the course of this trial.

 8        Tomorrow we will begin our early schedule at 8:00 a.m.

 9   Please leave your homes in sufficient time because, as you can

10   see, we can't start until you're all here.  I promise that,

11   when you get here, someone will be able to let you in.  It will

12   probably be me.  I get here early.  You will also have coffee.

13   I can't guarantee how good the coffee will be, but I guarantee

14   that it will be fresh and it will be hot.

15        So with that I'm going to ask you to go back into the jury

16   room and you're dismissed for the evening.

17        (The following proceedings were held in

18        open court out of the presence of the jury:)

19             THE COURT:  All right.  The Court is going to remain

20   in session.

21        You may step down.

22        I have a couple of -- I actually have one issue with

23   respect to the jury instructions.  I've taken a look at the

24   instructions, and I have a number of observations and a number

25   of problems with the instructions.

```
 1        The most glaring issue that I see is with respect to
 2   disputed Instruction no. 12.  I'm looking at document 182 which
 3   was filed on June 15.  The Government has in its elements for
 4   the 875(d) count, the third element is that the communications
 5   contained a true threat to injure someone's reputation.  I
 6   don't know what the jury is supposed to divine from "true
 7   threat."
 8        There's no definition in the Government's instruction of
 9   what a true threat is.  There is definition in the -- proposed
10   by the defendant to which you object -- to which the Government
11   objects, but you don't make a proposal in terms of what we're
12   going to instruct the jury as a true threat.
13        Can you enlighten me why you're not defining "true
14   threat"?
15            MR. JAUREGUI:  Your Honor, we can provide some
16   language for the Court tonight if that's all right.  We can
17   look into it and provide some language to the Court.
18            THE COURT:  Okay.  You need to take a look at these
19   instructions because I think that the other issue that I have
20   is with respect to the extortion and the attempted extortion
21   instructions.  You have apparently chosen not to use the
22   9th Circuit's Model Instruction, and that 9th Circuit Model
23   Instruction has an element in it that the Government has to
24   prove a wrongful act.
25        Now, I know there's some 9th Circuit cases out there, and
```

1    the comment to that 9th Circuit Model Instruction, it's not the

2    clearest.  But does the Government believe that it is the

3    Government's burden to prove that the threat is a wrongful act,

4    or what is your position?  Because you've left it out of the

5    instructions.

6        I know that some of the 9th Circuit cases talk about it as

7    an affirmative defense, but I don't really view it as

8    affirmative defense.  So you have to take a look at that.  It's

9    been a long day.  I realize that.  But take a look at those

10   issues tonight, and let's have a conversation tomorrow.  We'll

11   resume at 7:45.  And certainly I invite the defense to chime in

12   on those issues also.

13            MR. CHOWDHURY:  Thank you, Your Honor.

14            THE COURT:  How much longer do you have with

15   Mr. Burns?

16            MS. JAIMEZ:  Your Honor, I would estimate

17   approximately a half hour, perhaps 45 minutes depending on how

18   he answers.

19            THE COURT:  Okay.  And then the estimate for

20   cross-examination is 60 minutes?

21            MS. AHMAD:  No, Your Honor.  I think it will

22   probably be 45 minutes.

