1  Mr. Burns' cell phone.

2      Mr. Burns reported to the FBI that he believed he was

3  being extorted; right?

4  A    Yes, sir.

5  Q    And his report started the investigation by the FBI in

6  this case.

7  A    The FBI upon receiving the report from Mr. Burns along

8  with Mr. Burns' statement is what we used to initiate the

9  investigation.

10 Q    Okay.  So once you received his report and a statement,

11 you began the investigation?

12 A    Yes, sir.

13 Q    And Mr. Burns reported that demands were being made to him

14 by text message?

15 A    Yes, sir.

16 Q    So you knew that there was potential evidence on

17 Mr. Burns' cell phone?

18 A    Sir, I wasn't present during the first day that Mr. Burns

19 showed up in the office.

20 Q    You met with him on March 6, 2015; right?

21 A    I don't recall.  Is that regarding the cell phone

22 examination or beginning of the investigation, sir?

23 Q    Well, he provided you with his cell phone on

24 March 6, 2015; right?

25 A    You know, I believe it was March 6, but I don't have

```
 1   anything in front of me.
 2           MS. JAIMEZ:  Objection.
 3   Q    BY MR. CHOWDHURY:  Mr. Burns only provided consent for the
 4   FBI to extract text messages and text messages with photographs
 5   from the cell phone; is that right?
 6   A    Mr. Burns provided a consent on a consent to search form
 7   which he signed, and he allowed us to examine or extract text
 8   messages and multimedia messages.
 9   Q    And you're aware one of your colleagues, Agent Parillo,
10   did the original extraction of the text messages and text
11   messages with photos from Mr. Burns' phone; right?
12   A    Yes.  There was -- there was an extraction that was done
13   before I obtained the phone.
14   Q    Okay.  And then, as you said, you yourself conducted a
15   second extraction of Mr. Burns' cell phone?
16   A    Yes, sir.
17   Q    And you only extracted messages between February and March
18   of 2015.
19   A    That's correct.
20   Q    Okay.  Let's talk about the interviews of Mr. Burns.
21        You directly participated in interviews of Mr. Burns.
22   A    Yes, sir.
23   Q    You interviewed him on June 19, 2015?
24   A    I don't recall every date that I interviewed --
25   Q    Or thereabouts?
```

```
 1   A    I've met with him several times in furtherance of
 2   interviews.  So I really don't know a specific -- the specific
 3   dates in which I met with him.
 4   Q    You've met with him multiple times in June; is that right?
 5   A    Once again, I cannot put a number on it.  I'd have to --
 6   Q    More than once?
 7   A    In the month of June, yes, sir.  More than once.
 8   Q    More than twice?
 9   A    I do not know, sir.
10   Q    Agent Bouman, you don't recall if you've met with
11   Mr. Burns more than twice in the month of June?
12   A    It's quite possible I have, sir, but I don't recall the
13   number.
14   Q    You also reviewed reports of interviews with Mr. Burns
15   that were conducted by other FBI agents; is that right?
16   A    Repeat the question, sir.
17   Q    You also reviewed reports of interviews with Mr. Burns
18   that were conducted by other FBI agents?
19   A    Yes, sir.
20   Q    And you're aware that other agents interviewed him on
21   March 3rd, 2015?
22   A    Yes, sir.
23   Q    And on March 6, 2015?
24   A    No, sir.  I'm not aware of an interview on March 6.  I
25   believe that, as I previously cited, that I may have obtained
```

**UNITED STATES DISTRICT COURT**

1    his cell phone on March 6 to do the extraction, but I don't

2    believe that anyone interviewed him on March 6.

3    Q    Your testimony is that there was a meeting with him on

4    March 6, 2015, to obtain his cell phone?

5    A    Mr. Burns, if it was in fact March 6, came to the FBI

6    office with his representation.  I obtained the cell phone from

7    Mr. Burns.  I did the extraction and then provided the cell

8    phone back to Mr. Burns.

9    Q    Now, each time the FBI interviewed Mr. Burns, the FBI

10   learned new information about Mr. Burns' relationship with gay

11   pornography actors; is that right?

12   A    I don't know the answer to that question, sir.

13   Q    Well, the FBI did not learn about Mr. Burns' relationship

14   with Mr. Amadon on March 3rd or March 6; is that right?

15   A    I was not present during the interview on March 3rd, and I

16   did not conduct an interview of that nature on March 6.

17   Q    But you reviewed the reports of those interviews; right?

18   A    Yes, sir.  Well, there was no interview on March 6.

19   Q    On the March 3rd interview, there was no information that

20   Mr. Burns gave about Mr. Amadon; is that right?

21   A    I don't recall the specifics of the report, and I don't

22   recall exactly what it was that he shared with the agents that

23   were present that day.

24   Q    You don't recall?

25   A    No, sir.

```
 1              MR. CHOWDHURY:  May I have one moment?

 2   Q    Agent Bouman, would it help refresh your recollection if I

 3   were to show you the FBI report of that March 3rd, 2015?

 4   A    Yes.  Would you please, sir?

 5              MS. JAIMEZ:  Objection.  Hearsay.

 6              THE COURT:  We don't know what he's using it for

 7   yet.

 8              MR. CHOWDHURY:  Your Honor, may I approach?

 9              THE COURT:  Sure.

10              MS. JAIMEZ:  Objection, Your Honor.  Mr. Bouman was

11   not even present for this particular interview.

12              THE COURT:  So what's the objection?

13              MS. JAIMEZ:  The objection is that it lacks

14   foundation, Your Honor.

15              THE COURT:  That objection is overruled.

16   Q    BY MR. CHOWDHURY:  Mr. Bouman, take a moment and look at

17   that and see if that refreshes your recollection.

18              THE COURT:  Refreshes his recollection about what?

19   He wasn't at the interview.  So your question is going to have

20   to be more specific.

21              MR. CHOWDHURY:  Yes, Your Honor.

22   Q    Mr. Bouman, you testified you did not recall whether the

23   FBI had learned about Mr. Amadon at the original March 3rd

24   meeting; is that right?

25   A    I don't know the specifics about what was shared regarding
```

1  Mr. Amadon during this March 3rd interview.  This is a summary

2  of the pertinent facts of the interview as performed by the

3  agents that were present that day.