23            THE COURT:  Okay.  And then when do you have the

24   defense witnesses?  When are they going to be required to

25   appear?  They're on call as I understand it.  What day did you

```
 1   expect them to be here?
 2              MS. AHMAD:  I believe, Your Honor, we -- they should
 3   be on call for appearing tomorrow or Thursday.
 4              THE COURT:  Okay.  Because I'm not going to delay
 5   the trial.
 6              MS. AHMAD:  No.  I understand, Your Honor.
 7              THE COURT:  You'd better have them here.  They can
 8   sit in the witness room.
 9       What about the individual whose name used initials
10   yesterday but it was -- now that we -- Jason Bumpus.  He's the
11   one that was unavailable on Thursday?
12              MS. AHMAD:  Yes, Your Honor.  We communicated to his
13   counsel that he has to be available.
14              THE COURT:  Okay.  What was the response?
15              MS. AHMAD:  Unpleasant.
16              THE COURT:  Expletive deleted.
17              MS. AHMAD:  You don't want to know.
18              THE COURT:  Okay.
19              MS. AHMAD:  I'm sorry, Your Honor.  Can I raise
20   another issue?
21              THE COURT:  Sure.
22              MS. AHMAD:  As the Court knows, prior to the
23   original trial date -- so I don't have the exact date in front
24   of me, but it was a few weeks before the original trial date,
25   so it must have been April at some point, defense subpoenaed
```

1    Mr. Burns.  And in addition to subpoenaing Mr. Burns, we

2    subpoenaed documents to be brought to the trial date today,

3    Your Honor.  As the Court knows, there was no motion to quash

4    filed with respect to that subpoena.

5        So Sidley Austin today produced 400 pages of documents

6    purportedly responsive to that subpoena that is entirely

7    redacted.  It's 400 pages of black pieces of paper.

8                THE COURT:  Okay.  I wish you would have raised it

9    when Mr. Axel was here.  What are you able to glean from those

10   pages?  Are they all black?

11       Mr. Axel, just in time.  We're discussing an issue with

12   respect to the documents that you produced pursuant to a

13   subpoena that counsel has just held up and indicated that

14   they're -- I don't know, there's 400 some pages, and they're

15   heavily redacted.  Can you enlighten us?

16               MR. AXEL:  Yes, Your Honor.  I'd ask my colleague

17   Anand Singh to --

18               MR. SINGH:  We had agreed we would produce the

19   financial --

20               THE COURT:  Please take the lectern and announce

21   your appearance.

22               MR. SINGH:  Anand Singh, S-i-n-g-h A-n-a-n-d,

23   Sidley Austin on behalf of the victim.  Thank you, Your Honor.

24       So we had met and conferred with defense counsel over a

25   period of well over two months I would say, and we came to an

1    agreement that was memorialized in correspondence dated May 7.

2    We produced the documents to them today pursuant to our

3    agreement.  And it included -- among those are Goldman Sachs

4    statements that are obviously redacted transactions that we

5    didn't agree to provide.

6         THE COURT:  So why did you wait until today?

7         MR. SINGH:  That was our agreement.  They told us we

8    did not have to produce until today.

9         THE COURT:  Let me see a copy of the letter.

10        MS. AHMAD:  I don't have the --

11        THE COURT:  Let me see a copy of the documents.

12        MR. SINGH:  In fact, Your Honor, we had a discussion

13   with them.  I can't recall the date offhand, but I specifically

14   asked when they wanted -- if they expected us to produce early,

15   and they said no.

16        THE COURT:  So what is the nature of the information

17   that you have redacted?

18        MR. SINGH:  Yes, Your Honor.  If I could just take

19   one step back to frame what they asked for.  They had asked for

20   certain financial transactions with specified individuals, and

21   we had negotiated with them about who those individuals would

22   be.  So what we had agreed ultimately was to search the

23   victim's Goldman Sachs account for those names and produce

24   transactions to those persons.  And what we have done, we've

25   pulled the official business records from Goldman Sachs and

1   produced every transaction with those persons that were

2   specified on the subpoena subject to our negotiated narrowing

3   and redacted everything else which would include presumably

4   things like gas charges and electricity bills, things like

5   that.

6          THE COURT:  I'm certainly not going to take the time

7   to page through these, but it appears to me that -- I see.  So

8   they're heavily redacted; but uncertain of the pages, for

9   example, on Bates no. 362, there's a redacted portion on the

10  top and a redacted portion on the bottom.  But it does have a

11  transaction -- it does evidence a transaction on

12  January 21, 2015 to Amadon, A-m-a-d-o-n, of $4,000.

13      It looks to me -- I'm not going to get into what you

14  agreed to and what you didn't agree to, but it sounds to me

15  like there's information that's included in these reports with

16  respect to the individuals that are the individuals that --

17  some of which the defense intends to call as a witness.  At

18  this late time I'm unable to parse through those, but it does

19  look like the information -- even though they're heavily

20  redacted, there is information in there.  So take a look at

21  them tonight, and we can discuss it in the morning.