4  Q    And you reviewed that report previously?

5  A    I have read the report, but I don't -- I can't recall

6  every detail of this report at this moment.  And it's a

7  four-to-five-page report, sir.

8  Q    Okay.  And you've reviewed it.

9       Does it refresh your recollection as to whether the report

10  mentions anything about Mr. Amadon?

11            MS. JAIMEZ:  Objection, Your Honor.  The agent

12  wasn't there.

13            THE COURT:  Well, that doesn't necessarily mean --

14  what's your ultimate question?  What are you using this report

15  for?

16            MR. CHOWDHURY:  I'm simply asking whether Mr. Bouman

17  is aware if Mr. Burns had disclosed information about

18  Mr. Amadon at the March 3rd meeting.

19            THE COURT:  Well, then you're going to need the

20  agent who wrote the report in order to ask that question

21  because he doesn't know.

22            MR. CHOWDHURY:  That's fine, Your Honor.

23  Q    Now, Agent Bouman, you met with -- strike that.

24       It wasn't until June 30 that Mr. Burns told you about his

25  relationship with Mr. Amadon; is that right?

A    It was a recent interview that we conducted with Mr. Burns
where the name of Mackinzie Amadon was disclosed, but I don't
know exactly when agents in this investigation may or may not
have known about the existence of Mr. Amadon in some way,
shape, or form.

Q    So you're aware that Mr. Burns has told the FBI that he
began his relationship with Mr. Brank in 2013; is that right?

A    Mr. Burns and Mr. Brank's relationship?

Q    Yes, sir.

A    I believe it was in April or May of 2013 that it began.

Q    You're also aware that Mr. Burns reported communicating
with Mr. Brank by text message?

A    Yes, sir.

Q    And that he also communicated with Mr. Brank by e-mail?

A    Yes, sir.

Q    Now, even though you knew that Mr. Burns reported having
interactions with Mr. Brank dating back to 2013, you did not
search Mr. Burns' cell phone for text messages going back to
2013; right?

A    No, sir.

Q    And you didn't have to rely exclusively on Mr. Burns'
consent in conducting your search; is that right?

A    That's incorrect, sir.

Q    Well, you could have sought a search warrant; is that
right?

1    A    We could have sought a search warrant and seized his

2    phone, yes, sir.

3              THE COURT:  Would you get closer to the microphone

4    so we can hear you?

5              THE WITNESS:  I apologize, Your Honor.

6    Q    BY MR. CHOWDHURY:  Can you repeat the answer, please?

7    A    Can you repeat the question, please?

8    Q    The question was you could have sought a search warrant?

9    A    Yes.  We could have.

10   Q    But you chose not to seek a search warrant?

11   A    I don't recall exactly what the decision process was at

12   the time, but we did not obtain a search warrant.

13   Q    So even though you knew that Mr. Burns reported having

14   e-mail communication with Mr. Brank, you didn't conduct any

15   investigation of Mr. Burns' personal computer.

16   A    No, sir.

17   Q    And even though as the case progressed you learned

18   information that Mr. Burns did not himself volunteer, you chose

19   not to seek authorization for a more thorough search of his

20   cell phone?

21   A    I would have preferred to search his cell phone in its

22   entirety, but the search was limited in scope by Mr. Burns.

23   Q    And you never sought authorization to search his computer.

24   A    No, sir.

25   Q    So you have no knowledge about any text messages exchange

1    between Mr. Burns and Mr. Brank prior to February, 2015?

2    A     No, sir.

3    Q     And you have no knowledge about any phone calls between

4    Mr. Burns and Mr. Brank prior to February of 2015?

5    A     Sir, I actually may know of some messages that were shared

6    between Mr. Burns and Mr. Brank from the extraction of the

7    defendant's phone but not from the extraction of Mr. Burns'

8    phone.

9    Q     Because the search of Mr. -- the extraction of Mr. Burns'

10   phone was limited to February to March, 2015.

11   A     Yes, sir.

12   Q     And you have no knowledge of any face-to-face conversation

13   between Mr. Burns and Mr. Brank prior to February, 2015?

14   A     I do not understand the question, sir.

15   Q     Well, you have no personal knowledge of any face to face

16   conversations between Mr. Burns and Mr. Brank prior to

17   February, 2015; is that right?

18   A     Once again, sir, he described in detail his relationship

19   with Mr. Brank, and that's the limits of what I know.

20   Q     The limits of what Mr. Burns told you?

21   A     And again, this is April or May of 2013 you're citing?

22   Q     No.  Prior to February, 2015.

23   A     Well, once again, sir, I received details from the victim

24   Mr. Burns.

25   Q     From Mr. Burns?

**UNITED STATES DISTRICT COURT**

```
 1    A     Yes.
 2              MR. CHOWDHURY:  No further questions, Your Honor.
 3              THE COURT:  All right.  Any cross-examination?
 4              MS. JAIMEZ:  Yes, Your Honor.
 5                        CROSS-EXAMINATION
 6    BY MS. JAIMEZ:
 7    Q     Good afternoon, Agent Bouman.
 8    A     Good afternoon.
 9    Q     Now, how do you typically corroborate crimes reported to
10    you?
11    A     A number of ways.  We initiate an investigation.  We
12    interview people.  We try to collect evidence as it exists as
13    far as we know it.  And there are many more investigative steps
14    that are available to us that we can use if necessary.
15    Q     And did you attempt to corroborate Mr. Burns' report of
16    extortion to you on March 3rd, 2015?
17    A     Yes.
18    Q     Can you outline the steps that you took to corroborate the
19    reporting of this crime?
20    A     Several steps, and it began with the extraction of
21    Mr. Brank's phone and the interview of numerous people that we
22    believed were in some way, shape, or form associated with
23    either Mr. Burns or Mr. Brank or other individuals that have
24    appeared before the Court during the course of this trial.
25    Q     And what was the result of these investigative steps?
```

1    A      Mr. Brank, the defendant, was charged with extortion.

2    Q      Did the investigative steps you took at the time, did they

3    confirm the extortion that had been reported to you?

4    A      I believe they did.

5    Q      Did you also review the defendant's phone --

6               MR. CHOWDHURY:  Your Honor, I'd move to strike the

7    last answer as a legal conclusion, Your Honor.