22          MS. AHMAD:  All right.  Thank you, Your Honor.

23          THE COURT:  Anything else?  We'll be in recess.

24  We'll see you at 7:45.

25      (Proceedings concluded at 5:12 p.m.)

**UNITED STATES DISTRICT COURT**

```
 1                   CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4

 5             I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

 6    COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

 7    THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

 8    PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

 9    FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10    STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11    ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12    CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13    THE UNITED STATES.

14

15                        DATED THIS  21ST  DAY OF JULY, 2015.

16

17

18                        /S/ MIRANDA ALGORRI

19                        MIRANDA ALGORRI, CSR NO. 12743, CRR
                          FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

```
 1                UNITED STATES DISTRICT COURT

 2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3          HONORABLE JOHN F. WALTER, U.S. DISTRICT JUDGE

 4

 5   UNITED STATES OF AMERICA,        )
                                      )
 6                Plaintiff,          )   Case No.
                                      )
 7          vs.                       )   CR 15-131-JFW
                                      )
 8   TEOFIL BRANK,                    )
                                      )
 9                Defendant.          )
     ─────────────────────────────────)

10

11

12

13                   REPORTER'S TRANSCRIPT OF
                           TRIAL DAY 2
14               WEDNESDAY, JULY 8, 2015
                           7:57 A.M.
15               LOS ANGELES, CALIFORNIA

16

17

18

19

20

21

22   _____

23            MIRANDA ALGORRI, CSR 12743, CRR
                FEDERAL OFFICIAL COURT REPORTER
24            312 NORTH SPRING STREET, ROOM 435
                LOS ANGELES, CALIFORNIA 90012
25                 MIRANDAALGORRI@GMAIL.COM
```

```
 1                        APPEARANCES OF COUNSEL:

 2

 3    FOR THE PLAINTIFF:

 4         STEPHANIE YONEKURA
           United States Attorney
 5         BY:  KIMBERLY DENISE JAIMEZ
           BY:  EDDIE JAUREGUI
 6         BY:  RYAN WHITE
           Assistant United States Attorney
 7         United States Courthouse
           312 North Spring Street
 8         Los Angeles, California 90012

 9

10    FOR THE DEFENDANT:

11         HILARY L. POTASHNER
           Federal Public Defender
12         BY:  SEEMA AHMAD
           BY:  ASHFAQ G. CHOWDHURY
13         Deputy Federal Public Defender
           Central District of California
14         321 East Second Street
           Los Angeles, California 90012

15

16
      FOR THE VICTIM:
17
           SIDLEY AUSTIN, LLP
18         BY:  DOUGLAS A. AXEL
           BY:  ANAND SINGH
19         555 West Fifth Street
           Suite 4000
20         Los Angeles, California 90013

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

M A S T E R   I N D E X

WEDNESDAY, JULY 8, 2015, 7:57 A.M.

Chronological Index of Witnesses

| Government's Witnesses: | Direct | Cross | Redirect | Recross | Voir Dire |
|---|---|---|---|---|---|
| Burns, Donald | 13 | 38 | 65 | 70 | |
| Griggs, Justin | 74 | 82 | 90 | 91 | |
| Yim, Etienne | 93 | 111 | 119 | 120 | |
| Winning, Michael | 121 | 143 | | | |
| Williams, Benjamin | 144 | 150 | | | |