8               THE COURT:  Well, unfortunately I think you opened

9    the door.  So I'm going to deny the motion.

10   Q      BY MS. JAIMEZ:  Did you also extract messages from the

11   defendant's phone?

12   A      Yes.  As part of the investigation, we extracted messages

13   from the defendant's phone.

14   Q      Did you find anything that did not confirm what you had

15   been previously reported?

16   A      No.  To the contrary.  It actually seemed to prove the

17   existence of the extortion.

18               MR. CHOWDHURY:  Same objection, Your Honor.

19               THE COURT:  That objection is overruled.

20   Q      BY MS. JAIMEZ:  Now, let's discuss the examination of the

21   victim's phone on March 6.  Can you describe how that

22   examination came to be?

23   A      I was made aware by my co-case agents that Mr. Burns was

24   to show up in our office at some time during that day to

25   provide us his phone for the extraction, and prior to the time

1    I obtained the phone, there was another individual in our

2    office who obtained the phone and conducted an extraction.  And

3    when I determined the manner in which the individual went about

4    it by not receiving and having them sign -- Mr. Burns sign a

5    consent form, I then had Mr. Burns sign the consent form to

6    formalize the search, and I conducted the extraction a second

7    time.

8    Q    Was there a limit of some sort to the extraction of

9    Mr. Burns' phone?

10    A    Yes, ma'am.

11    Q    What was the limit?  Do you recall?

12    A    I believe he limited the extraction to dates of

13    February 16 through March 5th, and it was limited to text

14    messages and MMS messages only.

15    Q    And why was the extraction limited?

16    A    Mr. Burns preferred it that way.

17    Q    Did he give any reasons?

18    A    He was concerned about the personal and business

19    information that was obtained in his phone outside of the

20    limits of the dates of the extortion.

21    Q    Now, you mentioned corroborating the evidence of the

22    reported crime here.  Did you issue any subpoenas to

23    corroborate the reported crime?

24    A    Yes.  Several.

25    Q    Did you seek court orders for phone records?

1    A     Yes, ma'am.

2    Q     Did you obtain a search warrant for any social media

3    sites?

4    A     Yes, ma'am.

5    Q     Did you obtain search warrants for other telephones

6    related to the investigation?

7    A     Yes, ma'am.

8    Q     Did you conduct any other extractions of other telephones

9    in this case?

10   A     Yes.  Yes, ma'am.  We did.  Mr. Griggs' phone.

11   Q     Mr. Griggs' phone.  What was the result of that

12   extraction?

13   A     Well, it was from that phone which we found the screenshot

14   which had the tweet which, for all intents and purposes, began

15   the extortion.

16   Q     So the subpoena phone records, search warrants, and other

17   extractions, what was the conclusion of all of these

18   investigative steps?

19   A     That the defendant extorted Mr. Burns.

20            MR. CHOWDHURY:  Objection, Your Honor.  Calls for a

21   legal conclusion.

22            THE COURT:  That objection will be sustained.  I'll

23   entertain it as a motion to strike.  The motion is granted.

24   The jury is to disregard the last answer.

25   Q     BY MS. JAIMEZ:  Now, when did the FBI find out about --

1  let me strike that.

2      How did the FBI learn about the details concerning

3  Mr. Burns' relationship with Mr. Amadon?

4  A    It was during an interview -- no.  Correction.  We learned

5  about it because we received a subpoena that -- information

6  about a subpoena from an attorney that was representing

7  Mr. Amadon, and the attorney directly contacted us after

8  Mr. Amadon, his client, received the subpoena, and the subpoena

9  was delivered to them by the defense.

10 Q    But prior to that, had the defendant mentioned supporting

11 anyone financially in -- I'm sorry.  Had the victim,

12 Donald Burns, mentioned supporting someone --

13             MR. CHOWDHURY:  Your Honor, I object to the

14 characterization of Mr. Burns as the victim.

15             THE COURT:  The objection is sustained.

16             THE WITNESS:  Yes.  Yes.  Mr. Burns --

17             THE COURT:  The objection was sustained.  You can't

18 answer the question.  Let's have another question.

19 Q    BY MS. JAIMEZ:  So prior to having information about the

20 subpoena you mentioned, had Mr. Burns mentioned financially

21 supporting anybody?

22 A    Yes.  We were aware that he was financially supporting an

23 individual, but Mr. Burns had indicated clearly that he didn't

24 want to involve that individual in the investigation.

25 Q    And why didn't he want to involve that individual?

1  A    Out of personal concerns for the individual's privacy.

2  Q    Did Mr. Burns provide the details concerning the

3  relationship early on in the investigation?

4  A    I'm not aware of the extent at this time.  Again, I would

5  have to review the report.

6        MS. JAIMEZ:  One moment, Your Honor.

7  Q    Agent Bouman, are you aware -- you've reviewed several of

8  the reports; correct?

9  A    Yes, ma'am.

10 Q    Do you remember seeing references to an unidentified male?

11        THE COURT:  You're going to open up a line of

12 questioning that I precluded based upon the defense's offer of

13 this report?

14        MS. JAIMEZ:  Not that report, Your Honor.

15        THE COURT:  No.  You're going to go to another

16 report -- did he write the report?

17        MS. JAIMEZ:  This particular report that I'm

18 referring to I'd have to --

19        THE COURT:  Well, if he didn't write the report,

20 then you're asking me to allow questioning that I prevented the

21 defense from asking.

22        MR. JAUREGUI:  Your Honor, may we confer for ten

23 seconds?