| Defendant's Witnesses: | Direct | Cross | Redirect | Recross | Voir Dire |
|---|---|---|---|---|---|
| Bumpus, Jason | 155 | | | | |
| Power, Matthew | 160 | 163 | | | |
| Bouman, Jonathan | 164 | 176 | | | |

```
 1                              EXHIBITS

 2

 3            WEDNESDAY, JULY 8, 2015, 7:57 A.M.

 4                               For        In    Withdrawn
 5     Exhibits           Identification Evidence or Rejected

 6     804  E mail dated 12/23/14  40         40

 7     805  Photograph of Donald   57         57
            Burns
 8
       806  Photograph of Donald   58         58
 9          Burns

10     807  3 Photographs of       59         59
            Donald Burns
11
       163  Photo of Ammunition   106        106
12
       126  Toll Records Analysis 129        129
13
       171  Selfie Photos from    134        134
14          Twitter

15     410  E-mail from Deft to    141        141
            Buholtz
16
       411  E-mail from Deft to    141        141
17          Buholtz

18     412  E-mail from Deft to    141        141
            Buholtz
19
       413  E-mail from Deft to    141        141
20          Buholtz

21     159  Photo of Ammunition   149        149

22     160  Photo of Ammunition   149        149

23     161  Photo of Ammunition   149        149

24     162 Photo of Ammunition    149        149

25
```

EXHIBITS CON'T

| Exhibits | | For Identification | In Evidence | Withdrawn or Rejected |
|---|---|---|---|---|
| 164 | Photo of Ammunition | 149 | 149 | |
| 165 | Photo of Ammunition | 149 | 149 | |
| 169 | Photo of Bag with Knife | 149 | 149 | |
| 502 | Stipulation | 155 | 155 | |
| 401 | Custodian of Records Declaration for BOP | 155 | 155 | |

**UNITED STATES DISTRICT COURT**

```
 1              LOS ANGELES, CALIFORNIA; WEDNESDAY, JULY 8, 2015
                            7:57 A.M.
 2                              ---
 3          (The following proceedings were held in
 4       open court out of the presence of the jury:)
 5              THE CLERK:  Day 2 jury trial.
 6              THE COURT:  All right.  All counsel and the
 7    defendant are present.  The jury is not present.
 8          I wanted to start discussing the jury instructions, and I
 9    indicated last evening that I thought that the instructions
10    that had been proposed -- and I'm referring to document 183
11    which was filed on June 15, 2015, that we're going to run into
12    a problem instructing the jury as to the first element that the
13    defendant knowingly sent a communication through interstate
14    commerce containing a true threat without having any definition
15    of a true threat.
16          So have you given any thought as to how we're going to
17    solve that problem?
18              MR. JAUREGUI:  Yes, Your Honor.  Eddie Jauregui for
19    the United States.
20          I have conferred internally within my office.  I have come
21    up with a -- with some language defining true threat.  It
22    actually now tracks pretty closely the language provided by
23    defense counsel.  It's based on the *Bagdasarian* case cited by
24    defense counsel.  It is a little different.  It tracks more
25    closely the language in that case.  I didn't file it last night
```

1  because I was still waiting to hear back from someone in our

2  appeals unit to be perfectly frank.  I've now heard back, and

3  if the Court would like, we can file it today.

4          THE COURT:  Let me take a look at it.

5      Have you seen it?

6          MR. CHOWDHURY:  Yes, Your Honor.  I have seen it.

7          THE COURT:  Your comment?

8          MR. CHOWDHURY:  Your Honor, I just received it a

9  couple minutes ago.  As to the true threat language, it appears

10 to be similar -- largely similar to the true threat language

11 that we have in our disputed Instruction no. 12.

12      One thing I would say is that we still have an issue as to

13 our proposed fourth element which has a language that

14 Government must show that the defendant knew he was not

15 entitled to receive the property.  But as to the objective and

16 subjective standard as to true threat, I think it's relatively

17 similar.  I can take a moment to look at it further.