24        THE COURT:  Sure.

25        (Counsel confer.)

```
 1   Q    BY MS. JAIMEZ:  Okay.  Just a few more questions,
 2   Agent Bouman.
 3        Did Mr. Burns, the witness in this case, did he ever
 4   refuse to answer any questions that you have offered him
 5   concerning specifically Mr. Amadon?
 6             THE COURT:  You're going to have to restate the
 7   question.  It doesn't make any sense.  Questions that you
 8   offered him, what does that mean?
 9   Q    BY MS. JAIMEZ:  Agent Bouman, has Mr. Burns, during the
10   time that you've interviewed him, did he ever refuse to answer
11   any of your questions?
12   A    He was cooperative throughout the investigation.
13             THE COURT:  No.  The question was simply yes or no.
14   Do you have the question in mind?
15             THE WITNESS:  I don't know.
16   Q    BY MS. JAIMEZ:  Did he provide information about
17   Mr. Amadon when asked directly?  Did Mr. Burns provide
18   information about Mr. Amadon when asked directly?
19   A    Yes, he did.
20             MS. JAIMEZ:  Thank you.  No further questions.
21             THE COURT:  Any additional questions?
22             MR. CHOWDHURY:  No, Your Honor.  Thank you.
23             THE COURT:  May this witness step down?
24             MS. JAIMEZ:  Yes, Your Honor.
25             MR. CHOWDHURY:  Yes.
```

**UNITED STATES DISTRICT COURT**

1              THE COURT:  You may step down.

2        Call your next witness.

3              MS. AHMAD:  The defense rests, Your Honor.

4              THE COURT:  Any rebuttal case?

5              MR. JAUREGUI:  No, Your Honor.

6              THE COURT:  All right.  Ladies and gentlemen, that

7    concludes the evidence in this case.  We're normally going

8    until 2:00 o'clock, but we're going to have to discuss jury

9    instructions, and I need to give counsel some time to prepare

10   their closing arguments.  We're ahead of schedule in the case.

11   So we're going to recess early today.

12        Tomorrow we'll commence at 8:00 o'clock.  You will hear

13   the closing arguments of counsel, and I will give you the

14   Court's instructions, and then you will have the case to begin

15   your deliberations.

16        As I indicated to you on Tuesday, your hours are going to

17   change.  You're going to be expected to be here until at least

18   4:00 o'clock tomorrow while you deliberate, and we'll have

19   lunch brought in.

20        I expect that you would have the case somewhere around

21   10:00 o'clock to begin your deliberations.  So I appreciate

22   everybody's efforts in being here on time this morning.  It

23   allowed us to almost start on time.

24        In any event, I want to remind you of the instruction that

25   I've given you, and that is you're not to discuss this case

1   with anyone including your fellow jurors, members of your

2   family, or anyone else, nor are you permitted to instruct

3   others to discuss this case with you.

4       And again, I can't emphasize more strongly that I have

5   issued and will continue to remind you of the order that I made

6   yesterday, and that is that you are not permitted to look --

7   you're not permitted to search on Google or any other source of

8   information -- and there are so many for me to list them all.

9   I probably don't know what they all are.  But any forms of

10  investigation.  You can only consider the evidence that's been

11  presented in this case.

12      I know that everybody has access.  You can search

13  something on Google with your iPhone, but you cannot do that

14  because it's unfair to the parties because the parties don't

15  know what you're looking at and, as I indicated yesterday, if

16  you do violate my order, that means that I have to declare a

17  mistrial.  So it's very, very important that you don't obtain

18  any information whatsoever outside the evidence that's

19  presented during the course of this trial.

20      So with that, have a safe journey home, and we will see

21  you tomorrow at 8:00 a.m.

22      (The following proceedings were held in

23      open court out of the presence of the jury:)

24          THE COURT:  All right.  The jury is not present.

25  We're going to take a 45-minute recess, and we'll come back

**UNITED STATES DISTRICT COURT**

1    here at 1:45.  I still have continuing concerns about the jury

2    instructions.  So I want to finalize, as I'm sure you do, the

3    jury instructions so you will know what the jury instructions

4    will be so you can prepare your closing arguments.

5         All right.  So we'll see you at 1:45.

6         (A recess was taken at 12:55 p.m.)

7              THE COURT:  All right.  We're on the record.  All

8    counsel and the defendant are present.  We'll go over the jury

9    instructions.

10        I provided you -- each counsel with a copy of the Court's

11   Instruction no. 12 and Court's Instruction no. 13 which we'll

12   discuss at an appropriate time, sooner than later.  But I just

13   wanted to give you a heads up because it's hard to visual these

14   instructions.

15        I think the easiest way do this is for me to indicate what

16   my rulings are with respect to the jury instructions that are

17   set forth in document no. 182.  I just think that's the easiest

18   way to do it, and I'll let you go ahead and make whatever

19   record you want to make.

20        With respect to Count 1 of the Indictment, Count 1 charges

21   the 18 United States Code Section 875(d), and that's the

22   instruction that I have drafted which I've given to you as

23   Court's Instruction no. 12, and that's based upon the document

24   that I received this morning from the Government which included

25   a definition of "true threat" and also a proposed jury

1    instruction with respect to "wrongfulness."

2        What I have done is the following.  The Court's

3    instruction for Count no. 1, which is the -- as I said, the

4    violation of 875(d), incorporates a wrongful element in

5    accordance with two cases admittedly out of Circuit.  But it's

6    *United States versus Coss*, C-o-s-s, at 677 F.3d 278 which is a

7    6th Circuit 2012 case; *United States versus Jackson* which is a

8    case at -- out of the 2nd Circuit.  It's 180 F.3d page 55.  And

9    then a District Court of Arizona case which is *United States*

10   *versus Klos*, K-l-o-s, at 212 Westlaw 412, 043, all of which

11   have determined that 875(d), like 18 United States Code Section

12   1951, has a wrongfulness element.

13       In the joint memorandum of law, the Government cites to

14   *Coss* as authority for its proposed Instruction no. 12 on 875(d)

15   yet doesn't acknowledge that *Coss* had a wrongful element in

16   875(d).