18          THE COURT:  Well, we're not going to decide today.

19 Well, maybe later on this afternoon.

20          MR. CHOWDHURY:  Sure, Your Honor.

21          THE COURT:  I'm not asking for a decision.  I just

22 wanted to get in general your reaction to it.

23          MR. CHOWDHURY:  Yes.

24          THE COURT:  I'm just looking at it also for the

25 first time.  We can continue our discussions this afternoon.

```
 1    I'll take an additional look at it.  I actually don't like the
 2    words "true threat" because I think -- I guess if we define
 3    it -- why couldn't we substitute for the word -- instead of
 4    using "true threat," if we used the word "wrongful threat"?
 5              MR. CHOWDHURY:  Your Honor, I think that is a
 6    possible fix.  We do have, as you know in disputed Instruction
 7    no. 13, further definition of wrongfulness that the defense has
 8    proposed.  So with that definition and the objective and
 9    subjective standards set out by both parties now, I do think
10    that's a possible fix.
11              THE COURT:  I mean, if we use the first element as
12    the defendant knowingly sent a communication -- and I actually
13    think that it's confusing the way the first element is written,
14    that the defendant knowingly sent a communication in interstate
15    commerce.  I think we should drop the interstate commerce into
16    a separate element to make sure the jury understands that the
17    defendant knowingly sent a communication containing a true
18    threat rather than knowingly sent a communication in interstate
19    commerce.  I think that makes it clear, and then dropping the
20    interstate commerce into a separate element.
21         But if we used the word "wrongful threat," in determining
22    whether a communication is a wrongful threat, you must find
23    that it meets both the objective and subjective standard and
24    then goes through the definitions -- I'll take a look at it.
25         You know, when dealing with jurors, I can just see the
```

```
 1   first note coming out trying to understand what a true threat
 2   is because we all know what it means in the context of the case
 3   law, but common lay person being asked to make a determination
 4   as to what a true threat is may be a problem.  But I think this
 5   works toward a solution.
 6             MR. JAUREGUI:  May I be heard on this quickly?
 7             THE COURT:  Sure.
 8             MR. JAUREGUI:  My understanding, having looked at
 9   the cases, is that the reason true threat was used is because
10   threats that are not true threats are protected by the
11   1st Amendment whereas true threats are not protected by the
12   1st Amendment.
13             THE COURT:  That's true.  We know that as a legal
14   matter, and that's what we're trying to communicate to the
15   jury.  But we also want to communicate it to the jury in a
16   fashion that they can understand it.  And I assume you would
17   agree that a wrongful threat is one that is not protected by
18   the 1st Amendment.
19             MR. JAUREGUI:  Yes, Your Honor.
20             THE COURT:  Okay.  So it's basically the flip.  A
21   true threat just is -- we understand what it means in terms of
22   the law, but in terms of trying to instruct the jury may be
23   problematic.  I'm not ruling now.  I just want to get a sense
24   because I see some issues with respect to the jury instructions
25   which leads me to another question, that is, with respect to
```

**UNITED STATES DISTRICT COURT**

1    the 1951 instruction which is the disputed Instruction no. 13.

2    For purposes of the record, the instruction that we were

3    referring to before is disputed Instruction no. 12.

4        But the Government's proposed instruction with respect to

5    the 1951(a) violation, there is -- the Government indicates in

6    its argument in support of its instruction and against -- in

7    opposition to the defendant's obstruction is that the defendant

8    appears to be relying on an outdated version of the 9th Circuit

9    Model 8.142A which is the current version as approved by the

10   9th Circuit as the June, 2014; that is, with respect to the

11   second element, that the defendant acted with the intent to

12   obtain property which is the Government's proposed instruction.

13       The defendant argues that the -- that takes the wrongful

14   element out of the jury instruction, and you argue that, as I

15   said, that you think the defendant is operating under the old

16   Model which may be true except that you have modified the

17   June, 2013, Model Instruction 8.142A.  But you haven't included

18   the provision in that Model Instruction that a threat is

19   wrongful, and then there's a bracket if it's unlawful or if the

20   defendant knew he was not entitled to obtain the property.