17       So the Government now, at least it appears to concede,

18   that it must prove wrongfulness and that the defendant is

19   entitled to a claim of right instruction in the context of 1951

20   instruction as demonstrated by its new proposed jury

21   instruction on wrongfulness that was submitted this morning,

22   but that instruction was silent with respect to the

23   wrongfulness element of Count 1.  So I have drafted Court's

24   Instruction no. 12 accordingly.

25       I also agree with the defendant, and based upon the

```
 1    Government's submission this morning, conclude that it must
 2    agree that the true threat has both an objective and subjective
 3    standard.  And although the 9th Circuit has never specifically
 4    held that a threat under 875(d) requires an objective analysis
 5    in addition to the subjective analysis, other Circuits have
 6    required that element.
 7         And as I didn't have with me this morning, what I was
 8    referring to is the model 11th Circuit instruction that the
 9    Government cites in support of its proposed instruction which
10    is the 11th Circuit Pattern Instructions -- it was 18-30.4 --
11    defines true threat using an objective test.
12         I adopt the Government's definition of true threat as it
13    comports with the 9th Circuit definition in United States
14    versus -- and the last name is B-a-g-d-a-s-a-r-i-a-n,
15    652 F.3d 1113 which addressed the definition of true threat for
16    the purposes of section 879(a)(3).
17         I've also, as you'll see in Court's Instruction no. 12, I
18    changed the Government's definition of "intent to distort."
19    You can see how I have changed that.  I think that definition
20    that I've included more accurately tracks the statute than the
21    Government's definition and also incorporates the wrongfulness
22    element.  Because it incorporates the wrongfulness element, the
23    Court believes it is duplicative and unnecessary to use
24    defendant's instruction that reads "Defendant sent the
25    communication with the intent to obtain property that the
```

1    defendant knew that he was not entitled to receive."

2        So that's the instruction that I propose to give with

3    respect to Count 1.

4        The freestanding definition that I intend to include for

5    the definition of wrongful, which will apply to Counts 1, 2,

6    and 5, is set forth in what I've given you which is the Court's

7    Instruction no. 13.

8        Does anybody have any objection to either of these

9    instructions?

10            MR. JAUREGUI:  Your Honor, just for the record, I

11   would like to note that the Government doesn't concede that the

12   defendant is entitled to a claim of right instruction in this

13   case.  We -- docket no. 183, which is the memorandum on the

14   joint jury instructions, sets out the Government's position at

15   page 6 through 9.

16            THE COURT:  Well, then how can you submit the

17   definition of wrongfulness which indicates that a threat to

18   publicly disclose a person's sexual secrets or indiscretions is

19   wrongful where the claim for money or property to which the

20   defendant had no right and could not reasonably believe he had

21   a right or which he had no nexus, that is, no connection to a

22   legitimate claim for money?  That's the claim of right.

23            MR. JAUREGUI:  I see.  So the instruction that the

24   Government submitted includes both the claim of right defense

25   and a definition of wrongful.  That's the issue.  When we

1    submitted that instruction, Your Honor --

2                THE COURT:  Which instruction?

3                MR. JAUREGUI:  The proposed instruction on

4    wrongfulness.

5                THE COURT:  When?  This morning?

6                MR. JAUREGUI:  Yes.  It was -- I believe I said on

7    the record this morning that we were submitting that

8    instruction in the event that the Court decided that the

9    defendant was entitled to a claim of right defense.

10                THE COURT:  Right.  I'm concluding that he is.

11                MR. JAUREGUI:  Okay.

12                THE COURT:  So you don't have any problems with my

13    definition of wrongfulness in Court's Instruction no. 13?

14                MR. JAUREGUI:  I do not.

15                THE COURT:  Okay.  What about Court's Instruction

16    no. 12?

17                MR. CHOWDHURY:  Your Honor -- I'll let the

18    Government proceed.

19                MR. JAUREGUI:  No objection to the instruction --

20    Court's Instruction no. 12, Your Honor.

21                MR. CHOWDHURY:  Your Honor, we have no objection to

22    Instruction no. 12.  The only point I would raise -- and maybe

23    the Court is going to get to it as to the question this raises,

24    at least in our minds, is we define true threat in

25    Instruction no. 12, and I'm not sure what the language will be

**UNITED STATES DISTRICT COURT**

```
 1   that we use in Counts 2 and 5.  But just looking at
 2   Government's proposed Count 2, the first one talks about a
 3   wrongful threat.
 4        So we have two terms out there.  I know the Court had
 5   highlighted this concern.  There's a true threat that's going
 6   to be defined, and then there's this wrongful threat that's
 7   also going to have a tie back to the wrongfulness freestanding
 8   definition 13, Court's definition.  Now, I do think, upon
 9   looking at the Court's ruling, I recognize that we did not, in
10   the memorandum or in the proposed orders, suggest the true
11   threat definition on Counts 2 and 5.  But I do believe, looking
12   at the Court's ruling, that the true threat definition should
13   apply on Counts 2 and 5 because it is precisely the same type
14   of threat.  It's a threat to reputational harm just as it
15   stated in Count 1.
16             THE COURT:  Now you're going to 2 and 5?
17             MR. CHOWDHURY:  Well, yes, Your Honor.
18             THE COURT:  Why don't we save that because I'm
19   trying to do them in piecemeal here.
20             MR. CHOWDHURY:  That's fine, Your Honor.
21             THE COURT:  So do you have an objection to 12 or 13?
22             MR. CHOWDHURY:  Your Honor, no objection as to 12.
23   If I can have one moment on 13.
24        Your Honor, we would simply propose that our instruction
25   we believe more closely tracks the claim of right defense as
```

**UNITED STATES DISTRICT COURT**

1   it's been set out in the cases in the 9th Circuit.  I

2   understand that there is some language about this nexus to a

3   legitimate claim for money or property, but we do think that

4   the claim of right defense, especially as set out in 8.142A, is

5   a simpler argument that the threat is wrongful only if the

6   defendant knew he was not entitled to obtain property.  We

7   would suggest putting the period there and not have the

8   remaining clause following.  That's in line with what we

9   proposed in disputed Instruction no. 13, Your Honor.

10            THE COURT:  All right.  Well, unfortunately I

11   brought out with me the old Model Instruction, the 8.142A.

12            MR. CHOWDHURY:  I have a copy if the Court would

13   like.

14            THE COURT:  No.  I have it.  This is the June one.

15       So you're proposing we use the language that a threat is

16   wrongful if the defendant knew he was not entitled to the

17   property?

18            MR. CHOWDHURY:  Yes, Your Honor.  And so I think

19   that makes -- that is a way to perhaps avoid some confusion.

20   We're just adopting the Model 9th Circuit definition.  It's a

21   simple sentence.  That would apply to Counts 1, 2, and 5.

22            THE COURT:  What's the Government's position on

23   that?