21       The commentary to the Model Instruction indicates that

22   it's unclear in terms of whether or not the Government is

23   required to prove that the defendant knew that he was not

24   entitled to the -- to obtain the property, but the commentary

25   indicates that, until the 9th Circuit decides the question, the

1    Committee recommends the instruction include the wrongful

2    element.

3          So what's the Government's position on that?

4          MR. JAUREGUI:  So, Your Honor, our position is as

5    stated in our brief.  I mean, I think our position is that the

6    commentary misapprehends and misapplies *Villalobos.*  And

7    *Villalobos* says that some attempts to obtain property are so

8    inherently wrongful that, whether the defendant had a lawful

9    claim to the property demanded is not relevant in determining

10   whether extortion or attempted extortion has been proven.

11         THE COURT:  But those cases draw a distinction

12   between the threat of violence and the threat of economic harm

13   or harm to one's reputation, and I think the -- there are cases

14   outside of the 9th Circuit which, in dealing with the economic

15   harm require -- and I think, if my memory serves me -- I left

16   my notes in my desk.  I can't remember which of the Model

17   Instructions I looked at, but there is a wrongful element.

18         So I'm not -- I appreciate an argument that the case that

19   you've referred to you think that the 9th Circuit Jury

20   Committee misapprehended the import of that case, but in

21   absence of some better or more persuasive argument, I think

22   that, in the context of this case, which is clearly as the way

23   the Government's theory is a threat of reputational harm which

24   is the same as the cases outside the Circuit which are dealing

25   with economic harm, that we're going to have to have some

```
 1    instruction with respect to the wrongfulness of the threat.
 2                    MR. JAUREGUI:  Okay.  Understood, Your Honor.
 3         We did provide in our joint memorandum of disputed jury
 4    instructions on page 9, footnote 4 --
 5                    THE COURT:  Wait a minute.
 6                    MR. JAUREGUI:  Sure.
 7                    THE COURT:  All right.
 8                    MR. JAUREGUI:  We did provide an alternate
 9    definition or instruction for wrongfulness.
10                    THE COURT:  That's the one that you've included in
11    the document you gave me this morning?
12                    MR. JAUREGUI:  As I informed Mr. Chowdhury, it's
13    slightly modified, very slightly modified, but it is almost
14    exactly the same.  The change is in the last sentence which now
15    reads "A threat is also wrongful if it is unlawful."  That part
16    is borrowed from the 9th Circuit Model Jury Instruction.  The
17    rest comes from the case I assume the Court is referring to
18    which is United States versus Jackson from the 2nd Circuit
19    Court of Appeal.
20                    THE COURT:  Yes.  That's the Bill Cosby case.
21                    MR. JAUREGUI:  Correct.
22                    THE COURT:  All right.  We will take this up in more
23    detail this afternoon, but at least we're making some progress.
24         We have our jury.  So have your witness come in, and we'll
25    commence the -- resume with Mr. Burns.
```

```
 1            MS. JAIMEZ:  Your Honor, should Government counsel
 2   take the lectern now?
 3            THE COURT:  Sure.
 4        This is not an easy area of the law.
 5            MR. CHOWDHURY:  No.
 6            MR. JAUREGUI:  No, Your Honor.
 7            THE COURT:  The law is not that -- I mean, the law
 8   is complicated, but they're trying to translate the law into
 9   something that makes sense to the jury is where the difficulty
10   comes in.  But we'll get through it.
11        (The following proceedings were held in
12        open court in the presence of the jury:)
13            THE COURT:  All right.  Good morning, ladies and
14   gentlemen.
15        Counsel may resume.
16            THE CLERK:  Sir, please be reminded that you remain
17   under oath.
18            THE WITNESS:  Yes, ma'am.
19            THE COURT:  You may proceed.
20            MS. JAIMEZ:  Thank you, Your Honor.
21                  DIRECT EXAMINATION (RESUMED)
22   BY MS. JAIMEZ:
23   Q    Good morning, Mr. Burns.
24   A    Good morning, Ms. Jaimez.
25   Q    Now, yesterday we discussed your group sex meetings, and
```

```
 1    to clarify, who would come to these meetings?

 2    A     They were adult industry pornographic models.

 3    Q     And, Mr. Burns, how would you typically treat these

 4    pornography models or actors who slept with you?

 5    A     Well, historically I referred to them as adult models, and

 6    I did my best to treat them with respect.  I flew them to and

 7    from my home where the meetings would take place and from time

 8    to time had casual follow-up conversations with them.

 9    Q     Would you typically provide them with financial support?

10    A     Generally no.

11    Q     Were there ever any exceptions to that rule?

12    A     In one or two instances, for example, with Mr. Griggs, he

13    would run into financial difficulty, and I would help him out

14    from time to time with small amounts of money.

15    Q     And looking back now, how much money do you think you've

16    given Mr. Griggs altogether?

17    A     In estimate over the last year would be about $4,000.

18    Q     And to clarify, who is Mr. Griggs to you?

19    A     Mr. Griggs is a person that I had a pay-for-sex -- more

20    than one pay-for-sex meeting with.

21    Q     Were there any other exceptional cases?

22    A     Yes.

23    Q     Can you describe that?

24    A     Mr. Amadon and I, after originally meeting for a

25    pay-for-sex arrangement, became friends and travel companions
```