24            MR. JAUREGUI:  We do not agree with that,

25   Your Honor.  We think Instruction no. 13 as set out -- Court's

```
 1   Instruction no. 13 is wholly appropriate, especially in light
 2   of United States versus Jackson which the Court is very
 3   familiar with.
 4        Also, the Model Jury Instruction is not what defense
 5   counsel purports it to be.  It says a threat is wrongful if it
 6   is unlawful or if the defendant knew he was not entitled to
 7   obtain the property.  So cutting it at obtain the property
 8   doesn't track the 9th Circuit.
 9             THE COURT:  But that doesn't make any sense.  That's
10   why I've taken that sentence out of your wrongfulness
11   instruction.  A threat is also wrongful if it's unlawful.  I
12   don't know what that means.
13             MR. JAUREGUI:  Right.
14             THE COURT:  But I'll consider that tonight, and I'll
15   give you my ruling in the morning.
16             MR. JAUREGUI:  Okay.  Just to be clear, the
17   Government is in accord with Court's Instruction no. 13.
18             THE COURT:  Okay.  So whatever I decide on Court's
19   Instruction 13, it's going to apply -- that definition is going
20   to apply to Counts 1, 2, and 5.  2 and 5 are the ones we
21   haven't discussed yet.  So let me move there.
22        The first -- the next issue that I have though -- all
23   right.  This is Count 2.  This is the 1951(a) count.  Here's my
24   ruling on this disputed Jury Instruction no. 14.
25        Except for one modification, I'm going to give the
```

1    Government's proposed no. 14 because it parallels the

2    9th Circuit's Model Instruction that I just referred to 8.142A

3    relating to Hobbs Act extortion except that it does not include

4    the definition of wrongful within the instruction because it's

5    going to be a freestanding instruction on wrongfulness.

6          In addition, I'm going to modify the first element of the

7    Government's proposed instruction.  So it's going to read,

8    first, the defendant induced Donald Burns to part with property

9    by the wrongful use of fear, specifically by wrongful threat of

10   reputational harm.  And the reason I'm doing that is that's

11   what more closely tracks the way that Count 2 in the first

12   superseding Indictment reads because it indicates -- in the

13   first superseding Indictment, it's induced by the wrongful use

14   of fear.  So I think that more properly characterizes element

15   no. 1.  So that's how I'm going to change that.

16         Any objections?

17              MR. CHOWDHURY:  No objection, Your Honor.

18              MR. JAUREGUI:  None from the Government, Your Honor.

19              THE COURT:  All right.  The next issue that I

20   have -- and I think that this needs some focus because we have

21   the Government's proposed Instruction no. 15, and Instruction

22   no. 15 purports to define affecting interstate commerce, but we

23   have two different forms of an expression in the statute as

24   well as the Indictment in terms of the interstate commerce

25   requirement.

1        Count 1 charges that the -- with the intent to extort

2   money and things of value from the victim, knowingly

3   transmitted in interstate or foreign commerce telephone

4   communications and electronic text.  So that is one description

5   of the interstate commerce.

6        And then in Count 2 and in Count 5, the 1951, there is a

7   different description, and that is that knowingly with the

8   intent to obtain property obstructed, delayed, and affected

9   commerce and the movement of articles and commodities in

10  commerce.

11       So it seems to me that the Government's proposed

12  Instruction no. 15 re affecting interstate commerce, that

13  definition or that instruction is only applicable to Counts 2

14  and 5, and it's not Count 1 which it appears that that's a

15  different requirement, and that's a requirement that it's a

16  transmission in interstate or foreign commerce.

17       So what I propose to do is to define interstate commerce

18  in a standalone instruction, and it's defined at

19  18 United States Code Section 10, and that provides that

20  interstate commerce includes commerce between one state

21  territory possession or the District of Columbia or another

22  state territory possession or the District of Columbia -- we

23  don't need that.  But the definition would be -- would apply to

24  all counts that include interstate commerce as an element.

25       The Court proposes to add the Government's proposed

1   instruction on interstate commerce to affecting interstate

2   commerce as a separate paragraph in the two Hobbs Act

3   instructions which cover the elements.

4      So let me have your thoughts on this interstate commerce

5   because this is -- I think this is a lot to do about nothing,

6   but it concerns me with respect to the differences in the

7   language.

8         MR. CHOWDHURY:  Your Honor, to be frank, this wasn't

9   an issue that we had focused on yet.  I suggest that we could

10  take a look at the first superseding Indictment one more time

11  and then just give our thoughts to the Court in the morning.

12        THE COURT:  It's not going to be in the morning

13  because I'm going to draft these instructions or finalize these

14  instructions tonight.  So you can meet and confer.  But it

15  seems to me, if we just have one definition of interstate

16  commerce, then we're better off.  So I'll let you guys work on

17  that, and then get me something by close of business today.

18        MR. CHOWDHURY:  Yes, Your Honor.

19        MR. JAUREGUI:  Your Honor, may I note one thing

20  about the Hobbs Act?

21        THE COURT:  Yeah.

22        MR. JAUREGUI:  The statute and the Indictment both

23  say commerce only and not interstate commerce.

24        THE COURT:  Right.  So what's -- so you don't think

25  there's an interstate commerce element?

**UNITED STATES DISTRICT COURT**

```
 1              MR. JAUREGUI:  Like Mr. Chowdhury, I'll be frank and
 2    say --
 3              THE COURT:  Because then I don't understand what
 4    your proposed Instruction no. 15 was supposed to be designed to
 5    accomplish because I -- I mean, I read --
 6              MR. CHOWDHURY:  Your Honor, I've conferred with my
 7    counsel here.  The Court's proposal is to the one definition to
 8    interstate commerce.  That is fine with defense.
 9              THE COURT:  You're going to have to speak up.  You
10    folks have to learn to -- you know, my hearing is not the best,
11    but even if I have excellent hearing, you have to get next to
12    these microphones because the acoustics from up here -- I can't
13    hear you.
14              MR. CHOWDHURY:  My apologies, Your Honor.
15          I have just spoken with co-counsel.  We have no problem
16    with the Court's proposal in terms of the interstate commerce
17    definition that the Court described just now.
18              THE COURT:  What about the Government?
19              MR. JAUREGUI:  Your Honor, I think, if we can just
20    take a look at it, we can get something to the Court by the
21    close of business.  You know, I don't want to rush an answer.
22    1951 does have a definition of commerce, and it's 1951(b)(3).
23              THE COURT:  Yeah.  That pretty much tracks Title 18
24    United States Code Section 10 which I just read, but it does
25    have a -- I mean, if you read (b)(3), it's pretty clear what
```

1    they're talking about is interstate commerce.  Otherwise,

2    they -- admittedly they don't use the word "interstate

3    commerce," but I think it's pretty clear.  And also, the nexus

4    for federal court jurisdiction is going to be the interstate

5    commerce.