**UNITED STATES DISTRICT COURT**

```
 1   really now over the course of two years, and I have provided
 2   him continual financial support since late 2013.
 3   Q    And what do you mean when you say "provide financial
 4   support"?
 5   A    I provide him regularly -- regular monthly financial
 6   support for rent and school expenses and living expenses and
 7   things of that nature.
 8   Q    In approximately what amount per month?
 9   A    It's between 4- and $5,000 a month.
10   Q    And in total to date, how much have you provided in
11   financial support to this individual?
12   A    Somewhere over $200,000.
13   Q    That was over what period of time?
14   A    Well, it would have commenced in approximately
15   October, 2013, through and to today.
16   Q    And how would the other pornography actors with whom you
17   slept with receive payment typically?
18   A    If in fact I had a meeting for them that involved payment
19   for sex, they would be paid for that meeting, and then there
20   would be no further payment.
21   Q    So why do you treat Mr. Griggs and Mr. Amadon differently
22   from all of the others?
23   A    Well, with regard to Mr. Griggs, I rather thought of him
24   as a friend.  You know, he shared with me personal details
25   about his life.  He works in a job in his hometown making about
```

1    as much money as I did when I was his age, and it's very

2    difficult to make ends meet in an environment like that.  And I

3    just, you know -- if he asked me, I helped him from time to

4    time.

5    Q    And Mr. Amadon?

6    A    Mr. Amadon is a very different situation.  After that

7    first meeting that involved payment for sex, I guess I was

8    surprised when he said yes, but I invited him to go to Paris

9    with me on a trip with my friends, and he said yes.  And there

10   was no compensation for that trip other than the cost of travel

11   of course.  I had just become separated from a 17-year

12   relationship, and traveling with him was just really a

13   pleasure.  And my friends liked him, and it really distracted

14   me from what else was going on in my life.  And from there I

15   just developed a real friendship with him.

16   Q    Now, how does your relationship with Mr. Griggs and your

17   relationship with Mr. Amadon compare to your relationship with

18   the defendant?

19   A    The relationship with the defendant involved pay-for-sex

20   meetings.  I recall about four to five.  It involves paying him

21   to refer other adult industry models to me and paying him

22   referral fees for that.  And beyond that, we did not travel

23   around the world together.  I didn't give him gifts of any

24   value.  There was just no personal relationship outside casual

25   text conversations and these meetings that I've described and