6         You can submit something.  I'll give you an opportunity to

7    do so.  It's bothered me because the way that you've -- you've

8    properly tracked the statute, but the statutes are different.

9    And I don't want the jury to become confused on this kind of an

10   issue.  Enough said for that.

11        MR. JAUREGUI:  Thank you, Your Honor.

12        THE COURT:  Then the next instruction is the

13   disputed Instruction no. 16, and this relates to Counts 3 and

14   4, and my ruling on this is going to be as follows:

15        The Government and defendant essentially agree on the

16   elements of Counts 3 and 4 but disagree as to the manner in

17   which the instruction is worded.  The Court concludes that the

18   Government's instruction is a more accurate reflection of the

19   statutory elements and that the proposed element -- defendant's

20   proposed element no. 3 that the defendant knew he was receiving

21   money or property allegedly at the time it was transferred to

22   him does not correctly state the law.

23        Section 880's requirement that the defendant know that the

24   property was unlawfully obtained applies not only to receipt of

25   the money or property but also to possession, concealment, and

1    disposal.

2        In addition, the Court believes that the defendant's claim

3    of right paragraph is unnecessary because it's certainly one of

4    the elements that the Government must prove is that the

5    defendant knew the money or other property had been unlawfully

6    obtained.  This, in my view, eliminates any claim of right.

7        Accordingly, I'm going to give the Government's

8    proposed 16.  However, I believe that element no. 3 in the

9    Government's proposed instruction should be eliminated, and

10   that is that the offense is punishable by imprisonment for more

11   than one year.

12       What does that have to do with it?

13            MR. JAUREGUI:  It's one of the elements.

14            THE COURT:  That's a question of law that I don't

15   think has to go to the jury.

16            MR. JAUREGUI:  Right.  We're okay with that.

17            THE COURT:  All right.  Then the next would be

18   Count 5.  This is the attempted extortion, and here's my -- I'm

19   going to conform the first element of Count 5 to Count 2 and

20   include that it's by -- the first element is defendant intended

21   to induce Burns to part with property by the wrongful use of

22   fear, specifically by wrongful threat of reputational harm to

23   be consistent with the language of the Indictment.

24       I think the Government left out -- because this Count 5 is

25   the attempted extortion.  You left out the language that, with

```
 1    respect to the mere preparation is not a substantial step

 2    toward committing the crime that constituted a substantial

 3    step -- that paragraph that goes along with the attempt.  There

 4    is no attempt language in your Instruction no. 17.

 5            MR. JAUREGUI:  I'm looking at Instruction 8.142A,

 6    Your Honor.  You are correct, and we have no objection to

 7    adding that language in.

 8            THE COURT:  Okay.  So I'm going to give the

 9    Government's instruction except it will also include the mere

10    preparation paragraph that we just discussed.

11        Then Count 6, the ruling is going to be as follows: This

12    is disputed Instruction no. 18 which relates to the elements of

13    Count 6.  The parties agree on the elements of this crime but

14    merely disagree over the wording.  The Court will give the

15    Government's proposed 18 as it tracks the 9th Circuit's Model

16    8.144 as modified for attempt, and I conclude that it's a

17    clearer statement of the law than the defendant's proposed

18    instruction.

19        The Court believes that the defendant's clarification that

20    1952(a)(3) requires that the defendant intended to conduct an

21    unlawful activity at the time that the facility or interstate

22    commerce is used is unnecessary, and it's encompassed within

23    the Government's proposed instruction.  So that will be the

24    ruling on that.

25        And then we don't have any issues any longer with Count 7.
```

**UNITED STATES DISTRICT COURT**

1          MR. CHOWDHURY:  Your Honor, on Count 6, just a

2    question about the first element.  I know this wasn't something

3    that was raised by either party earlier.  I do think that we're

4    going to end up with questions about the laws of the state of

5    California since we don't have anything about that here.  So

6    our proposal, just to avoid any confusion, would be to track

7    the extortion offenses to Counts 1, 2, and 5.

8          THE COURT:  So you're proposed to take the extortion

9    offenses in violation of the laws of the United States?

10          MR. CHOWDHURY:  Yes, Your Honor.

11          THE COURT:  Does the Government agree?

12          MR. JAUREGUI:  May I confer with co-counsel here?

13          THE COURT:  Sure.

14      (Counsel confer.)

15          MS. JAIMEZ:  Your Honor, the Government would prefer

16    to leave the instruction as is because it follows the law,

17    Your Honor.

18          THE COURT:  It does what?

19          MS. JAIMEZ:  We would prefer -- it follows the

20    statute specifically to the extent the use of a facility of

21    interstate commerce facilitates any type of unlawful activity,

22    whether the state unlawful activity or federal, and by tieing

23    it simply to these counts, Your Honor, we're narrowing the

24    offense from the conduct that the statute encompasses.  The

25    Government would be prepared to provide an instruction with

1    respect to state law if that would be helpful.

2          THE COURT:  Well, I don't know if it's going to be

3    helpful, but I agree with counsel that the jury is going to

4    come out and say, okay, what's the law of the state of

5    California that's involved in this instruction, and then what

6    are we going to tell them?

7          MS. JAIMEZ:  Notably the law is very similar to what

8    the law was in the *Jackson* case where it notes that the

9    New York law included the definition of extortion to include

10    fear caused by a threat to expose a secret.  California law

11    also has very similar language in Penal Code 519.  And so we'd

12    want to be able to include that language here because to a

13    certain extent it's broader and more specific to this case, and

14    we would want to carve that language out when clearly it

15    applies under the language of the statute.  The statute allows

16    for the use of -- criminalizes the use of an interstate

17    facility in connection with an unlawful activity defined under

18    California law as well as under federal law.

19          THE COURT:  Why didn't you do that in your proposed

20    instruction that you submitted on June 15?

21          MS. JAIMEZ:  It was an oversight, Your Honor.

22          THE COURT:  Well, you can go ahead and submit

23    something, but I can tell you right now that I doubt I'm going

24    to include it.  But go ahead and submit something.

25          MS. JAIMEZ:  Thank you, Your Honor.

```
 1              THE COURT:  All right.  So those are the Court's
 2   rulings with respect to the jury instructions.  I'll take
 3   responsibility for preparing the instructions in final form.
 4   So I'll have a copy for counsel in the morning.
 5         How long are you going to need for closing arguments?
 6              MR. CHOWDHURY:  Your Honor, I believe ours will be
 7   15 to 20 minutes.
 8              THE COURT:  Okay.  And the Government?
 9              MS. JAIMEZ:  30 to 45 minutes, Your Honor.
10              THE COURT:  Is that opening and close?
11              MS. JAIMEZ:  The rebuttal will determine on --
12              THE COURT:  I can't hear you.
13              MS. JAIMEZ:  The rebuttal will depend largely on
14   what is said by the defense.
15              THE COURT:  I'm asking for a time estimate.
16              MS. JAIMEZ:  45 minutes --
17              THE COURT:  And then you can use those 45 minutes
18   however you choose to use them.  I don't care if you do a
19   5-minute opening and a 40-minute rebuttal.  I just want to know
20   how much time you reasonably estimate you're going to need for
21   your entire argument.
22              MS. JAIMEZ:  45 minutes, Your Honor.
23              THE COURT:  Okay.  The Court has a couple of rules
24   with respect to closing arguments.  To the extent counsel are
25   going to use any PowerPoint presentations, you're to disclose
```

1   those PowerPoint presentations to opposing counsel.  And if

2   there are any objections, you can file something or -- you can

3   file something today.

4       I don't allow counsel to display the jury instructions on

5   the elmo to the jury.  You can refer to the instructions.  You

6   can read from -- I don't want you to sit there and read the

7   instructions.  You can use bullet points and some form of the

8   instructions or pick out more important instructions, but we're

9   not going to just sit -- we're not going to just put an

10  instruction on the elmo for the jury.

11      I also -- the other question that I have is I typically

12  don't like to send the Indictment into the jury room, but given

13  the way that we have so many different charges in this case, I

14  think it's going to be necessary for the jury to have a copy of

15  the first superseding Indictment.

16      What I'm going to do is I'm going to redact the first

17  superseding Indictment and only -- and the redacted version

18  will only have Counts 1 through 6 because Count 7 has been

19  dismissed, and the forfeiture we will deal with by a Court

20  trial.

21          MR. JAUREGUI:  I'm sure the Court is going to do

22  this already, Your Honor, but the cover page also lists the gun

23  count.  So it would need to be redacted from that caption as

24  well.

25          THE COURT:  Since you have this on -- in a document

```
 1    that can be easily edited, why don't you -- why doesn't the
 2    Government prepare the redacted Indictment because, if I do it,
 3    it's going to look like -- it's going to be done with white
 4    out.  So why don't you prepare a redacted first superseding
 5    Indictment that eliminates the Count 7 language and the
 6    forfeiture language.
 7         And I never include the signature page because I've had
 8    jurors come out and ask if the Indictment is invalid because
 9    there's no signature of the foreperson.  So when you're doing
10    it, you can just end it at page 7.
11              MR. WHITE:  What I've done -- Ryan White for the
12    record speaking for the first time in the case.
13         What I've done in past trials is prepared -- rather than
14    redacting, prepared a trial Indictment for the jury.
15              THE COURT:  That's fine.  So you just basically
16    copy?
17              MR. WHITE:  I take out Count 7, take out the
18    forfeiture count, remove the signature page, call it trial
19    Indictment, remove the inappropriate references to the count,
20    and it will be a clean document that way.
21              THE COURT:  That's fine.  Is that agreeable with the
22    defense?
23              MR. CHOWDHURY:  Yes, Your Honor.
24              THE COURT:  Okay.  Unless there's anything else, why
25    don't we plan to get together at 7:45 tomorrow, and any
```

```
 1    additional rulings that I need to make on these jury
 2    instructions I'll make at that time.
 3              MR. CHOWDHURY:  Your Honor, just one question about
 4    the PowerPoint disclosure.  By when would the Court want any
 5    disclosure to happen?
 6              THE COURT:  Well, today.  Is somebody going to use a
 7    PowerPoint?
 8              MS. JAIMEZ:  The Government is, Your Honor.
 9              THE COURT:  Do you have it done?
10              MS. JAIMEZ:  Not completely.  It has to be revised
11    based on these proceedings.
12              THE COURT:  When is it going to be ready?
13              MS. JAIMEZ:  By close of business.  Around 6:00 p.m.
14    or so.
15              THE COURT:  So that's the answer.
16              MR. CHOWDHURY:  That's fine, Your Honor.  We have
17    considered using a PowerPoint.  We haven't decided.  If we do
18    use one, we will disclose it.
19              MR. JAUREGUI:  Your Honor, two really quick things,
20    Your Honor.  I'm a little unclear as to what exactly Mr. Lemon
21    said about immunity, and I just want to make sure for the
22    record that we're clear that the Government has provided no
23    immunity whatsoever to Mr. Yim.  We obviously have a plea
24    agreement with him, but after conferring with Mr. White, we had
25    a little bit of confusion about maybe Mr. Lemon saying
```

1    something about immunity.  And we just wanted to make sure it

2    was clear there's no immunity at all, not for drugs or anything

3    else.  It's just the plea agreement we have with him.

4              THE COURT:  Okay.

5              MR. JAUREGUI:  And question, Your Honor, about

6    whether the Court will preinstruct before closing.

7              THE COURT:  No.

8              MR. JAUREGUI:  That's it.  Thank you.

9              THE COURT:  Thank you very much.

10        (Proceedings concluded at 2:35 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5              I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

7    THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

8    PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

9    FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13   THE UNITED STATES.

14

15                    DATED THIS  22ND  DAY OF JULY, 2015.

16

17

18              /S/ MIRANDA ALGORRI

19              MIRANDA ALGORRI, CSR NO. 12743, CRR
                FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**